IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

John Fautenberry,

      Petitioner,

                        Case No. 1:00-cv-332

      v.                   JUDGE GRAHAM
                        Magistrate Judge Kemp

Betty Mitchell, Warden,

      Respondent.

**<u>OPINION AND ORDER</u>**

This is an action for habeas corpus relief filed pursuant to 28 U.S.C. §2254 by petitioner, John Fautenberry. In an opinion filed on December 26, 2001, this court determined that seven of petitioner's claims were procedurally defaulted, specifically, petitioner's grounds for relief numbers 1, 6, 8, 9(B) and (C), 10, 11(B) and (C), and 13(C). In regard to two additional claims, grounds for relief numbers 4 and 9(A), the court found that petitioner might be able to demonstrate cause and prejudice to excuse the apparent default of those claims, and the court deferred consideration of whether those claims were defaulted. The court also deferred ruling on whether petitioner's claim of ineffective assistance of appellate counsel set forth in ground for relief number 14 is procedurally defaulted. The court dismissed without prejudice petitioner's seventeenth ground for relief, which concerns his mental competency to be executed, concluding that this claim was premature. This case is now before the court for the cause and prejudice determinations as to grounds for relief numbers 4, 9(A) and 14, and, if necessary, a decision on the merits of those claims, and for a decision on the merits on petitioner's remaining claims, those being grounds for relief numbers 2, 3, 5,

7, 11(A), 12(A),(B), and (C), 13(A), (C), (D) and (E), 15, 16, 18 and 19.

## I. Factual and Procedural History

The facts and procedural history of this case are set forth in *State v. Fautenberry*, 72 Ohio St.3d 435, 650 N.E.2d 878 (1995):

> On March 27, 1991, the Grand Jury of Hamilton County, Ohio, returned a five-count indictment against appellant, John Fautenberry. Count One charged Fautenberry with the aggravated murder of Joseph Daron pursuant to R.C. 2903.01, and included two specifications: first, that the murder of Daron was committed while Fautenberry was committing, attempting to commit, or fleeing immediately after committing or attempting to commit the offense of aggravated robbery; and second, that Fautenberry possessed a firearm when he committed the murder. Count Two contained a second charge of aggravated murder involving the same victim and included two specifications, namely, that the murder was part of a course of conduct involving the purposeful killing of or attempt to kill two or more persons, and that Fautenberry possessed a firearm while committing the offense. The remaining counts charged Fautenberry with aggravated robbery, theft of a motor vehicle, and theft of a credit card.
>
> On July 23, 1992, a three-judge panel accepted appellant's pleas of no contest to each of the five charges. The panel then considered the admitted facts and evidence, and found appellant guilty as to all counts. The evidence, including the transcripts of several confessions appellant made to the police, established the following.
>
> During 1990, appellant worked as a cross-country truck driver for a company based in Portland, Oregon. In the early part of November 1990, appellant informed one of his supervisors that he was quitting his job because of the long hours that were required of him as a truck driver. Thereafter, appellant spent a few days at the Flying J Truck Stop in Portland loading and unloading trucks for money. It was at that time that appellant met Donald Nutley. On one occasion, Nutley, who possessed several firearms, invited appellant to go target shooting with him. The two drove to an area near Mt. Hood,

2

Oregon, where they proceeded to fire at bottles until approximately sunset. As they walked back to Nutley's vehicle, appellant fired a single, fatal .38 caliber round into the right side of Nutley's head. Appellant then stole approximately $10,000 in cash from his victim and dumped the body somewhere in the Mt. Hood area. Nutley's body was not located until April 1991.

In early February 1991, appellant was traveling from Rhode Island to Ohio when he arrived at the Pilot Truck Plaza in Hunterdon County, New Jersey. Appellant, out of money and in need of gasoline in order to continue his trip, met Gary Farmer, who allegedly offered to provide appellant with food and money in exchange for sex. Upon entering Farmer's truck, appellant fatally shot Farmer once in the head with a .22 caliber handgun. Appellant left the body in the truck, stole the victim's wallet, and completed his trip to Cincinnati, Ohio.

After spending some time in Cincinnati, appellant left his sister's home on February 17, 1991, with no money, no transportation, and, it appears, a desire to travel to Oregon. Appellant began hitchhiking on Interstate 275 when Joseph William Daron, a father of two young children, stopped his vehicle and offered appellant a ride. Appellant explained that he was trying to reach Columbus. Daron offered to drive appellant approximately twenty miles out of his way to a restaurant near the junction of Interstate 71, where appellant believed he might better be able to find a ride to Columbus. Upon reaching the restaurant, appellant exited Daron's vehicle, reached back into the car and shot Daron twice in the right side of his chest with the same .22 caliber handgun that he had used to kill Farmer. After the shooting, appellant drove to a wooded area on the north bank of the Ohio River, where he threw Daron's body. Appellant then used Daron's vehicle, credit cards, and cash to return to Oregon.

Appellant arrived in Portland, Oregon, on February 24, 1991, and went to a local bar to meet a friend, Wes Halbrook. Several people, including Christine Guthrie, were invited to join the two men at Halbrook's apartment for a private party. The following day, appellant and Guthrie traveled to Rockaway, Oregon, where they spent a few days at the Silver Sands Motel. On the return trip to Portland, appellant drove Guthrie to a wooded area, where appellant claimed they would find something of

interest.   The two walked into the woods on foot and appellant fired three shots from his Jennings J 22 pistol into the back of Christine Guthrie's head.   Appellant then took the victim's bank credit card and address book containing the personal identification number for the credit card, left the body in the woods, and returned to Portland, where he used the credit card to make cash withdrawals.   Guthrie's body was not discovered until April 1991.

In early March 1991, appellant traveled to Juneau, Alaska.   While there he spent his time working on a fishing boat and consuming large quantities of alcohol. Appellant met Jefferson Diffee at some point during this period.   On March 13, 1991, appellant accompanied Diffee to the latter's apartment, where appellant beat, handcuffed and fatally stabbed Diffee seventeen times. Shortly thereafter, appellant was arrested by the Alaska police.   He ultimately pled guilty to the charge of first-degree murder in connection with Diffee's death, and received the maximum sentence available under Alaska state law: ninety-nine years' confinement without parole eligibility.

Shortly after his arrest by the Alaska police, appellant made four separate statements to various law enforcement officers concerning his involvement with the five murders.   Appellant spoke to the police in detail concerning the sites of the murders, the manner in which he had carried out the killings, and the locations where the police could find the victims' bodies.

After finding appellant guilty of all counts and specifications in connection with Daron's murder, the Hamilton County three-judge panel conducted a mitigation hearing on September 14, 1992.   The panel unanimously sentenced Fautenberry to death.   Consecutive sentences were imposed for the other offenses, except those which were merged.

*Fautenberry*, 72 Ohio St.3d at 435-437.

Petitioner pursued a direct appeal from his convictions and death sentence.   The First District Court of Appeals, Hamilton County, Ohio, affirmed the judgment of the trial court.   *See State v. Fautenberry*, No. C-920734, 1994 WL 35023 (Ohio App. Feb. 9,

4

1994).  The decision of the court of appeals was affirmed by the Ohio Supreme Court.  *See Fautenberry*, 72 Ohio St.3d at 446.

On March 28, 1996, petitioner filed an "Application for Reconsideration and Reopening" in the Ohio Supreme Court pursuant to former S.Ct.Prac.R. XI(1)(B) and *State v. Murnahan*, 63 Ohio St.3d 60 (1992), alleging ineffective assistance of appellate counsel on his direct appeal before the Ohio Supreme Court.  The court treated this application as a motion for reconsideration and denied the motion.  *State v. Fautenberry*, 75 Ohio St.3d 1475, 663 N.E.2d 1302 (1996).

On July 24, 1996, petitioner filed an application to reopen his case in the court of appeals pursuant to Ohio App. R. 26(B), alleging ineffective assistance of appellate counsel.  On October 17, 1996, the court of appeals denied the application as untimely, concluding that no good cause was shown as required under Ohio App. R. 26(B)(2)(b).  The court of appeals also found that the application was barred by *res judicata* because the issue of appellate counsel's ineffectiveness before the court of appeals could have been raised in the motion for reconsideration filed before the Ohio Supreme Court.  The Ohio Supreme Court affirmed the decision of the court of appeals denying the application for reopening and motion for reconsideration.  *See State v. Fautenberry*, 78 Ohio St.3d 320, 677 N.E.2d 1194 (1997).

Petitioner then filed a petition for postconviction relief pursuant to Ohio Rev. Code §2953.21 in the Hamilton County Court of Common Pleas.  Petitioner asserted various claims of ineffective assistance of counsel, alleged that death by electrocution constitutes cruel and unusual punishment, and asserted that he did

5

not make a knowing, voluntary, and intelligent waiver of his right to a jury trial. The trial court denied the petition, and petitioner appealed to the First District Court of Appeals. The court of appeals affirmed the judgment of the trial court denying postconviction relief. *See State v. Fautenberry*, No. C-971017, 1998 WL 906395 (Ohio App. Dec. 31, 1998). An appeal of that decision to the Ohio Supreme Court was not allowed, *see State v. Fautenberry*, 85 Ohio St.3d 1477, 709 N.E.2d 849 (1999), and petitioner's motion to reconsider that decision was denied, *see State v. Fautenberry*, 86 Ohio St.3d 1422, 711 N.E.2d 1015 (1999).

Petitioner filed his initial petition in this court on April 25, 2000, and later filed a corrected petition on May 5, 2000.

## II. Standards for Habeas Review

The provisions of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), which became effective prior to the filing of the instant petition, apply to this case. *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997). Under the AEDPA, a writ of habeas corpus shall not issue unless the state court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. §2254(d)(1), or was based on "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. §2254(d)(2). The provisions of §2254(d)(1) govern the review of legal error, whereas claims of factual error are subjected to the standard enunciated in §2254(d)(2). *Weaver v. Bowersox*, 241 F.3d 1024, 1029 (8th Cir. 2001).

Under §2254(d)(1), a state court decision is "contrary to"

6

Supreme Court precedent if the state court arrived at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decided a case differently than did the Supreme Court on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 413 (2000). A state court decision involves an unreasonable application of Supreme Court precedent if the state court identifies the correct legal principle from the decisions of the Supreme Court but unreasonably applies that principle to the facts of the petitioner's case. *Id.* A federal habeas court may not find a state adjudication to be "unreasonable" simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. *Id.* at 411. Rather, a state court's application of federal law is unreasonable "only if reasonable jurists would find it so arbitrary, unsupported or offensive to existing precedent as to fall outside the realm of plausible credible outcomes." *Barker v. Yukins*, 199 F.3d 867, 872 (6th Cir. 1999).

Claims of error in making factual determinations are addressed under §2254(d)(2). Under that section, an application for habeas relief may not be granted unless the state court adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." §2254(d)(2). In addition, 28 U.S.C. §2254(e)(1) provides that the findings of fact of a state court are presumed to be correct, and the petitioner bears the burden of rebutting the presumption of correctness by clear and convincing evidence.

### III. Petitioner's Claims

**A. Second and Third Grounds for Relief**

Petitioner's second and third grounds for relief are related and will be addressed together.  Petitioner's second ground for relief is as follows:

> Mr. Fautenberry's convictions and sentences are invalid because his lead trial counsel labored under a conflict of interest in his dual role of attorney for John Fautenberry and trustee for Anderson Township, the political subdivision in which the decedent's body was found.

Petitioner's third ground for relief states:

> Mr. Fautenberry's convictions and sentences are invalid because the trial court failed to conduct a hearing regarding the conflict under which his trial counsel labored as a result of trial counsel's representation of John Fautenberry and the citizens of Anderson Township.

Petitioner raised these claims in his petition for postconviction relief filed in the Hamilton County Common Pleas Court on July 8, 1996.  Petitioner subsequently filed first and second amended petitions on July 24, 1996, and August 27, 1996.  In his second amended petition, Appx. Vol. IX, p. 64, petitioner claimed that Michael L. Walton, one of the attorneys appointed to represent him, was also serving as the president of the Anderson Township Board of Trustees and as a trustee on the board during the pendency of petitioner's case.  He submitted board minutes dated 1991 and 1992 which reflected Walton's participation on the board, and a newspaper article concerning Walton's appointment as petitioner's counsel which also identifies him as a township trustee.  Appx. Vol. X, pp. 183-87.  Petitioner also produced a death record of the Hamilton County Coroner's Office which

indicates that the body of Joseph Daron, the victim in this case, was found in Anderson Township.  Appx. Vol. X, p. 8.

Petitioner alleged that Walton's responsibilities, as reflected in the board minutes, Appx. Vol. X, p. 184, included approving the payment of funds to the Hamilton County Sheriff's Department, which investigated the Daron homicide.  Petitioner further alleged that Walton, as a trustee, "owed a fiduciary duty to the Township citizens and Board to discover and facilitate the punishment of people who commit crimes in Anderson Township." Appx. Vol. IX, p. 64, ¶ 86.  Petitioner submitted billing records indicating that Anderson Township paid the Hamilton County Sheriff's Department for providing police protection to the township in 1991.  Appx. Vol. XI, pp. 65-79.

Petitioner also asserted that under Ohio Rev. Code §309.09(B), the Hamilton County Prosecutor's Office represented Anderson Township and Walton in his official capacity.  Petitioner states in an affidavit, submitted as Exhibit 39 to the petition, Appx. Vol. X, p. 189-90, that Walton never told him about his relationship with Anderson Township, the Hamilton County Sheriff's Department or the Hamilton County prosecuting attorney, and that, had he known, he would have questioned Walton about how these relationships would have affected his representation.  Petitioner alleged that he was prejudiced and denied the effective assistance of counsel by the failure of his attorney to disclose the conflict.  Petitioner also alleged that the members of the three-judge panel should have known of Walton's status as a trustee and should have inquired about the potential conflict of interest.  Appx. Vol. IX, pp. 67-68.

On October 27, 1997, the Hamilton County Common Pleas Court

entered an opinion denying the petition for postconviction relief. Appx. Vol. XII, p. 5.   In regard to petitioner's conflict of interest claim, the court found no evidence that Anderson Township or the Anderson Township trustees had an interest in the outcome of petitioner's trial, that Walton's service as a township trustee hampered his representation of petitioner, or that the Hamilton County Prosecutor's Office represented Walton in any matter during petitioner's trial.[1]   Appx. Vol. XII, p. 12.   The court further found that no conflict of interest existed by reason of Walton's positions of defense attorney and township trustee, the fact that the township contracted with the sheriff for police protection, or the county prosecutor's representation of the township or its trustees in their official capacities.  Appx. Vol. XII, pp. 12-13. The court also concluded that the trial judge had no obligation to explore a non-existent conflict of interest where the record did not demonstrate that the court was aware of the facts upon which the alleged conflict of interest was based.  Appx. Vol. XII, p. 13.

In its decision upholding the denial of postconviction relief, the First District Court of Appeals, citing in *Bullock v. Whitley*, 53 F.3d 697 (5th Cir. 1995), *Small v. Endicott*, 998 F.2d 411 (7th Cir. 1993), and *Powell v. Bordenkircher*, 789 F.2d 425 (6th Cir. 1986), concluded that, "absent evidence of an actual conflict,

---

[1]The last of these findings is correct insofar as it applies to the exhibits to the postconviction petition.  However, petitioner later submitted documents with a pleading entitled "Petitioner Fautenberry's Response to Respondent State's Motion for Ruling" filed on November 18, 1996, which indicate that the Hamilton County Prosecutor's Office represented Anderson Township and its trustees in a civil action during 1991, and that the judge assigned to that case was Judge William S. Mathews, one of the members of petitioner's three-judge panel.  Appx. Vol. XI, pp. 57-64.  The trustees were represented in that case by Assistant Prosecutor Christopher J. Snyder, whereas petitioner's case was prosecuted by Assistant Prosecutors Deters, Tolbert and Peipmeier.

there is no presumption of prejudice arising from the mere fact that defense counsel also serves in some capacity as a public official." *Fautenberry*, 1998 WL 906395 at *5. While agreeing that any counsel has an obligation to divulge to his or her client any source of potential conflict, the court noted that the failure to do so does not, in itself and without a showing of prejudice, establish a constitutional claim of ineffective assistance of counsel. *Id*. The court found that petitioner had failed to produce any evidence that Walton's position as trustee influenced his ability to defend petitioner at trial. *Id*.

**1. Conflict of Interest Claim**

A claim of ineffective assistance of counsel requires a showing by the petitioner that (1) his counsel's performance was deficient, and (2) this performance prejudiced the defense, thereby depriving the petitioner of a fair trial. *Strickland v. Washington*, 466 U.S. 668 (1984). Where counsel is operating under a conflict of interest, "counsel breaches the duty of loyalty, perhaps the most basic of counsel's duties." *Strickland*, 466 U.S. at 692. However, prejudice due to an alleged conflict of interest is presumed "only if the defendant demonstrates that counsel 'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance.'" *Id*., quoting *Cuyler v. Sullivan*, 446 U.S. 335, 345-50 (1980). In the absence of an objection at trial to counsel's representation, the defendant must demonstrate that "a conflict of interest actually affected the adequacy of his representation." *Cuyler*, 446 U.S. at 348-49.

This standard for ineffective assistance of counsel also

11

applies where the petitioner has entered a guilty or no contest plea. In such a case, the petitioner must establish: (1) that there was an actual conflict of interest; and (2) that the conflict adversely affected the voluntary nature of the guilty plea entered by the petitioner. *Moss v. United States*, 323 F.3d 445, 467 (6th Cir. 2003).

An actual conflict of interest is "a conflict *that affected counsel's performance*-as opposed to a mere theoretical division of loyalties." *Mickens v. Taylor*, 535 U.S. 162, 171 (2002). Prejudice will be presumed "only if the conflict has significantly affected counsel's performance-thereby rendering the verdict unreliable[.]" *Id.* at 173. In *Thomas v. Foltz*, 818 F.2d 476, 481 (6th Cir. 1987), the Sixth Circuit adopted the standard in *United States v. Mers*, 701 F.2d 1321, 1328 (11th Cir. 1983) for determining whether an actual conflict of interest exists within the meaning of *Culyer*:

> We will not find an actual conflict unless appellants can point to "specific instances in the record to suggest an actual conflict or impairment of their interests." ... Appellants must make a factual showing of inconsistent interests and must demonstrate that the attorney "made a choice between possible alternative courses of action, such as eliciting (or failing to elicit) evidence helpful to one client but harmful to the other. If he did not make such a choice, the conflict remained hypothetical." ... There is no violation where the conflict is "irrelevant or merely hypothetical"; there must be an "actual significant conflict."

Petitioner argues that his attorney had a conflict of interest due to his position as a trustee of Anderson Township. Petitioner contends that Walton owed a duty to the citizens of Anderson Township to see that crimes committed in the township were prosecuted and punished. Petitioner further contends that a

conflict was present due to the fact that Anderson Township retains the police protection services of the Hamilton County Sheriff's Department, the agency which investigated the homicide, and that the board of trustees approves the payment of the bills submitted by the sheriff's office for these services.  He notes that his no contest plea eliminated the need for his counsel to cross-examine the sheriff's deputies involved in the case.

In analogous situations, courts have declined to find an inherent or actual conflict of interest merely because defense counsel also occupied some type of government position.  *See, e.g., Paradis v.* Arave, 130 F.3d 385, 391 (9th Cir. 1997)(defense counsel's employment as city park police officer insufficient to establish ineffective assistance where park police were not involved in investigation of murder; "[p]otentially divided allegiances do not constitute active representation of conflicting interests."); *Beaver v. Thompson*, 93 F.3d 1186, 1192 (4th Cir. 1996)(defense counsel's position as part-time assistant Commonwealth attorney in another county did not establish actual conflict); *Bullock*, 53 F.3d at 702 (defense counsel's position as mayor of city in which case was tried not sufficient to establish actual conflict of interest where counsel was not involved as mayor in investigation or prosecution of defendant's case); *Small*, 998 F.2d at 417 (mere fact that defense counsel also served as a special prosecutor in unrelated murder not sufficient to establish actual conflict of interest); *Powell*, 789 F.3d at 426-27 (criminal defendant's representation by city attorney for city in which trial took place did not create an actual conflict of interest, even though city attorney was required to prosecute violations of city

ordinances in police court and to maintain good relations with police force).

There is no evidence in this case that Walton, in his capacity as township trustee, was involved in any way in the investigation or prosecution of the homicide with which petitioner was charged. Even assuming that the township trustees owe some general duty to the citizens of the township to ensure that crimes within the township are investigated and prosecuted, the citizens of the township have a legitimate interest only in the prosecution, conviction, and just punishment of the person who actually committed the crime, not the conviction of an innocent person or the imposition of excessive punishment on the guilty party. These societal interests are not in conflict with the responsibilities of defense counsel.

A trustee's obligation to make some provision for police protection for the township does not automatically conflict with the trustee's representation of a defendant in a criminal case. Here, the township contracted with the Hamilton County Sheriff's Department for police protection pursuant to Ohio Rev. Code §§311.29 and 505.43. Unlike the situation where the township establishes its own police district and appoints and disciplines its own officers, *see* Ohio Rev. Code §505.49, there is no statutory provision, or evidence of any contractual provision, in this case which grants the trustees any power of supervision over the activities of the sheriff and his deputies. The trustees in Anderson Township simply contract with the sheriff for police services and authorize payment of the bill for those services. There is no evidence that Walton had any responsibility for the

performance of the sheriff's deputies who investigated the case, or that he had any previous contact or relationship with those deputies which would motivate him to advise petitioner to forego a trial so that he would not have to cross-examine those deputies.

Petitioner also asserts that the representation of his counsel, in his capacity as township trustee, by the Hamilton County Prosecutor's Office presents an actual conflict. There is evidence in the record that Walton was represented by an assistant county prosecutor in a civil suit filed against Anderson Township. However, there is no evidence that the civil case was related in any way to petitioner's case. The assistant prosecutor in the civil case did not participate in petitioner's case. The precise extent of any contacts Walton may have had with the prosecutor's office and its personnel by reason of this civil representation is not of record. There is no evidence of any personal bias in favor of the prosecutor on Walton's part resulting from this relationship. There is no evidence that Walton's decisions in petitioner's case, including his advice concerning a no contest plea, were in any way affected or influenced by any relationship or dealings he may have had with the assistant prosecutor in the civil case, or by the prosecutor's representation of him in his official capacity as a trustee. The mere fact that the prosecutor's office was statutorily responsible for representing Walton in this and other unrelated civil actions is not enough to establish an actual conflict of interest, nor is it sufficient to show that this relationship prejudiced Walton's representation of the petitioner.

Petitioner relies on Opinion No. 96-6, 1996 WL 467118 (August 9, 1996), an opinion issued by the Ohio Supreme Court's Board of

15

Commissioners on Grievances and Discipline, in which the board concluded that a city council member could not ethically represent a criminal defendant in the city's municipal court without the appearance of impropriety.  The board noted that city council has a relationship with the city law director who prosecutes offenses in municipal court and with the city's police officers who are employees of the municipality.  *Id.*, 1996 WL 467118 at *4-5.  This situation is distinguishable from Walton's circumstances.  Here, there is no evidence that the township trustees had any control over the operations of the sheriff's department.  The charges against petitioner were prosecuted by the Hamilton County Prosecutor's Office, not a township attorney, for violations of state law, not township law, in the court of common pleas, not a tribunal controlled by the township.

The Board of Commissioners has also issued opinions concluding that a part-time Child Support Enforcement Attorney may perform criminal defense work in private practice, *see* Opinion No. 90-10, 1990 WL 640505 (June 15, 1990), and that a county commissioner may represent persons in criminal cases brought in the common pleas court of the county in which the attorney serves as a commissioner, *see* Opinion No. 88-020, 1988 WL 508811 (August 12, 1988).  Walton's position as a township trustee is more analogous to that of a county commissioner than it is to a city council member.

Even assuming that the Board of Commissioners would find some ethical problem with Walton's dual role, this would not automatically be sufficient to meet petitioner's burden.  The Supreme Court stated in *Nix v. Whiteside*, 475 U.S. 157, 165 (1986):

> Under the *Strickland* standard, breach of an ethical standard does not necessarily make out a denial of the

16

Sixth Amendment guarantee of assistance of counsel.  When examining attorney conduct, a court must be careful not to narrow the wide range of conduct acceptable under the Sixth Amendment so restrictively as to constitutionalize particular standards of professional conduct and thereby intrude into the state's proper authority to define and apply the standards of professional conduct applicable to those it admits to practice in its courts.

The record fails to reveal that Walton's position as trustee had any impact on his representation of petitioner.

**2. Court's Duty to Inquire**

Petitioner also contends that the trial court should have inquired into the potential conflict of interest posed by his attorney's status as a township trustee.  He notes that Judge Mathews was also the judge in the civil action brought against Anderson Township and its trustees, and that the three-judge panel should have been aware of Walton's position as trustee.  Under *Holloway v. Arkansas*, 435 U.S. 475 (1978), inquiry by the trial court is required only when "the trial court knows or reasonably should know that a particular conflict exists[.]" *Culyer*, 446 U.S. at 347.  "Absent special circumstances, therefore, trial courts may assume either that multiple representation entails no conflict or that the lawyer and his clients knowingly accept such risk of conflict as may exist." *Culyer*, 446 U.S. at 346-347.  The fact that "the trial court is aware of a vague, unspecified possibility of conflict" is not sufficient. *Mickens*, 535 U.S. at 169.

In *Mickens*, the Supreme Court noted "that a defense attorney is in the best position to determine when a conflict exists, that he has an ethical obligation to advise the court of any problem, and that his declarations to the court are 'virtually made under oath.'" *Id*. at 167-68, quoting *Holloway*, 435 U.S. at 485-86.  The

17

Court also held that even where the trial court fails to inquire into a potential conflict of interest which is brought to the attention of the court, this failure does not relieve petitioner of his burden of proving that his counsel actively represented conflicting interests and that the conflict of interest adversely affected his counsel's performance. *Mickens*, 535 U.S. at 173-75.

There is no clear evidence that the members of the three-judge panel were actually aware of Walton's position as trustee, or that Judge Mathews was aware of the connection between the Michael Walton named as a defendant in the civil suit and the Michael Walton acting as petitioner's counsel. However, even assuming that the court was aware of Walton's position as trustee, the record fails to reveal any facts or circumstances which should have alerted the court that Walton's position posed any potential conflict of interest to his representation of petitioner which would trigger a duty to inquire. The mere fact that Walton was a trustee is not enough. Going further on this chain of assumptions, even if the court did have an obligation to inquire about Walton's status, there is no evidence of an actual conflict which adversely affected counsel's performance or prejudiced petitioner's case. The mere failure of the court to inquire is not sufficient to sustain petitioner's claim of ineffective assistance of counsel. *Mickens*, 535 U.S. at 173-74.

In addressing petitioner's conflict of interest claim, the Ohio trial court applied the *Culyer* standards to petitioner's claim, and the state court of appeals relied on federal cases which discussed those standards. The decision of the state courts are not contrary to, nor did they involve an unreasonable application

18

of, clearly established federal law as determined by the United States Supreme Court. The state court decisions are supported by the record and were not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Petitioner has not proved that he is entitled to habeas relief on his conflict of interest claims, and the second and third grounds for relief are denied.

## B. Fourth Ground for Relief

Petitioner's fourth ground for relief is as follows:

Mr. Fautenberry's convictions and sentences are constitutionally infirm because the trial prosecutors suppressed material exculpatory and impeachment evidence.

Petitioner argues in his fourth ground for relief that the trial prosecutors suppressed material, exculpatory and impeachment evidence in violation of the constitutional rights discussed in *Brady v. Maryland*, 373 U.S. 83 (1963). In its *Opinion and Order* of December 26, 2001, (Doc. No. 52), this court concluded that petitioner's claim had never been presented to the state courts, but that the court would defer until after discovery the determination of whether petitioner's claim was barred by procedural default.

On December 4, 2000, this court granted petitioner's motion to review certain records and, on November 29, 2001, this court granted petitioner's motion for limited discovery. On April 30, 2002, this court granted petitioner's motion to compel discovery, pursuant to which respondent submitted certain grand jury materials for *in camera* review to determine whether they contained material, exculpatory or impeachment evidence. On October 28, 2002, the Magistrate Judge issued a *Report and Recommendation* concluding that

19

the grand jury transcripts did not contain material exculpatory or impeachment evidence and would, therefore, remain under seal.  This court affirmed the magistrate judge's ruling on December 19, 2002.  Notwithstanding petitioner's inability to review the grand jury transcripts, due to the determination by this court that those transcripts contained no material, exculpatory or impeachment evidence, petitioner was able to review countless other documents and materials in connection with the discovery order issued by this court.

Petitioner urges the court to consider the merits of his claim in spite of the fact that he never presented it to the state courts.  Petitioner reasons that the factual basis of the claim was not available to him earlier, due to the state's suppression of the materials that he only learned of for the first time through the discovery afforded by this court.

Whether this court may consider petitioner's fourth ground for relief depends on whether petitioner can demonstrate cause and prejudice to excuse the default of the claim.  The determination of whether petitioner can demonstrate cause and prejudice, however, overlaps with the determination of whether petitioner can demonstrate the components of a *Brady* violation.

In his fourth ground for relief, petitioner argues that the prosecution suppressed favorable evidence material to the issues of culpability and punishment in violation of *Brady v. Maryland, supra,* (holding that suppression by the prosecution of evidence favorable to the accused violates due process if the evidence is material to guilt or to punishment).  Petitioner offers five types of evidence that allegedly were suppressed in violation of *Brady*,

which may be summarized as follows:

A.   Evidence that would have provided a basis to suppress incriminating statements made by petitioner to Alaska police.

B.   Evidence calling into question the state's assertion that the murder took place in Hamilton County or even in Ohio.

C.   Evidence suggesting that the victim may have taken his own life or contributed to his death due in part to his illicit use of drugs.

D.   Evidence concerning the sexual aspects of the crime, which could have been presented as mitigation evidence in light of evidence suggesting that petitioner suffered physical and sexual abuse as a child.

E.   Evidence regarding petitioner's questionable state of mind at the time of the murder.

The question before the court is whether petitioner can establish cause and prejudice sufficient to excuse the default of his second claim for relief for purposes of federal habeas corpus review.  *See generally Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Murray v. Carrier*, 477 U.S. 478, 485 (1986).  The Supreme Court has refrained from establishing firm contours for the cause-and-prejudice standard that the Court adopted for excusing the default of a constitutional claim during state court proceedings. *Amadeo v. Zant*, 486 U.S. 214, 221-22 (1988).  Decisions following *Wainwright v. Sykes* do, however, offer guidance as to what constitutes "cause" sufficient to excuse the default of constitutional claims.  In *Reed v. Ross*, 468 U.S. 1, 13-14 (1984), the Supreme Court held that while tactical or deliberate decisions to forgo a state court remedy normally will not constitute cause, the failure of an attorney to raise a constitutional issue that was reasonably unknown to him may satisfy the cause requirement.  In *Murray*, 477 U.S. at 488, the Supreme Court clarified that "the

21

existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the state's procedural rule." "A showing that the factual or legal basis for a claim was not reasonably available to counsel, or that 'some interference by officials' made compliance impracticable, would constitute cause under this standard." *Id.* at 222. The withholding or concealment of evidence by state officials which prevents the defendant from reasonably discovering the factual or legal basis of a claim generally constitutes cause sufficient to excuse the procedural default. *See, e.g., Amadeo v. Zant*, 486 U.S. 214, 222 (1988)(concealment by county officials of scheme to underrepresent minorities and women in master jury pool sufficed as cause to excuse procedural default of that claim). Recently, the Court of Appeals for the Sixth Circuit added that, "In order to show cause, [the petitioner] must provide a substantial reason for the default that is external to him." *Jamison v. Collins*, 291 F.3d 380, 386 (6th Cir. 2002).

Of course, it is not enough for petitioner to demonstrate cause for his procedural default. He must also show that he was actually prejudiced by the claimed constitutional error. The Supreme Court delivered the most definitive explanation of the prejudice prong in *United States v. Frady*, 456 U.S. 152, 170 (1982). "[The petitioner] must shoulder the burden of showing, not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." In the context of a *Brady* claim, a

petitioner satisfies the prejudice requirement by showing that "'there is a reasonable probability' that the result of the trial would have been different if the suppressed documents had been disclosed to the defense." *Strickler v. Greene*, 527 U.S. 263, 290 (1999)(quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)).

In the instant case, of course, petitioner essentially offers as "cause" for the default of his *Brady* claim the alleged *Brady* violation itself. That is, petitioner argues that the prosecution's failure to disclose the material, exculpatory evidence set forth in his fourth ground for relief prevented him from discovering, developing, or presenting his fourth claim until now. The Supreme Court addressed the same scenario in *Strickler*. At least one Judge within this district has also addressed the same scenario. *Jamison v. Collins*, 100 F. Supp. 2d 647 (S.D. Ohio 2000)(Spiegel, J.), *aff'd*, 291 F.3d 380 (6th Cir. 2002) .

The petitioner in *Strickler*, like petitioner herein, raised his *Brady* claim for the first time in his amended habeas corpus petition, after learning of the allegedly favorable, undisclosed evidence for the first time during habeas corpus discovery. *Strickler*, 527 U.S. at 278. The exculpatory evidence at issue in *Strickler* consisted of documents prepared by an eyewitness who testified at trial, as well as notes of police interviews with that eyewitness, which impeached significant portions of her trial testimony as to the abduction of the victim. *Id*. at 266. The Supreme Court began its analysis by revisiting the three components of a *Brady* claim -- namely, (1) the existence of evidence favorable to the petitioner; (2) which was suppressed by state officials; and (3) which resulted in prejudice to the petitioner. *Id.* at 281-82

(citing *Brady v. Maryland*, 373 U.S. 83 (1963)).  The Court then explained:

> Because petitioner acknowledges that his *Brady* claim is procedurally defaulted, we must first decide whether that default is excused by an adequate showing of cause and prejudice.  In this case, cause and prejudice parallel two of the three components of the alleged *Brady* violation itself.  The suppression of the [eyewitness] documents constitutes one of the causes for the failure to assert a *Brady* claim in the state courts, and unless those documents were "material" for *Brady* purposes, their suppression did not give rise to sufficient prejudice to overcome the procedural default.

*Strickler*, 527 U.S. at 282.

Thus, to determine whether petitioner can demonstrate cause and prejudice to excuse his failure to present his fourth claim for relief to the state courts, this court must determine whether, (1) favorable evidence exists, (2) that was suppressed by the prosecution, (3) that was so material as to either guilt or punishment that petitioner was prejudiced by its omission.

With respect to undisclosed evidence, the inquiry of whether evidence was suppressed, (and whether petitioner can establish cause), turns in part on whether petitioner's trial counsel knew or reasonably could have known about the undisclosed evidence. *Strickler*, 527 U.S. at 286.  On the issues of the "cause" inquiry, Judge Spiegel held that, "the fact that [trial counsel] avers that he did not receive the documents from the Prosecution constitutes cause for failing to raise the *Brady* claim as to those documents prior to federal habeas corpus review." *Jamison v. Collins*, *supra*, 100 F.Supp.2d at 677.  This court is inclined to agree with that reasoning.

Turning to the issue of what evidence may have been suppressed

24

in the instant case, petitioner has attached 37 exhibits to his traverse and, in the discussion of his fourth ground for relief, refers specifically to exhibits 5-32.  Petitioner has not referenced, and this court was unable to find, any affidavit or other documentation by trial counsel averring that the exhibits referenced by petitioner in his fourth ground for relief were not disclosed prior to trial.  Rather, petitioner points to trial counsel's discovery motions and the responses submitted by the prosecution, all of which are part of the record, and argues that the exhibits he references in support of his fourth ground for relief were not included in the state's pretrial discovery response.

On November 1, 1991, petitioner's trial attorneys filed seven motions for discovery, requesting everything from exculpatory evidence, to impeachment evidence, to evidence relating to mitigating factors.  (J.A. Vol. II, at 73, 75, 94, 120, 122, 124, and 127).  In February 1992, the prosecution filed a response listing its witnesses and exhibits; indicating that it had already provided petitioner's criminal record and statements to police; turning over various tests, reports, and examinations, including an autopsy report for Jefferson Diffee; and stating that it knew of no favorable evidence to disclose.  (J.A. Vol. II, at 277).

Initially, it bears mentioning that three of the exhibits cited in support of petitioner's fourth ground for relief are newspaper articles, (Traverse Exhibits 27, 28, and 29), and petitioner will not be heard to argue that the prosecution committed a *Brady* violation by failing to disclose newspaper articles.  Further, two more exhibits cited in support of

petitioner's fourth ground concerned the autopsy of Alaska murder victim Jefferson Diffee, (Traverse Exhibits 25 and 26), and the prosecution's discovery response indicates that Diffee's autopsy report was turned over. (J.A. Vol. II, at 277-79). Thus, the record before this court belies petitioner's assertion that Traverse Exhibits 25 and 26 were not disclosed during pretrial discovery.

Although more definitive proof that the exhibits cited in support of petitioner's fourth ground for relief were suppressed would be preferable, such as an affidavit by trial counsel, the court is willing to assume, for purposes of this discussion, that most of the exhibits cited in support of petitioner's fourth ground for relief were suppressed. Thus, with the exception of the autopsy report for Jefferson Diffee, (Traverse Exhibits 25 and 26), and the newspaper articles cited by petitioner (Traverse Exhibits 27, 28, and 29), it would appear, based on petitioner's assertions in his traverse and a review of the prosecution's discovery response, that most of the exhibits referenced by petitioner in support of his fourth ground for relief became known to petitioner for the first time during federal habeas corpus discovery, and were accordingly suppressed within the meaning of *Brady*. Those materials are:

A. An FBI report by Special Agent Larry Ott recounting that Lieutenant Detective Steve Kalwara of the Juneau Police Department had advised him (Ott) that, among other things, questioning of Petitioner Fautenberry was terminated when petitioner indicated that he did not want to talk anymore; and that Petitioner Fautenberry had left a message for Special Agent Ott stating that he wished to confess to some things. (Traverse Exhibit 5)

B. A report from Sergeant G.A. Robertson reflecting that

Petitioner Fautenberry had declined, after leaving a voice message for Special Agent Ott, to call back, at Agent Ott's invitation, to speak to Ott personally, but that Agent Ott reported to the jail anyway and proceeded to interview petitioner. (Traverse Exhibit 6)

C. A Clermont County indictment, time-stamped March 14, 1991, charging petitioner with Grand Theft of a Motor Vehicle and Theft. (Traverse Exhibit 8)

D. A transcript of a telephone conversation between Special Agent Ott and Sergeant Thomas Boeing of the Hamilton County Sheriff's Department, during which Sgt. Boeing pressed Special Agent Ott as to whether petitioner had indicated where he had shot Joseph Daron, or whether there was a chance that he had shot Daron somewhere other than where he had dumped Daron's body. (Traverse Exhibit 9)

E. What appears to be a teletype from the FBI office in Cincinnati to the FBI office in Anchorage indicating a need to find out "the exact spot" where petitioner shot Daron, since jurisdiction would "lie in the county where the murder occurred." (Traverse Exhibit 10)

F. A teletype from the FBI office in Anchorage to the FBI office in Cincinnati confirming that agents would attempt to determine information from petitioner to "assist Ohio authorities in determining jurisdiction on the Joseph William Daron, Jr. Murder case." (Traverse Exhibit 11)

G. Clermont County missing person report by Det. Sgt. Rowland indicating on February 19, 1991, that Joseph Daron had had an argument over the telephone with co-worker Doug Rauh two days earlier and had not been seen since. (Traverse Exhibit 12)

H. Supplemental missing person report by Det. Sgt. Rowland indicating, among other things, that some co-workers thought that Joseph Daron had been depressed and was having financial problems, and that Mr. Daron's ex-wife did not think Daron would commit suicide. (Traverse Exhibit 13)

I. Supplemental missing person report by Det. Sgt. Rowland indicating, among other things, that Daron was dating a woman named Sandra who was not as serious about

Daron as Daron was about her, and that Daron was upset because he felt he was being left out of the friendship between co-worker Doug Rauh and Sandra. (Traverse Exhibit 14)

J. Supplemental missing person report, (handwritten), by Det. Sgt. Rowland indicating that Daron was depressed because Sandra did not want to pursue a serious relationship with him, that Daron told Sandra he would see her in heaven and he would be her guardian angel, and that Sandra thought Daron was suicidal. (Traverse Exhibit 15)

K. Information directed to Det. Sgt. Cliff Rowland indicating that Daron's father thought Daron was "flat broke," and that Daron had told his father that no one wanted to listen to him (Daron) anymore. (Traverse Exhibit 16)

L. Police report regarding the killing in Roseburg, Oregon of Richard Combs, (for which petitioner eventually admitted, though someone else had confessed and been convicted), indicating, among other things, that Richard Combs was bisexual. (Traverse Exhibit 17)

M. Treatment notes for Gary Farmer, (New Jersey man whom petitioner admitted killing), indicating, among other things, that Farmer allegedly had been involved in sexual abuse of a foster child. (Traverse Exhibit 18)

N. Document titled "Fautenberry Meeting, April 26-27, 1991," indicating, among other things, that Joseph Daron's legs were bent under his body and that his pants were partially pulled down. (Traverse Exhibit 19)

O. Hamilton County Sheriff Investigation Report by Detective Bill Engelman regarding the autopsy of Joseph Daron indicating, among other things, downward trajectory of the bullet wounds. (Traverse Exhibit 20).

P. Juneau Police Department Supplement by Officer Hernandez, dated 03/16/91, regarding investigation of Jefferson Diffee homicide, recounting Officer's recollection of having seen the victim at a bar laughing and talking with another adult male (possibly petitioner). (Traverse Exhibit 21)

Q. Juneau Police Department Supplement by Officer

Steffel, dated 03/16/91, regarding investigation of Diffee homicide, recounting interviews of several women who may have observed Diffee at the bar with petitioner shortly before Diffee was killed. (Traverse Exhibit 22).

R.   Juneau Police Department Supplement by Officer Hernandez, dated 03/16/91, recounting the discovery the body of Jefferson Diffee in his apartment, face down, with his shirt pushed up and his belt undone, and the fact that the word "DIE" was written in the dust on Diffee's mailbox. (Traverse Exhibit 23)

S.   Juneau Police Department Supplement by Officer Jennings, summarizing investigation of Jefferson Diffee homicide and identifying petitioner as a suspect. (Traverse Exhibit 24)

T.  Portland Police Department "Special Report" regarding the murder of Christine Guthrie, recounting several interviews with Olivia Herndon Priest, a former girlfriend of petitioner's with whom petitioner had some contact after returning from Ohio. (Traverse Exhibit 30).

U.   Transcript of interview of Kristine Fautenberry, (petitioner's sister), by Ohio Detectives David Cammerer and John Kunkemoeller. (Traverse Exhibit 31).

V.  Transcript of interview of Mark Christopher Jurges, (former boyfriend of petitioner's sister and roommate of petitioner's), by Ohio Detectives David Cammerer and John Kunkemoeller. (Traverse Exhibit 32)

(Appendix to the Traverse, Doc. No. 89).

Having found that the exhibits cited above were probably suppressed, this court is faced with the task of determining whether the apparently suppressed evidence was favorable and, if so, whether the evidence satisfies the materiality/prejudice components. If the court determines that any pieces of evidence were favorable, and that those pieces of evidence had not been disclosed by the prosecution, the court would then have to determine whether those pieces of evidence were so material that

their suppression prejudiced petitioner. If those pieces of evidence were not material, then petitioner cannot establish the prejudice prong of the cause-and-prejudice test to excuse the default of his *Brady* claim. *Strickler, supra*, 527 U.S. at 282.

Evidence is material within the meaning of *Brady* if it cannot be said that petitioner received a fair trial, "understood as a trial resulting in a verdict worthy of confidence," in the absence of that evidence. *Strickler*, 527 U.S. at 289-90 (quoting *Kyles, supra*, 514 U.S. at 434).

> As we made clear in *Kyles*, the materiality inquiry is not just a matter of determining whether, after discounting the inculpatory evidence in light of the undisclosed evidence, the remaining evidence is sufficient to support the jury's conclusion. (citation omitted). Rather, the question is whether "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."

*Strickler*, 527 U.S. at 290 (quoting *Kyles, supra*, 514 U.S. at 435). Petitioner must demonstrate more than a possibility that the suppressed evidence might have produced a different outcome of his trial; he must establish a reasonable probability that the result would have been different. *Strickler*, 527 U.S. at 289-291.

The determination of whether the suppressed evidence was favorable and material is complicated in this case by the fact that petitioner pleaded no contest. In *Campbell v. Marshall*, 769 F.2d 314 (6th Cir. 1985), the Sixth Circuit suggested that, in the context of a habeas corpus proceeding, a state defendant may raise, after a guilty plea, a claim that prosecutors withheld exculpatory

evidence in violation of *Brady*.[2]  However, a defendant so situated faces an uphill battle in establishing the favorability and materiality components of the *Brady* test.  In the context of a guilty plea, the Sixth Circuit framed the relevant determination as follows: "[D]id the prior withholding of the *Brady* information so taint the plea-taking as to render the guilty plea involuntary or unintelligent?"  *Id*. at 315.

With the foregoing in mind, the court will now examine in more detail the pieces of evidence offered by petitioner that allegedly, in violation of *Brady*, were not disclosed prior to trial. Initially, however, the court notes that the trial court complied with *Boykin v. Alabama*, 395 U.S. 238 (1969), in taking petitioner's no contest pleas, that petitioner received the assistance of counsel and stated on the record that he was satisfied with his attorneys, and that there was a factual basis for petitioner's no contest pleas.[3]  As the Sixth Circuit noted in *Campbell v. Marshall, supra*, 769 F.2d at 324, "These circumstances must go a long way toward protecting the plea-taking event from later collateral attack."

<u>Written Report of Sgt. G.A. Robertson</u>

Petitioner alleges that a written report by Sergeant G.A. Robertson that prosecutors failed to disclose during pretrial discovery would have provided a basis for suppressing petitioner's statements to FBI Special Agent Ott Larry confessing to the murder

---

[2]    For purposes of this discussion, it is immaterial that petitioner entered a no contest plea, as opposed to a guilty plea.

[3]    The court discusses these issues in considerable detail *infra* in connection with petitioner's seventh ground for relief, and that discussion will not be recounted here.

of Joseph Daron in Ohio, as well as two murders in Oregon and
another in New Jersey.  According to petitioner, he was arrested by
Juneau police in the late evening hours of March 16, 1991.  Between
1:00 and 2:00 p.m. on March 17, 1991, detectives from the Portland
police department attempted to interview him about the murders in
Oregon, but petitioner made no inculpatory statements, asked for
the questioning to cease, and requested the opportunity to speak to
a lawyer.

Later that evening, according to the suppressed report of
Sergeant G.A. Robertson, petitioner asked to make a phone call to
the local FBI office.  According to reports by Special Agent Ott of
the FBI, petitioner left a phone message indicating that he wished
to confess to some things.  Sergeant Robertson went on to state in
his report that Agent Ott then telephoned him (Robertson) and
advised him that he was willing to report to the local jail to
speak to petitioner, if petitioner would call back and personally
ask Agent Ott to do so.  Sergeant Robertson stated that Agent Ott
called twice in the following two hours to report that he had not
yet been contacted by petitioner.  According to Sergeant
Robertson's report, Agent Ott responded to the jail anyway and,
after being advised by Lieutenant Detective Steve Kalwara that
petitioner had previously requested that all questioning be ceased
and that a public defender would be contacting petitioner on March
18, 1991, Agent Ott proceeded to interview petitioner and to obtain
inculpatory statements.

Petitioner argues that, under *Edwards v. Arizona*, 451 U.S. 477
(1981), in which the Supreme Court held that all police questioning
of a suspect in custody must cease when the suspect invokes his

rights to remain silent and/or to an attorney absent clear re-initiation of contact by the suspect, Sergeant Robertson's suppressed statement would have provided a basis for suppressing the inculpatory statements petitioner made to Special Agent Ott. Petitioner reasons that Special Agent Ott knew he had committed an *Edwards* violation, which is why none of his reports mentioned the fact that he had contacted Sergeant Robertson at the local jail indicating that Petitioner Fautenberry should call and speak to him (Ott) directly if petitioner wished Special Agent Ott to come to the jail, or that petitioner had never called back or spoken to Special Agent Ott before Ott decided to respond to the jail anyway.

Petitioner's arguments assume a lot and fail to persuade the court that the suppression of Sergeant Robertson's written report undermines the voluntariness and intelligence of petitioner's no contest plea to the murder of Joseph Daron sufficient to establish that the suppressed report was material within the meaning of *Brady*. For one thing, the court is not willing to assume, as counsel for petitioner apparently are, that the failure of Petitioner Fautenberry to telephone Special Agent Ott to tell him personally that petitioner wished to see him was the result of a refusal on petitioner's part to do so. There are countless explanations for why petitioner may not have returned Special Agent Ott's telephone call, and the court is not willing, in the absence of more evidence, to assume that the reason was petitioner's affirmative refusal to do so.

Further, the telephone message that petitioner did leave for Special Agent Ott is entitled to a great deal of weight as affirmative evidence of a re-initiation of contact on petitioner's

part within the meaning of *Edwards*. A transcript of that telephone message was submitted as a state's exhibit in connection with petitioner's no contest pleas, (J.A. Vol. I, at 74, state's exhibit 18), and petitioner admitted in a March 19, 1991, statement to Portland Detective Tom Nelson to having left the message for Special Agent Ott, (J.A. Vol. V, at 212).

Moreover, it simply asks too much to assume, from the totality of the circumstances, that the failure of the prosecution to turn over Sergeant Robertson's written statement undermines the voluntariness of petitioner's no contest pleas, or, under *Kyles*, that Sergeant Robertson's statement could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict upon petitioner's no contest pleas. Nowhere in the laundry list of reasons cited by petitioner for why his no contest pleas were constitutionally invalid, (seventh ground for relief), did petitioner include the alleged suppression of evidence by the state that would have provided a basis for moving to suppress his inculpatory statement to Special Agent Ott. As discussed above, it is highly unlikely, under *Edwards v. Arizona, supra*, and its progeny, that petitioner would have prevailed with a motion to suppress on the basis of Sergeant Robertson's statement. The totality of the evidence leaves little doubt that petitioner re-initiated contact with law enforcement officers when he left a telephone message for Special Agent Ott that he wanted to "confess to some things."

Finally, it bears mentioning that petitioner's statements in response to questioning by Special Agent Ott were not the only inculpatory statements he made. Petitioner was indicted by the

Hamilton County Grand Jury on March 27, 1991. He did not enter his no contest pleas until more than a year later, on July 23, 1992. In the interim, petitioner admitted to the murders in an article in *The Juneau Empire* on June 17, 1991, which admissions were recounted in a newspaper article in the *Anchorage Times* on August 22, 1991. (Traverse Exhibits 28 and 29). It also appears that petitioner admitted to some or all of the murders during a telephone call to Olivia Herndon, (J.A. Vol. I, at 75, state's exhibit 22); a lengthy interview with Portland Detective Tom Nelson on March 19, 1991, which interview was initiated by petitioner, (J.A. Vol. I, at 78, state's exhibit 23; J.A. Vol. V, at 170-247); and during a telephone call to Detective Nelson initiated by petitioner on March 31, 1991, (J.A. Vol. I, at 79, state's exhibit 24; J.A. Vol. V, at 248-306). Thus, the court is not persuaded that, in the face of petitioner's numerous admissions to many or all of the murders between the time that he was indicted in Hamilton County and the time that he entered his no contest pleas, Sergeant Robertson's suppressed statement could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict upon petitioner's no contest pleas.

<u>Exculpatory Reports About Lack of Evidence of Jurisdiction</u>

Petitioner argues that the prosecution committed a *Brady* violation when it failed to turn over exculpatory reports demonstrating that law enforcement officers could not determine in which county or state the murder of Joseph Daron had occurred. Petitioner points out that the state is required to prove each essential element of a criminal offense beyond a reasonable doubt, and that in Ohio, proof of the state and county in which an offense

occurred are essential elements. Petitioner argues that the initial investigation of the disappearance and murder of Joseph Daron was conducted by the Miami Township Police Department, which township is located in Clermont County; that the victim lived in Clermont County and was last seen alive in Clermont County; and that petitioner was initially indicted by Clermont County regarding the aggravated robbery of Joseph Daron.

In support of his claim, petitioner cites five documents, allegedly provided for the first time during habeas corpus discovery, demonstrating that law enforcement officers were unsure in what county petitioner had murdered Joseph Daron. Traverse Exhibit 7 appears to be a stamp of the badge of Sergeant Cliff Rowland of the Miami Township Police Department, submitted by petitioner apparently to illustrate that the initial investigation into the disappearance and murder of Joseph Daron was conducted by Sergeant Rowland of the Miami Township Police Department, which township is located in Clermont County. It tests the limits of reasonableness to suggest that what appears to be a reproduction of the badge or other form of identification for Sergeant Cliff Rowland constitutes favorable or material evidence that prosecutors were required under *Brady* to disclose.

Traverse Exhibit 8 is a copy of an indictment, issued on March 14, 1991 by the Clermont County Grand Jury, charging petitioner with grand theft of a motor vehicle and theft in relation to the car and several personal possessions that belonged to Joseph Daron.

Traverse Exhibit 9 is a transcript of a phone call between Sergeant Thomas Boeing of the Hamilton County Sheriff's Department and FBI Special Agent Larry Ott on March 19, 1991, during which

Sergeant Boeing asked several questions of Agent Ott, who had interrogated petitioner, regarding whether petitioner had divulged the exact location where he had murdered Joseph Daron.

Traverse Exhibit 10 is a teletype dated March 31, 1991 from the FBI office in Cincinnati to the FBI office in Anchorage indicating a need for more specific information about the exact location where petitioner shot Joseph Daron. Specifically, the teletype stated:

> Would like specific information from subject relating to the exact spot where he shot Daron. Victim Daron lived in Clermont County and was last seen alive in Clermont County (when he dropped his kids off at his former wife's house), however, Daron's body was left in neighboring Hamilton County. Jurisdiction will lie in the county where the murder occurred.

Traverse Exhibit 11 is a teletype dated March 27, 1991 from the FBI office in Anchorage indicating that Portland detectives were assigned to try to "determine information from [redacted] interview with subject which will assist Ohio authorities in determining jurisdiction on the Joseph William Daron, Jr., murder case."

The court is not persuaded that the exhibits cited by petitioner constitute favorable, material evidence because they were largely cumulative to evidence that was provided to defense counsel during pretrial discovery and submitted during the hearing on petitioner's no contest pleas. The most that the new exhibits submitted by petitioner demonstrate was that, early in the investigation of the Joseph Daron homicide, law enforcement officers had questions about the exact location where Daron was murdered, since the evidence supported inferences that he could have been killed in Clermont County or in Hamilton County. That

this uncertainty existed, however, could not have been unknown to defense counsel.

During an interrogation on March 19, 1991, Portland Detective Tom Nelson asked several questions of petitioner specifically indicating that Ohio law enforcement officers needed to know, for purposes of determining jurisdiction, exactly where petitioner had shot Daron.  While asking petitioner a series of questions about where Daron had picked up petitioner, where petitioner had shot Daron, and where petitioner had dumped Daron's body, (J.A. Vol. V, at 191-196), Detective Nelson explained, "Okay.  This part doesn't mean anything to you and uh, sorry we have to ask you these details, but it kind of makes a difference to the people back there when they're trying to figure all of this out." (J.A. Vol. V, at 192).

A few weeks later, on March 31, 1991, during a telephone call initiated by petitioner, Detective Nelson again prodded petitioner for specific details about the exact location where he had shot Joseph Daron.  Detective Nelson explained:

> NELSON:  It's not important to me, but they, they all, you know, when, when they prosecute a case or when they, when they figure out where a killing occurred, they gotta figure out where it is so they know which county it is and who has jurisdiction.  It's, it's uh, you know, it's just a bunch of bureaucracy garbage, but I know it means nothing to you, but just, just kind of a pain in the neck.
>
> FAUTENBERRY: Oh.
>
> NELSON: Trying to figure out, you know, 'cause it was like when he first, when he first picked you up, he was in one county there, but then we found him dumped, he was in a different county.  *** It just makes makes it complicated for jurisdictional problems to figure out who gets what and where to, and you know, who takes care of

    it and who is in charge of all the paperwork.  Basically
    is what it comes down to.

(J.A. Vol. V, at 303).

    The prosecution's discovery response indicated that all
interviews of petitioner were submitted to defense counsel, and
petitioner does not contend that the interrogation statements from
March 19, 1991, and March 31, 1991, were not provided to him during
pretrial discovery.  Thus, it is somewhat difficult for petitioner
to assert that evidence demonstrating uncertainty on the part of
law enforcement officers about jurisdiction in the Joseph Daron
homicide was suppressed.

    Moreover, petitioner gave a fairly detailed description to
Detective Nelson of where he had shot Daron.  Petitioner cites to
a telephone conversation between Thomas Boeing of the Hamilton
County Sheriff's Department and FBI Special Agent Ott as evidence
that the fact that no one from Ohio interrogated petitioner
resulted in the failure to elicit specific information about where
the Daron murder occurred.  However, petitioner gave a fairly
detailed description to Detective Nelson of the Portland Police
Department in an interview on March 19, 1991.  Detective Nelson was
able to learn that petitioner was hitchhiking when Daron picked him
up "[o]n the on-ramp to 275 off of Highway 125 which is Beech Point
Avenue."  (J.A. Vol. V, at 191).  Petitioner went on to state that
he rode with Daron for about twenty miles north toward Columbus,
Ohio, and that Daron eventually dropped him off in a motel or
restaurant parking lot about five to ten miles north of Milford,
"[u]p off of 275."  (*Id*. at 191-92).  Petitioner stated clearly
that he did not shoot Daron in the location where he eventually
dumped Daron's body.  As noted above, this interview statement was

provided to defense counsel during pretrial discovery.  Defense counsel may very well have concluded, based on this information, that there was no significant issue concerning venue or jurisdiction.

In short, the court is not persuaded from the totality of the circumstances that the failure of the prosecution to turn over the traverse exhibits cited by petitioner undermines the constitutional validity of petitioner's no contest pleas, or, under *Kyles*, that those exhibits could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict upon petitioner's no contest pleas.  Thus, petitioner cannot demonstrate that the suppressed documents were favorable or material.

<u>Evidence That Daron May Have Taken His Own Life or Contributed to His Death</u>

Petitioner argues that the prosecution committed a *Brady* violation when it failed to turn over documents developed during the investigation demonstrating that the victim might have taken his own life or contributed to his death.  Such evidence, petitioner argues, provided an alternative basis for explaining Joseph Daron's disappearance.  In support of his claim, petitioner cites five documents, allegedly provided for the first time during habeas corpus discovery, giving reason to believe either that Daron was suicidal or that he may have otherwise contributed to his own death.

Traverse Exhibit 12 is the initial "missing person" report generated by the Miami Township Police Department.  It stated that, on the evening of February 17, 1991, Daron had gotten into an

argument with co-worker and friend Doug Rauh over the telephone and no one had seen him since. Traverse Exhibit 13 is a supplemental report noting additional details regarding Daron's whereabouts and activities before he disappeared.

Traverse Exhibit 14 is another supplemental missing person report noting, among other things, that Daron was upset on the evening he disappeared because the woman he had been seeing, Sandra, was not as serious about the relationship as was Daron. Traverse Exhibit 15 is a supplemental report recounting an interview with Daron's girlfriend Sandra, during which she confirmed that Daron was upset because she did not want to get as involved in the relationship as he did. According to Sandra, Daron said he would be seeing her in heaven, causing her to feel that he was suicidal.

Traverse Exhibit 16 is an investigative summary recounting an interview with Daron's father, Joseph Daron, Sr. Daron's father commented that Daron had a history of drug use, that Daron felt no one wanted to listen to him anymore, and that Daron was "flat broke."

The court is not persuaded that the exhibits cited by petitioner constitute evidence so favorable or material that the failure of the prosecution to disclose them is sufficient to undermine confidence in the outcome of the guilty verdicts stemming from petitioner's no contest pleas. For one thing, several of the documents contained just as much evidence belying suicidal thoughts on Daron's part as suggesting them. Daron's ex-wife, who was the last person to see Daron alive when he dropped off their children on the night of February 17, 1991, remarked not only that Daron was

overly friendly that night, but that she did not think he was capable of committing suicide because he loved his kids so much and because he seemed concerned that night about an injury he had sustained to his wrist while ice-skating earlier that day. (Traverse Exhibit 13). Additional interviews conducted when Daron turned up missing revealed new, recent interests on his part that belied suicidal thoughts, such as building an ultralight airplane, his affiliation with a church for which he did a lot of volunteer work, and the fact that he had rented a house so that his elderly father could move in with him. (Traverse Exhibits 13 and 16). If details contained in the undisclosed documents suggesting that Daron might have been suicidal constituted material and favorable evidence within the meaning of *Brady*, the materiality and favorability were surely diminished by the details contained in those same documents that belied suicidal thoughts on his part.

Moreover, by the time the Hamilton County Grand Jury had returned a capital indictment against petitioner, and nearly a year before the prosecution complied with petitioner's pretrial discovery request, petitioner had already admitted to killing and robbing Joseph Daron, dumping his body near the Ohio River, and traversing cross country to Oregon using Daron's automobile and credit cards. Petitioner first admitted to the murder and robbery of Joseph Daron to FBI Special Agent Larry Ott on March 17, 1991, and later admitted the same and provided additional details to Portland Detective Tom Nelson on March 19, 1991, and March 31, 1991. On March 18, 1991, Mr. Daron's body was located in the area where petitioner said he had dumped it, and Mr. Daron's cause of death was determined to be two gunshot wounds to the chest,

consistent with the manner in which petitioner had described shooting him. (Traverse Exhibits 19 and 20). Petitioner was indicted by the Hamilton County grand jury on March 27, 1991, after petitioner had already given confessions to Special Agent Ott and Portland Detective Nelson. Seven months after petitioner's multiple confessions, defense counsel filed their motions for discovery on November 1, 1991. Nearly a year after petitioner first confessed to the Joseph Daron homicide, the prosecution filed a response to defense counsel's discovery requests. In light of petitioner's admissions, it is difficult to characterize as material or even relevant evidence that the victim might have been depressed just before being murdered.

Thus, the court is not persuaded that the prosecution necessarily had a duty under *Brady* to disclose evidence suggesting that the victim may have been depressed or even suicidal, after petitioner had already admitted to murdering him. It is difficult to characterize as material evidence that the victim may have been depressed just before being murdered. Even assuming that the prosecution was under a duty to disclose the documents discussed above, the court is not persuaded that they were so material and favorable that the prosecution's failure to disclose them undermines confidence in the guilty verdicts that resulted from petitioner's no contest pleas. Those documents contained just as much evidence undermining the possibility that the victim would commit suicide as evidence suggesting that he could have committed suicide.

Evidence Concerning Sexual Aspects of the Homicides

Petitioner argues that the prosecution committed a *Brady*

violation when it failed to turn over evidence in its possession demonstrating the sexual aspects of the various homicides that petitioner committed. Such evidence, petitioner argues, could have helped explain, and possibly even mitigate, petitioner's commission of the murders, especially in light of the fact that he was physically abused, and may have been sexually abused, as a child by certain males.

In support of his argument that the prosecution suppressed relevant, material and exculpatory evidence in this regard, petitioner cites to not only certain exhibits allegedly disclosed for the first time during federal habeas corpus discovery, but also transcript cites and state exhibits that were part of the state court trial record. For instance, in arguing that evidence of the sexual aspects of the various crimes was relevant, petitioner points out that he was emotionally, physically, and possibly sexually abused as a child by certain males in his family, and that a close male friend in Hawaii once made a homosexual advance toward petitioner that caused petitioner significant stress. That information was contained in the state court transcript.

Petitioner also cites to a state's exhibit introduced during his no contest plea hearing in pointing out that he claimed responsibility for the 1984 murder in Oregon of Richard Combs, to which another man had confessed. Traverse Exhibit 17 is a police report from the Roseburg (Oregon) police department regarding the Combs homicide noting the fact that Combs was bisexual.

With respect to the murder of truck driver Gary Farmer in New Jersey, petitioner, citing a state's exhibit introduced during petitioner's no contest plea hearing, reiterates that Farmer

allegedly had lured petitioner to his (Farmer's) truck to have sex in exchange for food and/or money.  Traverse Exhibit 18 consists of medical notes indicating that Farmer had been accused of sexually abusing a foster son.

Petitioner argues that evidence suggesting sexual aspects to the murder of Joseph Daron was suppressed.  Traverse Exhibit 19 is a document entitled "Fautenberry Meeting, April 26-27, 1991," which stated, among other things, that when Joseph Daron's body was found, his pants were pulled down and his legs were bent beneath his body as if he had been kneeling when he was shot.  Traverse Exhibit 20 is an investigation report by the Hamilton County Sheriff's Department indicating that the downward trajectory of the two bullets recovered from Daron also were consistent with him being shot while he was kneeling.  Petitioner cites a state exhibit, however, for evidence that the presence of semen was detected on oral swabs taken from Daron.

Regarding the murder of Jefferson Diffee in Alaska, petitioner, citing Juneau Police Department reports (Traverse Exhibits 21 and 22), notes that he and Diffee had met in a bar a few weeks before the murder and that Diffee had offered petitioner a place to stay for a little while.  Petitioner cites a Juneau Police Department report, Traverse Exhibit 23, to point out that Diffee's body was found face down in his bed, with his belt undone and his shirt pushed up.  Citing another Juneau police report, Traverse Exhibit 24, petitioner points out that Diffee's wrists had marks on them consistent with handcuffs and that petitioner was in possession of a handcuff key when he was arrested.  Finally, citing documents from Diffee's autopsy, (Traverse Exhibits 25 and 26),

petitioner points out that tests to determine whether Diffee was sexually assaulted were performed, but that the results of those tests were not disclosed to habeas corpus counsel.

After careful consideration and review of the record, the court is not persuaded that a *Brady* violation was committed with respect to evidence of the sexual aspects of the various murders to which petitioner admitted. A lot of the information cited by petitioner in support of this *Brady* claim was supplied to him in other documents that were disclosed by the state. Further, an argument could be made that any evidence of sexual aspects of the homicides was within petitioner's personal knowledge, given the fact that he admitted to committing the homicides and provided considerable details about them during various interviews. The relevance or materiality of evidence that there were sexual aspects to the homicides was undermined by petitioner's express denials that he ever intended to have sexual relations with Gary Farmer or that he had sexual relations with Joseph Daron. Finally, the court fails to understand what possible relevance there was to evidence that Gary Farmer had been accused of sexually abusing his foster son.

Regarding evidence that either was provided to petitioner during pretrial discovery and during his plea hearing, or was arguably within petitioner's personal knowledge, the court reiterates that much of the evidence cited by petitioner in support of this aspect of his fourth ground for relief consisted of materials that the state provided to defense counsel during discovery or exhibits that the state introduced during petitioner's plea hearing to establish a factual basis for petitioner's plea.

46

In his traverse, petitioner cited the state court transcript, *i.e.*, Tr. 277, 280, 286, 278, and 288-89, for evidence that he suffered emotional, physical, and possibly sexual abuse from certain males as a child, and that a close friend of his in Hawaii had once made an unwanted homosexual advance.  In his traverse, petitioner cited state's exhibit 20, p.2, as evidence that New Jersey trucker Gary Farmer had lured petitioner to his (Farmer's) truck to have sex for money.  Petitioner also cited state's exhibit 5, p.9, as evidence that the presence of semen was detected on oral swabs taken from Daron during his autopsy.

Moreover, some of the facts and evidence cited by petitioner as suppressed evidence actually was supplied to defense counsel during pretrial discovery.  The fact that Joseph Daron's body was found with his pants pulled down was reflected in an interview of petitioner by Portland Detective Tom Nelson on March 19, 1991.  (J.A. Vol. V, at 195).  According to the state's discovery response, all statements by petitioner to law enforcement officers were provided.  (J.A. Vol. II, at 277-79).  Presumably, that would include petitioner's statements to Detective Nelson on March 19, 1991; petitioner has never argued otherwise.  Further, evidence that sexual assault tests were performed on Alaska murder victim Jefferson Diffee was contained in his autopsy report, (Traverse Exhibits 25 and 26), which report was provided to defense counsel during pretrial discovery, (J.A. Vol. II, at 277).

Thus, much of the information cited by petitioner in support of this *Brady* claim was supplied to him in documents that were disclosed by the state.  Further, an argument could be made that any evidence of sexual aspects of the homicides was within

47

petitioner's personal knowledge, given the fact that he admitted to committing the homicides and provided considerable details about them during various interviews. That being the case, much of the evidence in support of this component of petitioner's *Brady* claim cannot be characterized as *Brady* evidence, insofar as it either was not suppressed or was within petitioner's personal knowledge.

The court further notes that the relevance or materiality of evidence that there were sexual aspects to the homicides was undermined by petitioner's express denials that he ever intended to have sexual relations with Gary Farmer or that he had sexual relations with Joseph Daron. During a March 19, 1991, interview of petitioner, Portland Detective Tom Nelson obtained express denials by petitioner that he ever intended to have sex with New Jersey truck driver Gary Farmer for money or that he did have sexual relations with Joseph Daron.

> NELSON:        What was the story on that one [Gary Farmer]?
>
> FAUTENBERRY:    Oh, I was trying to get back to Ohio from visiting some friends up in Rhode Island and I didn't have any money and I was just sitting in there in the, in the driver's lounge watching TV and just talking to people and this guy come up and was queer and he wanted uh, to have sex I guess for, to give me some money. And I told him by story and what not and I didn't have enough money to get get me back to Ohio and the only thing I had was a radar detector, but I didn't really want to sell that and I had a CB, it wasn't worth but thirty bucks. And I didn't have nothing else that was worth any money so I said sure, what the hell. So I went to his truck and he told me to come back in the sleeper and I made like I was coming back there and when he wasn't looking, I shot him.
>
> NELSON:        With what?
>
> FAUTENBERRY:    With a .22.

NELSON:        That same .22?

FAUTENBERRY:        Uh-huh.

NELSON:        Then what did you take from him?

FAUTENBERRY:        Some money.

NELSON:        How much did he have?

FAUTENBERRY:        Not very much at all, maybe forty bucks.

NELSON:        So he thought you was coming back for sex and you were, didn't ever have any intention to do that.

FAUTENBERRY:        No.

(J.A. Vol. V, at 187-88).

*        *        *

FAUTENBERRY:        They found him [Daron].

NELSON:        Oh, yeah.  They found last night some guy just happened to be going uh to the side of the road who had to go to the bathroom and walked over the embankment and saw him.  And pretty much in the area of where you described it, I guess.  Uh, when they found him, his pants were down to his knees.  Did you have anything to do with that or did they just, did that happen when, when we went, rolled down the embankment.

FAUTENBERRY:        I didn't have sex with him if that's what you mean.

NELSON:        No, no.  I wasn't suggesting that.  I thought maybe you was going through his pockets or something.

FAUTENBERRY:        Dragging him or something, I don't know.

(J.A. Vol. V, at 195).  Thus, express denials on the part of petitioner that he intended to have sex with Gary Farmer and that

49

he did have sex Joseph Daron diminish somewhat the relevance or materiality of evidence suggesting that there were sexual aspects to the homicides. Further, since petitioner's statements to Detective Nelson were supplied by the state during pretrial discovery, (J.A. Vol. II, at 277-79), defense counsel may very well have decided that there was nothing favorable or exculpatory to pursue in this regard.

Finally, the court fails to understand what possible relevance there was to evidence that Gary Farmer had been accused of sexually abusing his foster son. That being so, such evidence cannot be regarded as *Brady* material, the suppression of which violated petitioner's rights.

Thus, the court is not persuaded from the totality of the circumstances that the failure of the prosecution to turn over evidence suggesting that there were sexual aspects to the homicides undermines the constitutional validity of petitioner's no contest pleas, or, under *Kyles*, that those exhibits could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict upon petitioner's no contest pleas. Much of the evidence was already known to petitioner. Evidence that appears to have been suppressed was only marginally relevant, if relevant at all. Thus, petitioner cannot demonstrate that the suppressed documents were favorable or material.

<u>Evidence of Petitioner's State of Mind</u>

Petitioner argues that the state committed a *Brady* violation in failing to turn over to defense counsel information that law enforcement officers had obtained about petitioner's state of mind during the relevant time period, *i.e.*, November 1990 through March

1991. Petitioner reasons that the state's theory was that petitioner had killed Joseph Daron during a course of conduct that involved killing a total of five people, beginning with the murder of Donald Nutley in Oregon on November 1, 1990, and ending with the murder of Jefferson Diffee in Alaska on March 21, 1991. Petitioner argues that it was crucial, therefore, for defense counsel to be able to explain petitioner's conduct. According to petitioner, evidence gathered by investigating officers demonstrating that petitioner had been severely depressed and even suicidal during the relevant time period would have been relevant in the sentencing phase of his trial and, therefore, should have been disclosed to defense counsel.

In support of his claim, petitioner cites three documents, allegedly provided for the first time during habeas corpus discovery, from people who were close to petitioner and who averred that, during the relevant time period, petitioner was severely depressed and even suicidal. Traverse Exhibit 30 is a narrative by Portland Detective Tom Nelson regarding three interviews he conducted of Olivia Priest Herndon, petitioner's former girlfriend, who remained his close friend and who visited with petitioner several times shortly before petitioner traveled to Alaska, where he committed his fifth and final murder during the five-month spree. According to Detective Nelson, Ms. Herndon recounted several conversations during which petitioner told her that he was very depressed, had done some "crazy things," was planning to commit suicide, did not know what he was going to do with his life, had lost everything and everyone who had ever cared about him, and saw himself doing some "strange things."

Traverse Exhibits 31 and 32 are transcripts of interviews conducted by Hamilton County Sheriff Detectives David Cammerer and John Kunkemoeller of petitioner's half-sister, Kristine Fautenberry, and her boyfriend, Mark Jurges. Both mentioned that, beginning in January of 1991 until he left Cincinnati in February of 1991, petitioner was very depressed and seemed to get worse every day. They mentioned that he was out of money, was forced to sell his motorcycle, had his truck repossessed, and eventually refused to leave the apartment or socialize with anyone.

Petitioner's arguments fail to persuade the court that the failure of the state to disclose evidence regarding petitioner's state of mind during the relevant time period undermines the voluntariness and intelligence of petitioner's no contest plea to the murder of Joseph Daron sufficient to establish that suppression of the evidence resulted in a *Brady* violation. To be sure, the court is of the view that evidence demonstrating that petitioner was extremely depressed and even suicidal is relevant, material evidence that probably should have been disclosed to defense counsel. That said, the court cannot find that the evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict upon petitioner's no contest pleas. First, it cannot be said that defense counsel were unaware that petitioner's mental state at the time of the offense might be a significant issue worthy of investigating. Moreover, in light of petitioner's statements to law enforcement officers indicating that robbery was the motive for each of the murders he had committed, it is highly unlikely that, had defense counsel received traverse exhibits 30, 31, and 32 suggesting that

petitioner was depressed and even suicidal, it would have put the case in such a different light as to undermine confidence in the outcome.

It appears from the record that defense counsel knew or should have known that petitioner's mental state at the time of the offenses was an issue worth investigating. Defense counsel filed a suggestion of insanity on September 23, 1991, and requested evaluations to determine petitioner's competency to stand trial and sanity at the time of the offense, as well as a neuropsychological examination. It appears that reports on petitioner's competency and sanity were prepared by Dr. Schmidtgoessling, Dr. William Walters, and Dr. Emmett Cooper. Additionally, another competency report was prepared by Dr. Schmidtgoessling in March 1992, and petitioner was transported to and treated at, for a short time, the Dayton Mental Health Center in March and April 1992. Finally, petitioner was evaluated by Dr. Schmidtgoessling again in September 1992 for purposes of petitioner's mitigation hearing.

Some of those reports, especially those that were conducted to determine petitioner's mental state at the time of the offense, contained indications of the extreme depression that petitioner was suffering around the time of the murders. For instance, the report filed by Dr. Schmidtgoessling regarding petitioner's mental state at the time of the offense recounted statements from petitioner that, during the relevant time period, he felt he did not have any control over his life, was experiencing a deteriorating financial situation, felt he had no one to talk to, felt like a "teapot with steam coming out," and felt depressed and rejected by his family. (J.A. Vol. II, at 257-262). The competency evaluation conducted by

53

the Court Clinic in March 1992 recounted an interview with petitioner's sister, Kristine Fautenberry, in which she stated that petitioner had sounded depressed and suicidal in January and February 1991. (J.A. Vol. II, at 291-92). Finally, the mental evaluation performed in connection with petitioner's mitigation hearing resulted in a report indicating that, at the time of the offense, petitioner suffered from no severe mental disease or defect, but had been experiencing a number of significant stressors, including two break-ups with women who were important to him, unemployment, perceived rejection by sister and her boyfriend, and the repossession of his truck. (J.A. Vol. II, at 474-77). The report indicated that, although petitioner had reported that his need for money and a car to get back to Oregon were the motivating factors in his murder of Joseph Daron, a chronic level of rage had built up due to the criticism from petitioner's sister and her boyfriend. The report concluded by noting that the physical and emotional abuse petitioner had suffered as a child contributed significantly to his personality, that he felt chronically vulnerable, that he was mistrustful and defensive, that he had a high level of rage, and that he questioned the value of his own life.

In addition to the many reports that were prepared and filed regarding petitioner's mental state, defense counsel had other indications about the depression that petitioner was suffering during the relevant time period. In response to a question by Portland Detective Tom Nelson on March 19, 1991, about what had made him change into someone capable of committing these murders, petitioner answered that he had a burning hate inside of him for

his father, his step-father, and for everyone who had it "better" than he did. (Tr. Vol. V, at 207-208). Later in the interview, petitioner stated: "My life went down the tubes. I lost my girlfriend, I lost my [] job...." (J.A. Vol. V, at 238). It also bears mentioning that defense counsel did travel to California to interview and depose Olivia Priest Herndon. *See* J.A. Vol. II, at 301-302. It seems unlikely that Mrs. Herndon did not mention, or that defense counsel did not inquire about, petitioner's mental state, mood, and behavior during the relevant time period.

In addition to finding that defense counsel knew or should have known that petitioner might have been suffering from severe depression during the relevant time period, the court also finds no prejudice from the failure of the state to disclose its evidence about petitioner's depression because in his own statements to law enforcement officers, petitioner indicated repeatedly and clearly that robbery was his motive for the murders. Thus, it is difficult to say that suppression of evidence regarding petitioner's mental state during the relevant time period – a fact which, in any event, defense counsel knew or should have known – put the case in such a different light as to undermine confidence in the outcome. During the March 19, 1991, interview by Portland Detective Tom Nelson, petitioner told Detective Nelson that he had killed Christine Guthrie for money. "That's all it's ever been for." (J.A. Vol. V, at 178). When asked what the reason was for the first murder, *i.e.*, the murder of Donald Nutley in Oregon, petitioner responded, "Money." (J.A. Vol. V, at 180). Petitioner went on to state that he murdered truck driver Gary Farmer in New Jersey for money, (J.A. Vol. V, at 187-89), and that he had killed Joseph Daron in Ohio to

55

take his car, (J.A. Vol. V, at 238). It is difficult to say that suppression of evidence regarding petitioner's mental state during the relevant time period put the case in such a different light as to undermine confidence in the outcome.

In short, the court is not persuaded from the totality of the circumstances that the failure of the prosecution to turn over evidence concerning petitioner's mental state during the five-month murder spree undermines the constitutional validity of petitioner's no contest pleas, or, under *Kyles*, that the evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict upon petitioner's no contest pleas. Thus, petitioner cannot demonstrate that the suppressed documents were favorable or material.

Conclusion

Having found that the exhibits cited by petitioner in support of his fourth ground for relief were probably suppressed, this court is faced with the task of determining whether the apparently suppressed evidence was favorable and, if so, whether the evidence satisfied the materiality/prejudice components. The court has determined that none of the exhibits cited by petitioner were so favorable and material as to undermine confidence in the judgment against him. That being so, petitioner has not established the prejudice prong of the cause-and-prejudice test to excuse the default of his *Brady* claim. *Strickler, supra*, 527 U.S. at 282. The court concludes that petitioner's fourth ground for relief is procedurally defaulted and that petitioner has failed to demonstrate cause and prejudice sufficient to excuse the default. In the alternative, the court finds that petitioner's fourth ground

for relief is without merit.

## C. Fifth and Seventh Grounds for Relief

Petitioner's fifth and seventh grounds for relief rely on the same or similar evidence and arguments and will be addressed together.  Petitioner's fifth ground for relief states:

Mr. Fautenberry's convictions and sentences are constitutionally infirm because his waiver of his right to a jury trial in both phases of the proceedings was not knowingly, intelligently, and voluntarily entered.

Petitioner's seventh ground for relief is as follows: Mr. Fautenberry's convictions and sentences are constitutionally infirm because his no contest pleas were not knowingly, intelligently, and voluntarily entered.

Petitioner contends in his fifth ground for relief that he did not knowingly, intelligently and voluntarily waive his right to a jury trial.  Petitioner alleges that there were defects in the written waiver form he signed because it was not designed for use in a capital case because it refers to an election to be tried by one judge, not three judges.  Petitioner further alleges that the judge who accepted his waiver erroneously informed him that he would decide petitioner's guilt, without referring to the fact that the case would be presided over by a three-judge panel, and that the judge only asked petitioner whether he had signed the written waiver.  He claims that he was not informed that he had a right to a jury if he was found guilty of a capital specification.  He alleges that the written waiver did not inform him that his jury waiver would allow for his conviction based on the concurrence of three people rather than a panel of twelve, that many issues raised by pretrial motion would become moot, thereby eliminating possible arguments on appeal, or that his jury waiver could be withdrawn at

any time prior to the commencement of trial.

Petitioner further contends that his counsel failed to provide him with the information he needed to make a knowing, voluntary and intelligent waiver of his right to a jury trial.  He claims that this failure was the result of the lack of a meaningful relationship with his attorneys.  He alleges that counsel misinformed him that all of the issues raised by pretrial motion would be preserved on appeal.

Finally, petitioner also alleges that he was not mentally competent to waive his right to a jury on June 9, 1992, the date of the jury waiver.

Petitioner claims in his seventh ground for relief that he did not knowingly, intelligently, and voluntarily enter his no contest plea.  He relies on the same arguments made in his fifth ground for relief concerning his lack of a meaningful relationship with his attorneys, the failure of counsel to advise him of the rights he was waiving, the alleged erroneous information given him by counsel concerning the preservation of issues in his pretrial motions and the effect of a no contest plea, and his mental condition.  He alleges that he was misinformed by counsel that a no contest plea would spare his life, that the panel would not hear evidence of the other homicides committed by petitioner, and that the no contest plea would be regarded as a mitigating factor by the panel.  Petitioner further asserts that the panel failed to hear evidence to properly determine if there was a factual basis for his plea, and that if the court had conducted a hearing, it would have found no basis for the plea.

Petitioner raised the issue of the validity of his jury waiver

before the state court as the ninth cause of action in his amended postconviction petition. Appx. Vol. VII, pp. 177-181. In support of his contention that he had no meaningful relationship with his attorneys, petitioner submitted the affidavit of Dr. Susan Schorr, a psychologist and court-appointed mitigation specialist, as Exhibit 8 to his petition. Dr. Schorr referred to "the failure of [petitioner's] counsel to establish and maintain a positive working relationship" with petitioner. Appx. Vol. VII, p. 241.

Petitioner also sought to establish through various documents that he was suffering from severe psychological problems at the time of his waiver. He presented the intervention notes of jail personnel as Exhibit 2 to his petition. Appx. Vol. VII, p. 190. These notes indicate that on June 2, 1992, one week prior to his waiver, a medical official in the jail reported that petitioner was hearing voices, and that petitioner told him that he needed his medications and a good night's sleep before his execution the next day. Appx. Vol. VII, p. 199. He was described as being alert, crying, shaking, but cooperative, and somewhat delusional and paranoid. On that date, one of petitioner's attorneys called the jail to report that petitioner was suicidal. Appx. Vol. VII, p. 200. Petitioner also submitted a phone message, Exhibit 46, which indicates that petitioner attempted to tell his attorney, Mr. Keller, that he had "killed him." Appx. Vol. VIII, p. 231.

The jail medical records, Exhibit 2, further reflect that on June 3, 1992, petitioner told jail officials that he was not going to kill himself, but that he could not stop the voices in his head. Appx. Vol. VII, p. 200. On June 5, 1992, a medical official at the jail described him as "[a]ngry, hopeless & helpless. Does not

59

think 'anyone wants to help.'" Appx. Vol. VII, p. 201.  The records reflect that on June 8, 1992, the housing officers reported that petitioner had not eaten anything for five days and had nothing to drink for two days.  Appx. Vol. VII, p. 202.

Petitioner also presented evidence that, although his attorney reported to the court that the jail had discontinued petitioner's medication, which included Sinequan, on June 2, 1992, the jail records, Exhibit 67, indicate that the medications were discontinued on June 5, 1992.  Appx. Vol. VIII, p. 350.  Petitioner argued that discontinuing his prescription for Sinequan, an antidepressant, would have deepened his depression.  However, he also takes the contrary position in his petition that there was "no mention in the record that the medication was ever discontinued." Appx. Vol. VII, p. 179.  He argued that his long isolation in the jail contributed to his mental state.

Petitioner also submitted an affidavit, Exhibit 39, in which he stated that his attorneys informed him that the three judges on his panel were desirable because Judge Bettman was liberal, and one of the other judges was preoccupied with personal problems.  Appx. Vol. VII, p. 203.  Petitioner also claimed that he was told by his attorney, Mr. Walton, that one of the judges had stated that if petitioner waived a jury, the court would not pursue the death penalty.  *Id*.  Petitioner also stated that his attorneys told him that all the issues raised in the pretrial motions would be preserved for appeal.  *Id*.  Petitioner also argued that the written jury waiver did not inform him that he would be proceeding before a three-judge panel as opposed to a single judge.

Petitioner challenged the validity of his no contest plea in

the tenth cause of action in his amended petition for postconviction relief. Appx. Vol. VII, p. 181-82. In support of this claim, petitioner incorporated the arguments made in regard to his jury waiver. In his affidavit, Exhibit 39, petitioner stated that the three-judge panel would not hear evidence concerning his other crimes if he pleaded no contest. Appx. Vol. VIII, p. 203. He also stated that he did not recall his attorneys advising him about the rights he would be waiving, and that his attorneys told him that all of the issues raised in his pretrial motions would be saved for appeal. Appx. Vol. VIII, p. 204. Petitioner submitted Exhibit 33, consisting of newspaper photographs taken during court proceedings, which, he argued, revealed that he was incoherent at the time. *See* Appx. Vol. VIII, pp. 171-75.

In its decision of October 27, 1997, the Ohio trial court noted the evidence submitted by petitioner.[4] *See* Appx. Vol. XII, pp. 17-18. The court also noted the report of Dr. Salah M. Samy, M.D., signed June 2, 1992, which was submitted as Exhibit 36 to the petition. *See* Appx. Vol. VIII, p. 178; Appx. Vol. XII, p. 18. In this report, Dr. Samy found that petitioner was competent to stand trial, and that he was not psychotic but simply suffering from the stress caused by his legal situation. The trial court also reviewed the transcript of the jury waiver proceedings.

The trial court concluded that this claim was barred by res judicata. The court also found no evidentiary support for

---

[4] The decision addresses this claim under the heading "Eighth Cause of Action" as it was labeled in the original postconviction petition, not the "Ninth Cause of Action" as it was renumbered in the amended petition. The decision also addresses petitioner's no contest plea claim under the heading "Ninth Cause of Action" rather than "Tenth Cause of Action" as it was renumbered in the amended petition. However, the arguments made in regard to these causes of action in both the original petition and the amended petition are virtually the same.

61

petitioner's argument that his jury waiver was not knowingly, intelligently and voluntarily entered or that his attorneys were ineffective at the time of the waiver.  The court found that petitioner was competent to enter his jury waiver, and that the waiver was knowingly, intelligently and voluntarily entered.  Appx. Vol. XII, p. 19.

In regard to petitioner's claim that his no contest plea was invalid, the trial court found that petitioner's affidavit was insufficient to rebut the record, which showed that his no contest plea was knowingly, intelligently and voluntarily entered.  Appx. Vol. XII, p. 20.

The court of appeals addressed petitioner's ninth and tenth causes of action together.  The court concluded that petitioner's affidavit in itself was insufficient to warrant a hearing on the issue of whether petitioner's waiver was based upon inadequate information given by defense counsel. *Fautenberry*, 1998 WL 906395 * 7 (citing *State v. Kapper*, 5 Ohio St.3d 36, 448 N.E.2d 823 (1983)(petitioner's self-serving declarations in affidavit insufficient to rebut record which otherwise showed that petitioner's plea was voluntary)).  The court of appeals noted that the record "shows that Fautenberry was engaged in a colloquy by the judge, and indicated squarely that he understood that he was waiving his right to a jury trial and that no promises had been made to him." *Id*.  The appellate court also noted that petitioner had been found competent to stand trial on January 15, 1992, and again on June 9, 1992, right after he had been psychologically evaluated and right before he entered his plea. *Id*.  The court rejected the opinion of Dr. Schorr concerning petitioner's

relationship with his attorneys as being insufficient to rebut the record, which demonstrated a knowing, voluntary, and intelligent waiver by petitioner of his right to trial. *Id*.

### 1. Validity of Jury Waiver

A defendant may waive his right to a jury trial. *Adams v. United States ex rel. McCann*, 317 U.S. 269, 277-78 (1942). A valid waiver has four elements:

> First, the waiver must be in writing. Second, the government attorney must consent to the waiver. Third, the trial court must approve the waiver. Fourth, the defendant's waiver must be voluntary, knowing, and intelligent.

*United States v. Martin*, 704 F.2d 267, 271 (6th Cir. 1983). Waiver may not be presumed from a silent record; however, if the record shows a jury waiver, the verdict will not be set aside except on a plain showing that the waiver was not freely and intelligently made. *Adams*, 317 U.S. at 281.

In order for a defendant's waiver to be voluntary, knowing and intelligent, he must have some understanding of the nature of the jury trial right. *Adams*, 317 U.S. at 280; *Martin*, 704 F.2d at 273. However, the defendant need not have a "technical knowledge" of the jury right in order for his waiver to be effective. *United States v. Sammons*, 918 F.2d 592, 596 (6th Cir. 1990). The trial court is not required to inform a defendant of all of the possible implications of a jury waiver. *Smith v. Anderson*, 104 F.Supp.2d 773, 795 (S.D.Ohio 2000), *aff'd sub nom. Smith v. Mitchell*, 348 F.3d 177, 213 (6th Cir. 2003).

For example, in *Lott v. Coyle*, 261 F.3d 594 (6th Cir. 2001), the Sixth Circuit found that the petitioner's jury waiver was valid despite the fact that the trial court failed to inform the

petitioner that the jury waiver would apply to the mitigation phase, that the concurrence of only three judges (rather than twelve jurors) would be sufficient to convict him on the charges and the death penalty specification and to sentence him to death, that there would be fewer appellate issues available to him concerning matters such as jury selection and jury instructions, and that he could withdraw his jury waiver at any time.  The Sixth Circuit upheld the validity of the waiver even though the trial court conducted only a brief inquiry of the petitioner concerning whether he understood his right to a jury trial and whether he had the opportunity to discuss the rights he would be forfeiting by waiving a jury trial, made no further inquiry into the extent of the discussions between the petitioner and his counsel, and simply accepted the word of counsel that petitioner understood his rights. *Id.* at 615.

In this case, the jury waiver was in writing, the state agreed to the waiver, and the court accepted the waiver, thus satisfying the first three *Martin* requirements.  Petitioner, however, contends that the written waiver he signed was not designed for capital cases, and erroneously referred to a trial before a single judge, not a three-judge panel.  He argues that this error was compounded by statements made by the court during the waiver proceedings.[5]  He

---

[5]The state trial court found that petitioner's postconviction claim concerning the validity of his jury waiver was barred by res judicata.  *See* Appx. Vol. XII, p. 19; *State v. Pless*, 74 Ohio St.3d 333, 339, 658 N.E.2d 766 (1996)(any error regarding the execution of written jury waiver can only be raised on direct appeal).  Any defects in the written form, and, for that matter, the trial court's inquiries, were matters of record which could have been raised on direct appeal.  Res judicata is an independent and adequate ground to bar the consideration of habeas claims.  *Norris v. Schotten*, 146 F.3d 314, 332 (6th Cir. 1998).  Therefore, this court questions whether this branch of petitioner's claim has been preserved for habeas review.  However, in the interests of judicial economy, the court will also address the merits of this branch of petitioner's

also contends that his waiver was not knowingly, voluntarily and intelligently made.

The written waiver signed by petitioner, Appx. Vol. II, p. 300, stated:

> I, John Fautenberry, Defendant in the above cause, hereby knowingly, intelligently and voluntarily waive and relinquish my right to a trial by Jury, and elect to be tried by a Judge of the Court in which the said cause be pending.
>
> I fully understand that under the laws of this State, I have a constitutional right to a trial by Jury.

This language tracks the language of Ohio Rev. Code §2945.05, which mandates that written jury waivers contain substantially this language.

Petitioner fails to explain how he could have been prejudiced by the reference to "a Judge" because, upon waiving a jury, he would be tried before a three-judge panel whose verdict would require the unanimous agreement of three judges, rather than just the decision of a single judge.  In any event, the following inquiry by the trial court also occurred:

> Court: Now, Mr. Fautenberry, it says here the defendant in the above cause hereby knowingly, intelligently, and voluntarily waives and relinquishes your rights to a trial by jury.  Is that your desire?
>
> The defendant: Yes.
>
> Court: Okay, and you elect to be tried by Judges of the Court in which this cause is now pending?
>
> The defendant: Yes.
>
> Court: And that you understand under the laws of the State of Ohio that you do have a precious constitutional

---

fifth ground for relief.

right to be tried by a jury, do you realize that?

The defendant: Yes.

Appx. Vol. I, p. 19.

The court then asked if petitioner had signed the form, if he had read it prior to signing it, if his attorneys had explained it to him, and if he understood the form. He responded "Yes" to these questions. Appx. Vol. I, p. 20. The court again asked petitioner if he understood that he had a constitutional right to be tried by a jury of twelve, and that by signing the form, he was waiving that right. Petitioner indicated that he understood. *Id.* The court then asked if petitioner understood that "I as a Judge will be presiding over this particular case and will make a decision as to whether the State of Ohio has proven you guilty," and petitioner stated that he understood. *Id.* Petitioner denied that anyone had offered or promised him anything for waiving his right to a trial by jury, and, when asked if he had any questions about the procedure that the court would be following, he stated that he did not. He responded affirmatively when asked if his attorneys had explained the procedure which would be followed, and said that he had no questions about his rights. *Id.*

A discussion followed about selecting the other two judges for the panel. *Appx. Vol. 1,* p. 22. The court then read a passage from Ohio Rev. Code §2945.06 to the petitioner, stating that "the judges or a majority of them may decide all the questions of fact and law arising upon the trial, however the accused shall not be found guilty or not guilty of any offense unless the judges unanimously, that means all three find the accused guilty or not guilty." *Id.* at pp. 22-23. The court further informed the

66

petitioner that if a defendant pleads guilty to aggravated murder, a court composed of three judges shall examine the witnesses and determine whether the accused is guilty of aggravated murder "or any other offense" and pronounce sentence accordingly. The court asked petitioner if he understood that "it will be three judges and it would have to be unanimous between the three judges" and petitioner indicated that he understood. *Id*. at p. 23. Petitioner made no objection at this point about continuing to proceed with his jury waiver, and two more judges were drawn to be assigned to the case.

The record reveals that the trial court adequately corrected any misconception which would have arisen as a result of the language of the jury waiver form. Although the judge at one point referred to the fact that "I as a Judge will be presiding over this particular case," he later clearly advised the petitioner that he would be tried and sentenced by a three-judge panel. Petitioner was also informed that he had a constitutional right to a trial by a jury of twelve, and that, by signing the form, he was waiving that right. Petitioner was further informed that the three judges would hear evidence and determine whether he was guilty of aggravated murder "or any other offense" and that the verdict of the three judges would have to be unanimous. The judge also informed him that he would be sentenced by the three-judge panel. Petitioner stated that his counsel had explained the form and the procedure which would be followed in his case, and that he had no questions about his rights. The jury waiver form and the trial court's inquiry in this case were sufficient.

Petitioner further claimed in his postconviction affidavit

that he was erroneously informed by counsel that the three-judge panel would not hear evidence of his other crimes, and that he would not be waiving issues raised in pretrial motions. Vol. VIII, p. 203. As to the second allegation, even assuming that petitioner's attorneys told him that he would not be waiving any issues asserted in his pretrial motion by waiving a jury, there is nothing in the record to indicate that he would not have waived a jury had he known that he could not assert jury-related issues on appeal, especially since the occurrence of any reversible error in regard to the jury was purely speculative at that point. Although petitioner claims in his petition that he was not advised of his right to withdraw his jury waiver at any time prior to trial, he did acknowledge in his affidavit that his attorneys told him that he could withdraw his jury waiver. *Id*. He also stated that he did not recall what his attorneys told him about what rights he would be waiving by proceeding before a three-judge panel. *Id.* This is not sufficient to establish that his attorneys failed to inform him about the consequences of a jury waiver.

Petitioner also submitted the affidavit of Dr. Schorr, which referred to the "failure of counsel to establish and maintain a positive working relationship" with petitioner. Appx. Vol. VII, p. 241. However, she offered no evidence indicating that she was privy to any conversations between petitioner and his attorneys concerning the jury waiver issue.

The trial court implicitly rejected petitioner's evidence in finding that petitioner's jury waiver was knowingly, voluntarily and intelligently entered. The state appellate court rejected petitioner's self-serving affidavit and the opinion of Dr. Schorr

as being insufficient under *Kapper* to rebut a record which otherwise showed that petitioner's waiver of his right to a jury was knowingly, intelligently and voluntarily entered. *Fautenberry*, 1998 WL 906395 * 7.  *See Cooey v. Coyle*, 289 F.3d 882, 893 (6th Cir. 2002)(noting that state court's rejection of petitioner's jury waiver claim due to petitioner's failure to present evidence supporting claim under *Kapper* amounted to an implicit holding that petitioner had defaulted this claim in state postconviction trial proceeding, barring further development of claim in habeas proceedings).  The factual findings of the state courts are presumed to be correct, and petitioner has not shown that these state court findings were clearly erroneous.

Petitioner further contends that he was mentally incompetent to waive his right to a jury trial.  He submitted medical records from the jail in support of his postconviction claim.  However, as noted by respondent, these records contain only petitioner's statements regarding his mental state the week prior to his jury waiver.  In essence, these statements are self-serving, and offer no independent basis for concluding that they are reliable.

The record reflects that prior to his jury waiver, petitioner was evaluated on two separate occasions to determine his competency to stand trial, first in the fall of 1991, and later in May of 1992.  Petitioner was examined on October 22, 1991 by Dr. William S. Walters, a clinical psychologist.  His report, dated November 5, 1991, was filed with the court.  Appx. Vol. II, p. 252.  Dr. Walters found that petitioner was an individual with average intellectual ability, "free from signs of significant psychiatric illness."  He further concluded that petitioner was able to

appreciate "the adversarial nature of the judicial system and the plea options available to a defendant" and that he was competent to stand trial.  Appx. Vol. II, p. 256.

The record also contains the November 8, 1991 report of Dr. Emmett G. Cooper, M.D., Ph.D.  Appx. Vol. II, p. 264.  Dr. Cooper noted that petitioner claimed to have had recent suicidal impulses, but that he denied auditory or visual hallucinations.  He found petitioner to be in the normal intellectual range.  Dr. Cooper concluded that petitioner understood the nature of the charges against him and the legal proceedings, that he could assist his attorneys, and that he was competent to stand trial.  Appx. Vol. II, p. 265.  On January 15, 1992, the trial court determined that petitioner was competent to stand trial.  Appx. Vol. II, p. 275.

In February of 1992, defense counsel filed a renewed motion to determine the competency of petitioner.  Appx. Vol. II, p. 282.  Petitioner was referred for another examination.  Appx. Vo. II, p. 284.  Petitioner refused to talk with the court-appointed psychologist, Dr. Nancy Schmidtgoessling.  Appx. Vol. II, p. 291.  Dr. Schmidtgoessling noted in her letter to the court that at her first evaluation of petitioner in early November, she stated that "hopelessness about [petitioner's] case was present and I advised the Court about his propensity to act in a self-defeating fashion about his case."  Appx. Vol. II, p. 292.  On May 21, 1992, the court ordered that petitioner be conveyed to the Dayton Mental Health Center for an evaluation of his competency to stand trial.  Appx. Vol. II, p. 296.

At the Dayton hospital, petitioner was evaluated by Dr. Salah M. Samy, M.D.  According to the report of Dr. Samy, petitioner was

admitted to the facility on May 26, 1992. Appx. Vol. VIII, p. 178.
Upon his arrival, he did not speak to Dr. Samy, but was observed
talking with other patients and shooting pool.  The staff reported
to Dr. Samy that on the second day of his stay, petitioner's
manner, performance and attentiveness were appropriate, and did not
reflect any signs of mental illness.  On the third day, petitioner
agreed to talk with Dr. Samy.  *Id*.  Petitioner appeared to be
"coherent, relevant and goal oriented."  Appx. Vol. VIII, p. 179.
Dr. Samy reported that he observed "no paranoid ideations,
delusions, omnipotence or omniscience type of thoughts."  *Id*.
Petitioner reported that he heard his mother's voice in jail, and
that he was hopeless about his acquittal.  However, he recalled Dr.
Samy's name, even though he had not seen him for two days.  Dr.
Samy reported that petitioner was aware that he was facing the
death penalty and an aggravated murder charge.  He observed that
petitioner was of average intelligence, probably in the upper
range.  *Id*.  He described petitioner as being healthy, well
nourished and well built.  Appx. Vol. VIII, p. 188.  He considered
petitioner's judgment "fair to good, based on his performance and
conduct on the ward[.]" Appx. Vol. VIII, p. 190.  He diagnosed
petitioner as possibly having an antisocial personality disorder,
as well as an adjustment disorder with mixed emotional features.
Appx. Vol. VIII, pp. 180, 190.  He concluded that petitioner was
competent to stand trial, and that he was not mentally ill.  Appx.
Vol. VIII, pp. 190-91.  His report stated that no discharge
medications were recommended.  Appx. Vol. VIII, p. 190.

    At the competency hearing held on June 9, 2004, a little more
than a week after his stay at the Dayton Mental Health Center,

71

petitioner indicated, in response to the court's inquiry, that he was feeling a "little bit" better.  Appx. Vol. I, p. 14. Petitioner indicated that he understood the nature of the proceedings that day, and the fact that Dr. Samy had found him competent to stand trial.  *Id.* at p. 16.  A trial date was scheduled in September.  *Id.*, at p. 18.  A brief recess was taken, and then counsel submitted a waiver of the right to a trial by jury.  *Id.* at p. 19.

The record contains sufficient information to support the factual conclusions of the state courts that petitioner was mentally competent to knowingly, intelligently and voluntarily waive his right to a jury trial.  A mere week before the incidents reported in the jail medical records, petitioner was evaluated by a psychiatrist in a hospital setting and found to be competent and not mentally ill.  The fact that petitioner may have been mentally depressed about his situation does not mean that he was psychotic or incapable of understanding the implications of a jury waiver. Further, the record of the court proceedings involving petitioner's jury waiver contains no indication that petitioner was mentally incompetent.

The factual findings of the state court in regard to petitioner's jury waiver claim are supported by the record and have not been shown to be clearly erroneous.  Likewise, it has not been shown that the state courts' legal conclusions were contrary to, or the result of an erroneous application of federal law. Petitioner's fifth ground for relief is denied.

**2. No Contest Plea**

Petitioner also attacks the validity of his no contest plea.

72

A guilty or no contest plea is valid if it is entered voluntarily, knowingly, and intelligently. *Brady v. United States*, 397 U.S. 742, 748 (1970); *King v. Dutton*, 17 F.3d 151, 153 (6th Cir. 1994). Under *Boykin v. Alabama*, 395 U.S. 238 (1969), when a defendant enters a guilty or no contest plea, the state has the burden to show that the plea was voluntary and intelligent. Before a court can uphold a plea as valid, the record must show that the defendant voluntarily and knowingly waived his constitutional rights, specifically, the Fifth Amendment privilege against compulsory self-incrimination, the right to trial by jury, and the right to confront one's accusers. *Id.* at 243. When a defendant subsequently brings a federal habeas petition challenging his plea, the state generally satisfies its burden by producing a transcript of the state court proceeding. *Garcia v. Johnson*, 991 F.2d 324, 326 (6th Cir. 1993). The factual findings of a state court generally are accorded a presumption of correctness unless the transcript of the plea proceeding is inadequate to demonstrate that the plea was voluntary, intelligent and knowing. *Id.* at 326-27; 28 U.S.C. §2254(e)(1). The propriety of a guilty or no contest plea is assessed by reviewing the totality of the circumstances surrounding the plea. Brady, 397 U.S. at 748-49; *Garcia*, 991 F.2d at 327. The proper standard of review is whether the record of the state court proceedings "leav[es] doubt as to whether the plea was in fact intelligent and voluntary."

To ensure that a defendant is aware of his constitutional rights, Ohio law provides that the trial court may not accept a guilty or no contest plea without personally addressing the defendant and:

(a) Determining that he is making the plea voluntarily, with understanding of the nature of the charge and of the maximum penalty involved, and, if applicable, that he is not eligible for probation.

(b) Informing him of and determining that he understands the effect of his plea of guilty or no contest, and that the court upon acceptance of the plea may proceed with judgment and sentence.

(c) Informing him and determining that he understands that by his plea he is waiving his rights to jury trial, to confront witnesses against him, to have compulsory process for obtaining witnesses in his favor, and to require the state to prove his guilt beyond a reasonable doubt at a trial at which he cannot be compelled to testify against himself.

Ohio R. Crim. P. 11(C)(2)(a)-(c).

A change of plea hearing was held in petitioner's case on July 23, 1992, *see* Appx. Vol. I, p. 39 *et seq.*, and the written forms, one for each count of the indictment, for the entry of a no contest plea signed by petitioner were submitted to the court. *See* Appx. Vol. II, pp. 342-46. The written forms advised petitioner about the nature of the charges, the potential penalties, and the effect of a no contest plea, including the fact that he would thereby waive his right to a jury trial, to confront witnesses, to compulsory process, and to require the state to prove the charges against him beyond a reasonable doubt at a trial where he could not be compelled to testify against himself. The forms also contained language indicating that petitioner, by signing the forms, also confirmed that he understood the nature of the charges, including whether or not he would be eligible for probation, that he had not been forced or threatened in any way to sign, that he was entering the plea knowingly, intelligently and voluntarily, and that he was satisfied with the legal representation and advice he had received

from counsel.    Petitioner's attorneys also signed the forms, thereby acknowledging that they had explained to petitioner the charges and penalties in his case, along with his constitutional rights, and representing that, in their opinion, petitioner was competent to enter his pleas and was doing so knowingly, intelligently and voluntarily.

The three-judge panel addressed petitioner and asked him, "After discussing your case with your attorney do you think it is your best advantage to plead no contest to these five counts of the indictment?"  Appx. Vol. I, p. 40.  Petitioner responded, "Yes, sir."  *Id*.  The following statement was then made by petitioner's attorney:

> Mr. Keller: Your Honor, if I may be heard briefly. with all due respect we have met with Mr. Fautenberry a number of times, most recently in the past several weeks for several hours at a time.  We have explained to him all of his rights under the laws of Ohio and the U.S. Constitution.  I want the record to reflect, and we have gone over this with him, that he understands first that he has voluntarily withdrawn or waived his right to a trial by jury, that he understands by doing that he has elected to go forward with the panel that is presently seated, that he understands that at any time prior to the commencement of trial he had every right to withdraw that former waiver and to go forward at a trial by jury where he obviously could not be compelled to testify against himself and would partake in the selection of a jury.
>
> Furthermore he understands that we are entering a plea of no contest.  We have explained to him in detail what the plea of no contest means, that he understands further that by pleading no contest that he is in essence giving up substantial number of rights, particularly those that may be available to him at the appellate level if he were to go to trial where there would be potential errors by either the State of Ohio or by defense counsel and/or perhaps by the Court in a trial; that he is again making this voluntarily, that we have discussed with him that there are no promises, no guarantees; that he understands

that as he stands before the Court today if after
entering the plea of no contest the Court finds him
guilty of either count 1 or count 2 with the
specification, that those allow this Court if there is a
finding of guilty and in the mitigation stage if the
aggravating circumstances are found to be greater than
the mitigating circumstances, that this Court would have
the authority to impose the death penalty.

Furthermore that this Court could impose a 30 full years
with eligibility for parole thereafter or thirdly 20 full
year with eligibility for parole thereafter.    Further
understanding that in pleading guilty to the multiple
counts that he would also be exposed to additional times
if found guilty for the offenses of aggravated robbery,
for the offenses of theft.    And furthermore this gun
specification which would carry a three year actual
period of incarceration to be run consecutive with any
other sentence.

I believe that we have covered our understanding.  John,
do you have any questions?

The Defendant: No.

Appx. Vol. I, pp. 40-42.

The court then stated, "I'd like to determine from Mr.
Fautenberry whether these signatures and the pleas were made
voluntarily, knowingly and intentionally."  Petitioner responded,
"Yes."  Appx. Vol. I, p. 43.  When questioned by the court,
petitioner acknowledged that he had read the plea forms and
reviewed them with his attorney, that he understood the nature of
the charges, and that he understood that he was waiving his
constitutional rights.  *Id*.  The court advised petitioner of the
potential penalties for each of the offenses to which he was
pleading no contest, including the fact that he could receive the
death penalty on counts 1 and 2.  *Id*. at p. 44.  The court read
each count of the indictment, and petitioner stated that he
understood the charges and the potential penalties for those

76

charges.  *Id*. at pp. 45-49.  Petitioner acknowledged that he understood that his no contest pleas were not an admission of his guilt but an admission of the truth of the facts as they were alleged in the indictment.  *Id.* at p. 49.

Petitioner stated that he understood that by pleading no contest, he waived his right to a jury trial, to confront the witnesses against him, to have compulsory process to obtain witnesses, and to require the state to prove his guilt beyond a reasonable doubt.  *Id*. at p. 50.  He stated that he understood that if he proceeded to trial, he would not be required to testify against himself.  *Id*. at pp. 50-51.  The court asked petitioner if he had "complete faith and confidence in your two attorneys" and petitioner stated that he did.  Petitioner was then asked if he "voluntarily and intelligently made and entered this plea" and he responded, "Yes, sir."  *Id*. at p. 51.  When asked if he had any questions concerning his rights, he said, "No, sir."  He also stated that he understood that none of the offenses were probationable.  *Id.* at p. 52.  He confirmed that he wished to enter a no contest plea to every count and specification.  *Id.* at p. 53. The prosecutor then read the indictment, and petitioner entered a plea of no contest to all of the counts and specifications in the indictment.  *Id.* at pp. 53-59.  The court found that petitioner's no contest pleas were voluntarily and intelligently entered and accepted the pleas.  *Id.* at p. 59.

The record of the state court proceedings reveals that the constitutional requirements in *Boykin v. Alabama* and the requirements of Rule 11(C)(2) were fully complied with in this case.  The trial court conducted an extensive inquiry of the

petitioner before determining that he knowingly, intelligently and voluntarily entered his no contest pleas.

In contesting the validity of his no contest plea in the state postconviction proceedings, petitioner relied on largely the same evidence which was discussed above in connection with his jury waiver. His evidence was rejected by the state court as being insufficient to refute the state court record, which supports the finding of the state courts that petitioner knowingly, intelligently and voluntarily entered his no contest plea. For the reasons noted above in the discussion concerning petitioner's jury waiver claim, the state courts' rejection of petitioner's challenge to his no contest plea was not unreasonable or contrary to federal law. In regard to petitioner's mental state at the time of his change of plea, the record contains no evidence that petitioner was mentally incompetent to enter a no contest plea. Petitioner claimed in his postconviction affidavit that he was erroneously informed by counsel that the three-judge panel would not hear evidence of his other crimes, and that he would not be waiving issues raised in pretrial motions. Vol. VIII, p. 203. However, as previously noted, petitioner was informed when he waived a jury that the three-judge panel would hear evidence concerning the aggravated murder and other charges. One of the aggravated murder charges included a specification that the murder was committed as part of a course of conduct which involved the purposeful killing of two or more people. Petitioner was advised of the nature of that charge prior to entering his no contest plea, including the specification. Petitioner's statement that he was erroneously told that all issues raised by pretrial motions would be preserved for

appellate review is contradicted by counsel's statement on the record during the change of plea proceedings that petitioner had been advised that he would be waiving claims of potential error. Petitioner's statement in his affidavit that he did not recall whether his attorneys advised him about the rights he would be waiving is insufficient to contradict counsel's statement on the record that petitioner had been advised of his rights, or to negate the court's explanation of those rights on the record. Petitioner's claim that he was told that a no contest plea would spare his life is refuted by counsel's statement on the record that they had discussed with petitioner the fact that "there are no promises, no guarantees" and that the court had the authority to impose the death penalty.

Petitioner asserts for the first time in his habeas petition that his no contest plea was invalid because the trial court did not hear evidence prior to finding him guilty. This argument was not presented to the state courts. Whether the trial court employed the proper procedure in finding petitioner guilty on his no contest plea is also irrelevant to the issue of whether petitioner's plea was knowingly, intelligently and voluntarily entered. Rather, this argument is more properly grouped with petitioner's eighth ground for relief concerning the sufficiency of the evidence to support petitioner's no contest pleas. In its order of December 26, 2001, this court found that petitioner's eighth ground for relief was procedurally defaulted. Likewise, the argument petitioner now makes concerning the panel's alleged failure to follow the proper procedures in finding him guilty was fully apparent from the trial court record and could have been

raised on direct appeal.  Petitioner has offered no reason as to why he did not raise this argument on direct appeal.  In addition, petitioner has not shown how he was prejudiced in this case.

Ohio R. Crim. P. 11(C)(3) provides that in cases of aggravated murder where specifications are alleged, and where a plea of guilty or no contest to both the charge of aggravated murder and one or more specifications are accepted, the three-judge panel shall:

> (a) determine whether the offense was aggravated murder or a lesser offense; and (b) if the offense is determined to have been a lesser offense, impose sentence accordingly; or (c) if the offense is determined to have been aggravated murder, proceed as provided by law to determine the presence or absence of the specified aggravating circumstances and of mitigating circumstances, and impose sentence accordingly.

Similarly, Ohio Rev. Code §2945.06 provides that if "the accused pleads guilty of aggravated murder, a court composed of three judges shall examine the witnesses, determine whether the accused is guilty of aggravated murder or any other offense, and pronounce sentence accordingly."

These provisions, read together, have been construed as requiring the three-judge panel to hear testimony upon acceptance of a guilty or no contest plea to aggravated murder to determine if the accused is guilty of aggravated murder beyond a reasonable doubt.  *See State v. Green*, 81 Ohio St.3d 100, 689 N.E.2d 556 (1998)(guilty plea); *State v. Post*, 32 Ohio St.3d 380, 513 N.E.2d 754 (1987)(no contest plea).  This requirement to hear testimony is usually not satisfied by a statement by the prosecutor summarizing the evidence in the case.  *Green*, 81 Ohio St.3d at 104.  However, where there was an explicit agreement between defense counsel and the state which permitted the state to present a statement of facts

in lieu of witnesses or other evidence in fulfillment of its evidentiary burden, the defendant is bound by the agreed-upon procedure. *Post*, 32 Ohio St.3d at 393.

In this case, after the court's inquiry of the petitioner, the prosecutor provided the three-judge panel with exhibits and a summary of the evidence in support of the state's case. Appx. Vol. I, pp. 60-84. The exhibit list for the transcript of the plea proceedings, located at the beginning of Appendix Volume I, indicates that physical and documentary evidence concerning the five homicides was submitted to the court, including photographs and autopsy reports of the victims of the five homicides, spent bullets, handguns, court records from petitioner's case in Alaska, and the deposition transcript of FBI Agent Larry Ott concerning his interview of petitioner. Defense counsel stipulated to all exhibits with the exception of the crime scene photographs, which were admitted over petitioner's objection. Appx. Vol. I, p. 83.

The court asked the prosecutor if the state had any further evidence, and the prosecutor responded, "Unless this panel wants to cross-examine some witnesses, no." *Id.* at p. 84. Counsel for petitioner then stated:

> Your Honor, I would like to point out to the Court that we entered the no contest plea as per Rule Eleven. We are admitting the facts as alleged in the indictment. We are not necessarily admitting the facts in the four-and-a-half or five-page statement that Mr. Deters gave you, only as per the indictment.

Appx. Vol. I, p. 85. The court then asked defense counsel if there was a specific part of the facts to which he was objecting, and he noted that part of it was based on hearsay, although he did not specify to which portions in particular he was objecting. *Id.* He

81

also objected to the reference to another homicide in Oregon in the
early 1980's.  *Id*. at 86.  The prosecutor indicated in response
that the summary was based to a large extent on statements given by
petitioner which were verified by law enforcement officers.  *Id*. at
p. 87.  The prosecutor further stated:

> It was the defendant's choice that [he] plead no contest
> to this charge.  We were at all times willing to go to
> trial on it.  It was his decision to do it.  We read the
> statement of facts, we read the indictment.  It is my
> understanding that he agrees this is what happened and it
> is this Court's duty to weigh that and determine guilt or
> innocence.

*Id*.  Petitioner's counsel, Mr. Walton, responded, "I am sure the
Court can weigh as Judge Matthews said, separate the wheat from the
chaff as per the statement."  *Id*.  The court then asked, "Are you
satisfied?" and Mr. Walton responded, "Yes."  *Id*. at 88.  Defense
counsel did not ask to cross-examine any of the government's
witnesses, nor did they protest the prosecutor's statement that the
defense agreed with the statement of facts.  The three-judge panel
concluded that the statements and evidence supported the
allegations in the indictment and found petitioner guilty on all
counts and specifications.  *Id.* at pp. 90-92; Appx. Vol. II, p.
347.

    This record supports a finding that defense counsel agreed
with the procedure of presenting the evidence by way of a statement
by the prosecutor instead of live testimony.  Defense counsel
stipulated to most of the exhibits, and did not take advantage of
the opportunity to cross-examine witnesses which was offered.
Thus, any error under Rule 11(C)(3) and §2945.06 was waived.

    However, even assuming that this exchange was insufficient to
establish a waiver under *Post*, the record also demonstrates that

the court substantially complied with the requirements of Rule 11(C)(3) and §2945.06. During the mitigation hearing, the court heard live testimony from the five police officers who investigated the five homicides committed by petitioner. This included testimony from Thomas Boeing, the deputy sheriff who investigated the murder of Joseph Daron. Appx. Vol. I, p. 335. He testified concerning the discovery of Daron's body and identified the autopsy report. *Id.* at pp. 335-37. Detective Thomas W. Nelson of the Portland, Oregon Police Bureau testified about finding Daron's briefcase in a storage locker used by petitioner in Portland. *Id.* at pp. 341-42. Nelson also testified concerning his interview with petitioner, during which petitioner admitted that he killed Daron and then drove Daron's car to a location along the Ohio River where he disposed of Daron's body. *Id.* at pp. 349-50. Petitioner also told Nelson that he took Daron's money and credit cards, and that he used the credit card to pay his way across the country. *Id.* at p. 351. The court also heard the testimony of FBI Agent Larry Ott, who identified Exhibit 20 as being the report of his interview with petitioner. *Id.* at p. 365.

This case is distinguishable from the situation in *Green*, in which the court "accepted Green's guilty plea and proceeded to sentencing without taking any evidence[.]" *Green*, 81 Ohio St.3d at 105. In this case, the court originally stated its guilty verdict on the record at the plea hearing and entered a journal entry prior to hearing the testimony of witnesses. *See* Appx. Vol. I, pp. 90-92; Appx. Vol. II, p. 347. However, the court also reaffirmed the finding of guilt in the final judgment after hearing the testimony of witnesses at the mitigation hearing, stating:

> By its verdict, the three-judge panel indicates its
> unanimous finding beyond a reasonable doubt that the
> defendant purposely killed Joseph Daron while committing
> the offense of Aggravated Robbery on February 17, 1991,
> and that this purposeful killing was also part of a
> course of conduct wherein the defendant killed five
> people.

Appx. Vol. II, p. 450. Thus, in petitioner's case, the court did
hear the testimony of witnesses and considered several documentary
and physical exhibits prior to imposing sentence. The requirements
of Rule 11(C)(3) and §2945.06 were satisfied in this case.
Petitioner has not shown that he was prejudiced by the failure of
the panel to employ another procedure, and this branch of
petitioner's seventh ground for relief is procedurally defaulted.[6]

Petitioner has failed to demonstrate that the decisions of the
Ohio state courts rejecting his claim concerning the validity of
his no contest claim constitute an unreasonable application of
federal law, or that the factual conclusions of those courts are
clearly erroneous. Petitioner's seventh ground for relief does not
warrant habeas relief.

**D. Ninth Ground for Relief**

Petitioner's ninth ground for relief states in relevant part:

Mr. Fautenberry's convictions and sentences are
constitutionally infirm because trial counsel failed to
provide him with the reasonable effective assistance
during the trial phase.

A. Trial counsel unreasonably failed to meaningfully
investigate the State's case.

---

[6] The court also notes that this argument asserts a violation of state law.
In habeas review, federal courts are limited to deciding whether the conviction
violated the Constitution or laws of the United States. Petitioner has not shown
that the procedure employed by the trial court violated his constitutional rights
or deprived him of due process of law.

Petitioner argues in sub-part A of his ninth ground for relief that his trial attorneys rendered constitutionally ineffective assistance for failing to conduct a reasonable factual investigation as to petitioner's guilt. In its *Opinion and Order* of December 26, 2001, (Doc. No. 52), this court concluded that petitioner's claim had never been presented to the state courts, but that, as with the *Brady* claim set forth in petitioner's fourth ground for relief, the court would defer until after discovery the determination of whether petitioner's claim was barred by procedural default. In other words, the court left open until after discovery its determination of whether petitioner could prove that the state's suppression of relevant, material and exculpatory evidence constituted cause and prejudice sufficient to excuse petitioner's failure to present his claim to the state courts.

On December 4, 2000, this court granted petitioner's motion to review certain records and, on November 29, 2001, this court granted petitioner's motion for limited discovery. On April 30, 2002, this court granted petitioner's motion to compel discovery, pursuant to which respondent submitted certain grand jury materials for *in camera* review to determine whether they contained material, exculpatory or impeachment evidence. On October 28, 2002, the magistrate judge issued a report and recommendation concluding that the grand jury transcripts did not contain material, exculpatory or impeachment evidence and would, therefore, remain under seal. This court affirmed the magistrate judge's ruling on December 19, 2002. Notwithstanding petitioner's inability to review the grand jury transcripts, due to the determination by this court that those transcripts contained no material exculpatory or impeachment

evidence, petitioner was able to review countless other documents and materials in connection with the discovery order issued by this court.

This court must determine whether to review sub-part A of petitioner's ninth ground for relief on the merits in spite of the fact that it was never presented to the state courts.  Although petitioner offers no specific arguments as to why the default of this claim should be overlooked, he argued in connection with his fourth ground for relief that the factual basis of his *Brady* claim was not available to him earlier, due to the state's suppression of the materials that he only learned of for the first time through the discovery afforded by this court.  The court determined *supra*, that whether it could consider petitioner's fourth ground for relief depended on whether petitioner could demonstrate cause and prejudice to excuse the default of the claim, and that the determination of whether petitioner could demonstrate cause and prejudice overlapped with the determination of whether petitioner could demonstrate the components of a *Brady* violation.

After careful review, the court determined that petitioner could not demonstrate a *Brady* violation and, therefore, that he could not demonstrate cause and prejudice sufficient to excuse the default of his fourth ground for relief.  The court incorporates that reasoning herein to conclude that petitioner cannot establish cause and prejudice to excuse the default of sub-part A of his ninth ground for relief.

In support of sub-part A of his ninth ground for relief, petitioner argues that the trial prosecutors listed forty-five witnesses in their discovery response and that defense counsel

failed to interview most of them.  Petitioner points out that, even though he was charged with killing Joseph Daron during a course of conduct that involved murders in Alaska, Oregon, and New Jersey, and that the various witnesses listed by the prosecution covered the states of Alaska, Oregon, Texas, and Tennessee, defense counsel failed to request the appointment of a criminal investigator. Petitioner asserts, by example, that attorney Michael Walton's itemized statement indicates that he spent 82 hours on factual investigation; that it is unlikely that any of that factual investigation involved interviewing out of state witnesses since all of the hours were billed in one-hour increments per day; and that 26 of those hours occurred after petitioner had entered his no contest pleas.

Petitioner argues that the failure to interview critical witnesses constitutes unconstitutionally deficient performance on the part of his defense attorneys.  Petitioner asserts that when defense counsel fail to interview witnesses or conduct reasonable pretrial investigation, their actions constitute negligence, not trial strategy.  Citing *Blackburn v. Foltz*, 828 F.2d 1177, 1182-83 (6th Cir. 1987), and *Workman v. Tate*, 957 F.2d 1339, 1345-46 (6th Cir. 1992), petitioner argues that the failure of his defense attorneys to conduct reasonable pretrial investigation was not strategic; rather, it was an abdication of their duty to advocate zealously on his behalf.

In making his arguments, petitioner relied in large part on several exhibits to his traverse that he originally cited in support of the *Brady* allegations set forth in his fourth ground for relief.  Petitioner argues that, had counsel conducted a reasonable

factual investigation, they would have learned that the state was unprepared to prove the essential element of venue. Petitioner also argues that, had counsel conducted a reasonable factual investigation, they would have learned that the FBI Special Agent Ott had made impermissible contact with petitioner after petitioner had requested counsel.

With respect to the issue of venue, petitioner points to the transcript of a telephone conversation between Sergeant Thomas Boeing of the Hamilton County Sheriff's Department and FBI Special Agent Larry Ott, who had interrogated petitioner in Alaska, during which Sergeant Boeing attempted without success to probe Agent Ott about details as to the exact locations where petitioner had gotten in the car with Joseph Daron and where petitioner had shot him. (Traverse Exhibit 9). Petitioner also points to two FBI teletypes which stated, among other things, that law enforcement authorities in Ohio, in order to determine jurisdiction, still needed more details regarding the exact location where petitioner had shot Daron. (Traverse Exhibits 10-11). Finally, petitioner points out that defense counsel should have been on notice that the essential element of venue was a significant issue, insofar as petitioner had told Dr. Emmett Cooper during a psychiatric evaluation on October 26, 1991, that he had killed Joseph Daron in the State of Kentucky. (Traverse Exhibit 33).

In finding that petitioner could not demonstrate cause and prejudice sufficient to excuse the allegations in his fourth ground for relief that the state had violated *Brady* by suppressing traverse exhibits 9, 10, and 11, this court concluded that the evidence in question was not favorable, material evidence within

the meaning of *Brady*.   Specifically, the court held that the exhibits were largely cumulative to evidence that was provided to defense counsel during pretrial discovery and submitted during the hearing on petitioner's no contest pleas.   The court went on to note that the most that the new exhibits submitted by petitioner demonstrate was that, early in the investigation of the Joseph Daron homicide, law enforcement officers had questions about the exact location where Daron was murdered, but that this uncertainty could not have been unknown to defense counsel, given various statements that petitioner had made to law enforcement officers while he was being detained in Alaska.   The court also noted that petitioner had given a fairly detailed description to Detective Nelson of where he had shot Daron.   Finally, the court concluded that defense counsel may very well have concluded, based on this information, that there was no significant issue concerning venue or jurisdiction.

Petitioner cites to some of those same exhibits in support of the allegations of ineffective assistance set forth in sub-part A of his ninth ground for relief.   In order to have those allegations reviewed on the merits, petitioner would need this court to find that the state's failure to disclose traverse exhibits 9, 10, and 11 prevented him from uncovering the factual basis of his ninth ground for relief and therefore constitutes cause and prejudice sufficient to excuse petitioner's failure to present those ineffective assistance allegations to the state courts.   This, the court cannot do.   The court concludes now, as it did in connection with petitioner's fourth ground for relief, that there was sufficient evidence available in the pretrial record establishing

that there was uncertainty early on among Ohio authorities as to where petitioner had killed Daron, and that petitioner had actually provided a fairly detailed description to Portland Detective Tom Nelson as to where he had shot Daron, such that defense counsel may very well have concluded that, in the end, there was no significant issue concerning venue or jurisdiction. In other words, petitioner has not demonstrated that the state's suppression of relevant, material and exculpatory evidence constituted cause and prejudice sufficient to excuse petitioner's failure to present these allegations of ineffective assistance of counsel to the state courts.

Petitioner also argues that, had defense counsel conducted a reasonable factual investigation, they would have discovered that FBI Special Agent Larry Ott had made impermissible contact with petitioner after petitioner had requested counsel. Petitioner points to a written report by Sergeant G.A. Robertson, who was a shift supervisor of the jail where petitioner was originally detained in Alaska, which statement was not provided to defense counsel during pretrial discovery. (Traverse Exhibit 6).

According to petitioner, he was arrested by Juneau police in the late evening hours of March 16, 1991. Between 1:00 and 2:00 p.m. on March 17, 1991, detectives from the Portland police department attempted to interview him about the murders in Oregon, but petitioner made no inculpatory statements, asked for the questioning to cease, and requested the opportunity to speak to a lawyer.

Later that evening, according to the suppressed report of Sergeant G.A. Robertson, petitioner asked to make a phone call to

the local FBI office. According to reports by Special Agent Ott of the FBI, petitioner left a phone message indicating that he wished to confess to some things. Sergeant Robertson went on to state in his report that Agent Ott then telephoned him (Robertson) and advised him that he was willing to report to the local jail to speak to petitioner, if petitioner would call back and personally ask Agent Ott to do so. Sergeant Robertson stated that Agent Ott called twice in the following two hours to report that he had not yet been contacted by petitioner. According to Sergeant Robertson's report, Agent Ott responded to the jail anyway and, after being advised by Lieutenant Detective Steve Kalwara that petitioner had previously requested that all questioning be ceased and that a public defender would be contacting petitioner on March 18, 1991, Agent Ott proceeded to interview petitioner and to obtain inculpatory statements.

Petitioner argues that, under *Edwards v. Arizona*, 451 U.S. 477 (1981), in which the Supreme Court held that all police questioning of a suspect in custody must cease when the suspect invokes his rights to remain silent and/or to an attorney absent clear re-initiation of contact by the suspect, Sergeant Robertson's suppressed statement would have provided a basis for suppressing the inculpatory statements petitioner made to Special Agent Ott. Petitioner reasons that Special Agent Ott knew he had committed an *Edwards* violation, which is why none of his reports mentioned the fact that he had contacted Sergeant Robertson at the local jail indicating that Petitioner Fautenberry should call and speak to him (Ott) directly if petitioner wished Special Agent Ott to come to the jail, or that petitioner had never called back or spoken to

Special Agent Ott before Ott decided to respond to the jail anyway.

Citing *Kimmelman v. Morrison*, 477 U.S. 365, 382 (1986), and *Tomlin v. Myers*, 30 F.3d 1235, 1243 (9th Cir. 1994), petitioner argues that the failure to file a meritorious motion to suppress statements can constitute ineffective assistance of counsel. Petitioner points out that, although defense counsel in his case filed a motion to suppress his statements, they failed to mention *Edwards v. Arizona*, never interviewed Sergeant Robertson, and ultimately withdrew their motion before petitioner entered his no contest pleas. Petitioner argues that there was no strategic reason for counsel to have withdrawn the motion, since the trial court was still required, upon petitioner's no contest pleas, to take evidence to determine whether petitioner was guilty.

In finding that petitioner could not demonstrate cause and prejudice sufficient to excuse the allegations in his fourth ground for relief that the state had violated *Brady* by suppressing traverse exhibit 6, this court concluded that suppression of the report did not undermine the voluntariness and intelligence of petitioner's no contest plea to the murder of Joseph Daron sufficient to establish that the suppressed report was material within the meaning of *Brady*. Specifically, the court refused to assume, based on the record and totality of the circumstances, that petitioner's failure to return Agent Ott's phone call was an affirmative refusal on his part to do so. The court further concluded that the telephone message that petitioner left for Agent Ott in the first place was entitled to a great deal of weight as affirmative evidence of a re-initiation of contact on petitioner's part within the meaning of *Edwards*. Finally, the court noted that

petitioner had made many inculpatory statements after, and unrelated to, the statement he made to Agent Ott. Thus, the Court concluded that the state's failure to disclose Sergeant G.A. Robertson's written report did not undermine the voluntariness and intelligence of petitioner's no contest plea to the murder of Joseph Daron, and could not reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict upon petitioner's no contest pleas, sufficient to establish that the suppressed report was material within the meaning of *Brady*.

In order to have these particular allegations of ineffective assistance reviewed on the merits, this court would have to find that the state's failure to disclose traverse exhibit 6 prevented him from uncovering the factual basis of his ninth ground for relief and therefore constitutes cause and prejudice sufficient to excuse petitioner's failure to present those ineffective assistance allegations to the state courts. The court cannot do this. The court concludes now, as it did in connection with petitioner's fourth ground for relief, that it was highly unlikely that petitioner would have prevailed with a motion to suppress alleging a violation of *Edwards v. Arizona*, given the clear re-initiation of contact on his part exhibited when he left a telephone message for Agent Ott saying he wanted to confess to some things. In other words, petitioner has not demonstrated that the state's suppression of relevant, material and exculpatory evidence constituted cause and prejudice sufficient to excuse petitioner's failure to present these allegations of ineffective assistance of counsel to the state courts.

Since the court was not persuaded from the totality of the circumstances that the failure of the prosecution to turn over the traverse exhibits cited by petitioner undermined the constitutional validity of petitioner's no contest pleas, or, under *Kyles*, that those exhibits could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict upon petitioner's no contest pleas, the court concluded that petitioner could not demonstrate that the suppressed documents were favorable or material. For the same reasons, the court cannot find that petitioner has established cause and prejudice – i.e., the state's suppression of evidence in violation of *Brady* – sufficient to excuse his failure to present the ineffective assistance of counsel allegations set forth in sub-part A of his ninth ground for relief. Sub-part A of his ninth ground for relief must be dismissed as procedurally defaulted.

**E. Eleventh Ground for Relief**

Petitioner's eleventh ground for relief reads in relevant part:

> John Fautenberry's death sentences are constitutionally infirm because the three judge panel admitted improper evidence in the penalty phase.
>
> A. The trial court improperly admitted testimony of the sentencing recommendations of the victim's widow and the investigating officer.[7]

Petitioner argues that the three-judge panel improperly admitted testimony concerning the sentencing recommendations of the victim's former spouse, father and employer, and Sergeant Thomas

---

[7] This court has previously determined that Subparts B and C of this ground for relief are procedurally defaulted. *See* Opinion and Order of December 26, 2001, pp. 28-31.

Boeing, the investigating officer.  Petitioner refers to the victim impact statements by these individuals, *see* Traverse Exhibits 34 - 37, which were included in the presentence investigation report. In these reports, these individuals described the impact of Daron's death on his survivors, and further stated that petitioner should receive the "maximum possible sentence" or the "maximum penalty." Petitioner, citing *Payne v. Tennessee*, 501 U.S. 808 (1991), argues that it was improper for the three-judge panel to consider such statements.  Petitioner contends that this evidence was in effect a nonstatutory aggravating factor, and that consideration of these statements by the three-judge panel violated his rights under the Eighth and Fourteenth Amendments.

In *Booth v. Maryland*, 482 U.S. 496 (1987), the Supreme Court held that it was improper to permit a jury in a capital case to consider victim impact statements which included the personal characteristics of the victims, the emotional impact of the crimes on the victims' family, and family members' opinions and characterizations of the crimes and the defendant.  The Court held that this type of information was irrelevant to a capital sentencing decision, and that its admission "creates a constitutionally unacceptable risk that the jury may impose the death penalty in an arbitrary and capricious manner."  *Id*. at 502. *See also South Carolina v. Gathers*, 490 U.S. 805 (1989).

Subsequently, in *Payne v. Tennessee*, the Supreme Court expressly overruled much of its previous holdings in *Booth* and *Gathers*.  The Court held that:

> if the State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no per se bar.  A

> State may legitimately conclude that evidence about the
> victim and about the impact of the murder on the victim's
> family is relevant to the jury's decision as to whether
> or not the death penalty should be imposed.  There is no
> reason to treat such evidence differently than other
> relevant evidence is treated.

501 U.S. at 826.  However, since statements amounting to
characterizations and opinions about the crime and the defendant or
statements concerning the appropriate sentence were not at issue in
*Payne*, the Court did not address the issue of whether such
statements would be admissible.  *Id*. at 830, n. 2.

The Ohio Supreme Court followed the dictates of *Booth* in *State
v. Huertas*, 51 Ohio St.3d 22, 553 N.E.2d 1058 (1990), holding that
"[e]xpressions of opinion by a witness as to the appropriateness of
a particular sentence in a capital case violate the defendant's
constitutional right to have the sentencing decision made by the
jury and judge."  *Id*. at syllabus.  However, that court has
consistently declined to find reversible error under *Booth* in cases
where a defendant is tried by a three-judge panel rather than a
jury, or where the victim impact statements were before the
sentencing judge but not the jury.  *See, e.g., State v. Goodwin*, 84
Ohio St.3d 331, 703 N.E.2d 1251 (1999)(no plain error where jury
did not hear statement of victim's brother, and no reference his
opinion appeared in trial judge's sentencing decision); *State v.
Brewer*, 48 Ohio St.3d 50, 549 N.E.2d 491 (1990)(affirming judgment
where there was no indication that three-judge panel considered
victim impact statement); *State v. Post*, 32 Ohio St.3d 380, 513
N.E.2d 754 (1987).

In *Post*, the Ohio Supreme Court held that "[a]bsent an
indication that the panel was influenced by or considered the

victim impact evidence in arriving at its sentencing decision, the admission of the victim impact statement ... did not constitute prejudicial error." 32 Ohio St.3d at 384. The court adopted the presumption that "in a bench trial in a criminal case the court considered only the relevant, material, and competent evidence in arriving at its judgment unless it affirmatively appears to the contrary[.]" *Id*. The Ohio Supreme Court has also noted that any error in the trial court's consideration of victim impact evidence could be cured by the appellate court's independent sentence review. *Goodwin*, 84 Ohio St.3d at 343.

Petitioner argued on direct appeal before the Ohio courts that it was error for the three-judge panel to consider the victim impact statements. The court of appeals found that the record did not disclose that the panel's sentencing decision was influenced in any way by the victim-impact evidence, noting that no reference to such evidence was made by the panel in its decision on the weighing process. *Fautenberry*, 1994 WL 35023 at * 8. The court of appeals presumed that the panel considered only relevant, material, and competent evidence in making its sentencing decision. *Id.* (citing *Post*, 32 Ohio St.3d at 384).

The Ohio Supreme Court referred to *Huertas* in its decision, but noted that under the more recent decision in *Payne*, 501 U.S. at 827, a state may now legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the decision whether to impose the death penalty. *Fautenberry*, 72 Ohio St.3d at 439. The court concluded that the statements which described the impact of Daron's death on his family and friends were properly admissible under *Payne*. *Id*. The

court also held that the expressions of opinion relating to the appropriate sentence to be imposed were not admissible. *Id*. However, the court found that the decision of the three-judge panel "fail[ed] to demonstrate that the judges contemplated or relied upon the victim-impact evidence which was available to them." *Id*. The court, citing *Post*, 32 Ohio St.3d at 384, held that absent an indication that the panel was influenced by or considered the victim impact evidence in arriving at a sentencing decision, the admission of such evidence was not reversible error. *Id*. The court adhered to the principle that in a bench trial, the judges are presumed to have considered only relevant, material, and competent evidence in arriving at their judgment unless it affirmatively appears to the contrary. *Id*.

Petitioner erroneously argues that it is the state's burden in this habeas action to affirmatively prove that the three-judge panel did not consider the victim impact statements. The state courts found, based on the record, that there was no evidence that the three-judge panel relied in any way on the sentencing recommendations or that any improper evidence was considered in arriving at a sentence in petitioner's case. This factual finding is presumed to be correct under the AEDPA. 28 U.S.C. §2254(e)(1). *See also Brewer v. Anderson*, No. 00-4234 (unreported), 2002 WL 31027950 * 4 (6th Cir. September 10, 2002)("Petitioner has failed to clearly demonstrate that the [Ohio Supreme] Court's conclusion that the panel was not influenced by the [victim impact] statements is incorrect as required under the AEDPA"). *See also Cooey v. Coyle*, 289 F.3d 882, 911 (6th Cir. 2002)(upholding findings of Ohio Supreme Court that there was no affirmative indication that the

victim impact statements were considered in sentencing petitioner to death, and noting burden of habeas applicant under the AEDPA to demonstrate by "clear and convincing evidence" that the factual findings of state court were erroneous).

The factual findings of the Ohio courts in this case are supported by the record. The opinion of the three-judge panel, Appx. Vol. II, p. 443, contains no reference to the victim impact statements or the sentencing recommendations expressed therein. No mention of the victim impact statements was made by the members of the panel in announcing their oral decision from the bench. *See* Appx. Vol. I, p. 394. No mention of the sentencing recommendations contained in the victim impact statements was made by the prosecutors during closing argument. *See* Appx. Vol. I, pp. 372-376, 386-393. Petitioner has failed to show that the factual findings of the Ohio courts on the issue of whether the panel considered the sentencing recommendations were clearly erroneous.

The Ohio Supreme Court correctly applied federal law as announced in *Payne* in holding that the victim impact statements in the instant case were admissible insofar as they describe the impact of Daron's murder on his family and friends. That court also did not err in holding that no reversible error had been shown based on the sentencing recommendations contained in the victim impact statements because there was no evidence that the three-judge panel relied on those recommendations or the other victim impact evidence that was available in sentencing petitioner. This holding was not an unreasonable application of federal law. *See Brewer v. Anderson,* 2002 WL 31027950 * 4 (decision of the Ohio Supreme Court that *Booth* is inapplicable to three-judge panels was

99

not an unreasonable application of federal law).  *See also Cooey*,
289 F.3d at 911-12 (upholding district court's denial of writ where
there was no evidence that police officer's sentence recommendation
caused panel to look more favorably on the death penalty).

Petitioner has not shown that the Ohio courts' decisions on
this issue were contrary to Supreme Court precedent, or involved an
unreasonable application of federal law, or were based on an
unreasonable determination of the facts.  Petitioner is not
entitled to relief on this claim.[8]

## F. Twelfth Ground for Relief

Petitioner's twelfth ground for relief states in relevant
part:

John Fautenberry's convictions and sentences are

---

[8] Petitioner also claims for the first time in his traverse, p. 90, that
he was prejudiced by the failure to grant trial counsel access to the victim
impact statements.  Petitioner points to no evidence to support this claim.
Under Ohio Rev. Code §2947.05.1(C), the court is authorized to furnish copies of
victim statements to defense counsel.  Appellate counsel raised as error the fact
that these statements were before the panel, but never contended that trial
counsel did not have access to them.  *See* Petitioner's Supplemental Brief, Appx.
Vol. III, p. 127.  The prosecution's argument that no objection was raised to the
statements at trial suggests that defense counsel did have access to these
documents.  *See* State's Brief, Appx. Vol. III, p. 134.

Petitioner has not shown cause why he failed to make his nondisclosure
argument in the state courts.  Petitioner has also failed to show prejudice.  He
relies on Exhibit 16 to the traverse, a police document which contains statements
purportedly taken from the victim's father in the context of the missing person
investigation involving the victim.  In this report, the victim's father
indicated that the victim had a history of drug use, and that he may be in
financial trouble or "flat broke."  This is the sort of information which might
assist the police in determining whether the victim had met with foul play.
Exhibit 34, the father's victim impact statement, gives a sympathetic view of the
victim.  The two statements are not inconsistent when viewed in the context in
which they were provided.  Further, since there is no indication in the record
that the panel considered the victim impact statements, petitioner has failed to
show that any failure to provide the victim impact statements to defense counsel
was prejudicial.  *See Cooey*, 289 F.3d at 911 (petitioner's claim of denial of
access to victim statements unwarranted "because he had no such right if the
statements were never considered in the first place").  This branch of
petitioner's claim is procedurally defaulted.