constitutionally infirm because the attorneys who represented him during the mitigation phase failed to provide reasonably effective assistance of counsel.

A. Defense counsel failed to conduct a reasonable investigation as to the sentencing phase.

B. Trial counsel failed to retain all necessary experts.

C. Trial counsel performed unreasonably in their presentation of mitigation evidence.

In his twelfth ground for relief, petitioner argues that his trial attorneys performed unreasonably and to his prejudice during the mitigation phase of his trial. Specifically, petitioner contends that his trial attorneys failed to conduct a reasonable investigation, failed to retain reasonable and necessary experts, and were therefore deficient in their presentation of mitigation evidence during the sentencing hearing.

Petitioner presented these allegations to the state courts in his second amended postconviction action.[9] Petitioner argued in his first cause of action that his attorneys were ineffective for failing to conduct a reasonable mitigation investigation and, specifically, for failing to discover and present evidence that petitioner suffered from brain impairment, i.e., frontal lobe damage impacting his personality and behavior, which would have been recognized as a "mental defect" for purposes of mitigation under R.C. §2929.04(B)(3). (J.A. Vol. IX, at 13-53). Petitioner supported his allegations regarding the undiscovered brain impairment with affidavits by Dr. Jeffrey Smalldon, who conducted a neuropsychological examination of petitioner, and Dr. Sharon

---

[9]    Petitioner filed his original postconviction action in the trial court on July 8, 1996, and his first and second amended postconviction actions on July 24, 1996, and August 27, 1996, respectively.

Pearson, who conducted a psychological examination of petitioner. In support of his allegations that defense counsel failed to glean valuable mitigation evidence from petitioner himself, due to their failure to foster a meaningful attorney-client relationship, and that defense counsel failed to conduct the "social science type of investigation" required for a mitigation preparation, petitioner also submitted affidavits by  Susan Shorr, who was retained, but never really utilized, by defense counsel to conduct a mitigation investigation prior to petitioner's sentencing hearing; Ronald Bailey, an attorney expert; Dorian Hall, a mitigation expert; Kenneth Corcoran, an acquaintance who could have provided information about a head injury suffered by petitioner as a child and the abuse that petitioner suffered at the hands of his step-father Donald Langdon; Louise Corcoran, who did testify on petitioner's behalf at the mitigation hearing; and Pamela Swanson, a mitigation specialist who conducted a mitigation-type investigation in support of petitioner's postconviction action. Petitioner also submitted two newspaper articles, exhibits 12a and 12b, regarding brain injury.  Petitioner argued that he was prejudiced by counsel's deficient performance in this regard, insofar as the sentencing court remarked that "there is nothing, there is no question at all that the aggravating circumstances are a hundred percent and mitigating is zero...." (J.A. Vol. IX, at 53).

In the third cause of action of his postconviction action, petitioner argued that his trial attorneys were ineffective for conducting an inadequate background search for competent experts, thereby allowing inaccurate mental health evidence to be admitted

during his mitigation hearing.    (J.A. Vol. IX, at 58-63).
Petitioner argued that, even though he was entitled to an
independent mental health expert, counsel chose instead to utilize
the Court Clinic mental health experts to gather and present
evidence on what can only be characterized as some of the most
critical mitigation evidence in any capital case.    Petitioner
argued that the Court Clinic mental health professionals have
limited time and resources and lack mitigation specialists.
Petitioner argued that Dr. Schmidtgoessling, as a result, testified
erroneously that petitioner showed no signs of brain impairment –
erroneous testimony that defense counsel were unable to dispute,
due to their failure to follow through with a neuropsychological
evaluation that petitioner refused to undergo.    Petitioner went on
to offer some of the same arguments that he had offered in support
of his first cause of action, *i.e.*, that defense counsel failed to
follow through with witness interviews and records collection that
would have verified the various head injuries that petitioner had
suffered as a child and an adult.    In support of his allegations,
petitioner submitted affidavits from Dr. Jeffrey Smalldon, Dr.
Sharon Pearson, Dr. Susan Schorr, attorney Ronald Bailey,
mitigation specialist Dorian Hall, acquaintances Kenneth and Louise
Corcoran, and postconviction mitigation investigator Pamela
Swanson; as well as some navy medical records, an order authorizing
the out of state depositions of Kenneth and Louise Corcoran, and a
letter from Dr. Nancy Schmidtgoessling to Judge Morrissey
requesting his authorization to release petitioner's records to the
Ohio Public Defender's Office.

   Petitioner argued in the seventh cause of action of his

postconviction action that his trial attorneys were ineffective for failing to humanize him, for erroneously and prejudicially introducing evidence of the non-statutory aggravating factor of petitioner's alleged future dangerousness, and for failing to introduce evidence of the mitigating factor of petitioner's positive adjustment to prison life. (J.A. Vol. IX, at 70-77). Petitioner argued that he was inappropriately presented as a dangerous non-human, due to the fact that counsel took no steps to ensure that he appeared in court without shackles, properly groomed, and appropriately clothed. He argued that counsel inexplicably mentioned during their direct examination of Dr. Schmidtgoessling that petitioner allegedly had conceived a plot to take them hostage in order to escape from prison, even though no other witnesses had mentioned this inflammatory matter, and petitioner's own jailers, based on their written reports, did not take his alleged plot seriously. Petitioner argued that counsel, in addition to introducing this particularly inflammatory non-statutory aggravating factor of petitioner's future dangerousness, also failed to collect and present evidence that was available demonstrating the mitigating factor of petitioner's positive adjustment to prison life.

In support of his allegations, petitioner submitted an investigative report regarding his escape attempt; an affidavit and report from Dr. Sharon Pearson stating, among other things, that petitioner was capable of positive adjustment to prison life; newspaper articles detailing his trial and death sentence, including one documenting his expressed desire to help child abuse victims; a psychological evaluation from Dayton Mental Health

Center dated May 29, 1992, stating, among other things, that petitioner's behavior and interaction with others had been appropriate and incident-free; letters and records from the Ohio Department of Rehabilitation and Correction regarding petitioner's attainment of the highest possible classification on death row; various prison kites demonstrating petitioner's attempts to handle incidents involving other prisoners through the established prison procedures; and a photograph purporting to show that petitioner appeared in court somewhat unkempt and in casual garb.

On October 27, 1997, the state trial court issued findings of fact and conclusions of law rejecting petitioner's claims of ineffective assistance of trial counsel. (J.A. Vol. XII, at 5-22). With respect to petitioner's claim that his trial attorneys were ineffective for failing to retain a neuropsychologist and other mental health experts to introduce evidence that petitioner suffered from brain damage, the trial court found that counsel had employed a neuropsychologist and an independent psychologist, that petitioner had refused to cooperate with the neuropsychologist, and that other mental status reports available to defense counsel reflected no signs of organic impairment on petitioner's part. The trial court went on to find, as a matter of law, that finding experts in postconviction proceedings who disagree with experts who offered evidence during trial proceedings does not show a violation of duty on trial counsel's part or prejudice, and that affidavits by "attorney" experts and "mitigation" experts are not cogent on the issue of ineffective assistance of trial counsel. The trial court also concluded that counsel fulfilled their duty by employing a neuropsychologist, despite petitioner's failure, ultimately, to

105

cooperate with the neuropsychologist. Finally, the trial court concluded that counsel has no duty to present mitigation evidence that the defendant does not want presented, that the Sixth Amendment does not guarantee a criminal defendant a "meaningful relationship" with counsel, and that a criminal defendant does not have a right to the appointment of mental health experts of his own liking.

As to petitioner's claim that his trial attorneys were ineffective for relying on the Court Clinic instead of their own independent psychologist, the trial court found that the record demonstrated that defense counsel had secured the appointment of a psychologist, a neuropsychologist, and a mitigation specialist. The trial court noted that petitioner had refused to talk to the neuropsychologist and that the psychologist had been paid for services rendered to trial counsel. The trial court concluded, as a matter of law, that trial counsel satisfied their duty by employing independent psychological experts and a mitigation expert, that the Sixth Amendment does not guarantee a criminal defendant a "meaningful relationship" with counsel, and that a criminal defendant does not have a right to the appointment of experts of his own liking.

Finally, with respect to petitioner's claim that his trial attorneys were ineffective for failing to ensure that petitioner appeared in court free of shackles and for introducing evidence of petitioner's future dangerousness, the trial court found that, as to the issue of petitioner's alleged future dangerousness, trial counsel introduced evidence that petitioner would be incarcerated in Alaska for at least sixty-six years. The trial court concluded,

as a matter of law, that any exhibits regarding petitioner's good behavior in prison following his conviction were not cogent on the issue of ineffective assistance of trial counsel in connection with the mitigation phase of petitioner's capital case. The court further concluded that it was a reasonable tactical decision on trial counsel's part to introduce evidence that petitioner would never be released from prison and would settle into prison life peacefully. Similarly, the trial court concluded that trial counsel's decision to introduce evidence of petitioner's alleged escape plot was a reasonable tactic to defuse any rebuttal by the prosecution. Finally, the trial court concluded that there was no violation of duty owed by trial counsel, or prejudice, stemming from the fact that petitioner appeared in court in shackles, since only the trial judge, as opposed to a jury, observed him in shackles.

On appeal from the trial court's decision denying petitioner's postconviction action, the Court of Appeals for the First Appellate District affirmed the trial court's decision. (J.A. Vol. XIII, at 367-381). With respect to petitioner's claim that his trial attorneys were ineffective for failing to retain a neuropsychologist and other mental health experts to introduce evidence that petitioner suffered from brain damage, the appellate court held that, "In order for the existence of this new evidence of brain impairment to have relevance to a claim of ineffective assistance of counsel, however, Fautenberry must show that his trial counsel violated a substantial duty by failing to secure the evidence to present at trial." (J.A. Vol. XIII, at 370). Regarding petitioner's assertion that he would have cooperated with

the neuropsychological evaluation arranged by defense counsel had he been better advised by defense counsel, the appellate court noted that the argument was based in large part on the vagaries of petitioner's recollection as to what was not told to him and on his self-serving statement that he would have cooperated had he been better advised. "We consider such evidence woefully deficient to overcome the strong presumption of reasonable assistance of counsel." *Id*. at 372. Noting that "the criteria of the best available practice in the defense field" did not apply, the appellate court held that counsel's performance, in not taking extra steps to persuade petitioner to cooperate with the experts they had secured, did not fall outside the "wide range of reasonable professional assistance." *Id*. The appellate court also noted that petitioner's self-serving statement that he would have cooperated with the neuropsychologist had he been better advised was somewhat undermined by the fact that he also refused to cooperate with the mitigation specialist retained by defense counsel, "a person whose good intent must have been known to him." *Id*. at 372-73.

As to petitioner's claim that his trial attorneys were ineffective for relying on the Court Clinic instead of their own independent psychologist, and therefore failed to present evidence of organic brain disorder or evidence of the head injuries petitioner had suffered, the appellate court reiterated that defense counsel had arranged for a neuropsychological evaluation with which petitioner refused to cooperate. "Thus, primary responsibility for the failure of the record to contain such evidence lies squarely with Fautenberry's own refusal to take

advantage of the testing provided for him." *Id*. at 374. The appellate court also concluded that any anecdotal evidence that might have been provided by Kenneth Corcoran was largely cumulative to information that was provided through the videotape deposition of his wife, Louise Corcoran.

Finally, with respect to petitioner's claim that his trial attorneys were ineffective for failing to ensure that petitioner appeared in court free of shackles and for introducing evidence of petitioner's future dangerousness, the appellate court held that petitioner's claims regarding his appearance in jail garb and his attorney's comment regarding his alleged escape plot were matters of record that were waived when they were not raised on direct appeal. With respect to petitioner's claim that his trial attorneys were ineffective for failing to present evidence from the Dayton Mental Health Center's Forensic Unit demonstrating that his manner, performance, and attentiveness were appropriate, the appellate court rejected the import of those statements, concluding that "if their purported mitigating value was to show that Fautenberry could adjust to prison life, thus militating against a death sentence, we hold they are cumulative to, and less cogent than, the direct testimony of Dr. Schmidtgoessling to this effect." *Id*. at 377. As to petitioner's argument that his attorneys were ineffective for failing to present evidence that, following his conviction, he became a non-violent prisoner willing to work within the prison kite system to resolve disputes and incidents, "Obviously it is an absurd argument to make that attorneys are incompetent for failing to produce evidence of post-trial behavior, before such evidence even exists." *Id*. at 377-78.

**1.  Sub-Part (A) – Failure to Conduct Reasonable Investigation.**

Petitioner alleges that his attorneys performed unreasonably and to his prejudice for failing to conduct a reasonable mitigation-phase investigation.  The Sixth Amendment guarantees criminal defendants the right to effective assistance of counsel. *McMann v. Richardson,* 397 U.S. 759, 771 n.14 (1970).  To prove a claim of ineffective assistance of counsel, the petitioner must show both that his counsel's performance was deficient and that the petitioner was prejudiced by his counsel's deficient performance. *Strickland v. Washington, supra*, 466 U.S. at 687.

Inherent in counsel's responsibilities is the duty to investigate.  *Id.* at 691.  The importance of competent representation during the penalty phase of a capital trial cannot be understated, especially with respect to the duty to investigate, since, as a practical matter, all that stands between a defendant who has been convicted of capital murder and a death sentence is whatever mitigation evidence he can muster.  *Mapes v. Coyle*, 171 F.3d 408, 426 (6th Cir. 1999).

> Under the Ohio statute, a capital defendant found guilty of a death specification has to present some mitigating evidence in order to avoid the death penalty.  If a jury has nothing to weigh against the aggravating circumstance, it almost certainly must find that the aggravating circumstance outweighs the (nonexistent) mitigating circumstances, and recommend death.

*Id.* The Sixth Circuit expanded on counsel's duty to investigate in connection with the mitigation phase of a capital trial, adding in *Carter v. Bell*, 218 F.3d 581, 596 (6th Cir. 2000), that, "The sole source of mitigating factors cannot properly be that information which defendant may volunteer; counsel must make some effort at

independent investigation in order to make a reasoned, informed decision as to their utility." The Sixth Circuit has held that "failure to investigate possible mitigating factors and failure to present mitigating evidence at sentencing *can* constitute ineffective assistance of counsel under the Sixth Amendment." *Martin v. Mitchell*, 280 F.3d 594, 612 (6th Cir. 2002)(emphasis in original)(citing *Carter v. Bell, supra*, 218 F.3d at 600, and *Skaggs v. Parker*, 235 F.3d 261, 271 (6th Cir. 2000).

Although the failure to investigate possible mitigating evidence can constitute ineffective assistance, there appears to be an important distinction in the Sixth Circuit between those cases in which no investigation was conducted and those in which petitioner complains that not enough investigation was conducted. In *Campbell v. Coyle*, 260 F.3d 531 (6th Cir. 2001), the Sixth Circuit explained:

> [W]e note that the cases where this Court has granted the writ for failure of counsel to investigate potential mitigating evidence have been limited to those situations in which defense counsel have totally failed to conduct such an investigation. In contrast, if a habeas claim does not involve a failure to investigate but, rather, petitioner's dissatisfaction with the degree of his attorney's investigation, the presumption of reasonableness imposed by *Strickland* will be hard to overcome.

*Id.* at 552. Where counsel essentially conducts no investigation and presents no mitigating evidence, his performance can amount to constructive denial of counsel and prejudice will be presumed. *Rickman v. Bell*, 131 F.3d 1150, 1157 (6th Cir. 1997). Where, on the other hand, counsel performs something of an investigation, and presents something in the form of mitigation, then the petitioner will be required to demonstrate not only that his attorney's

111

performance was deficient, but also that counsel's deficient performance prejudiced the outcome of the petitioner's sentencing proceeding. *Martin, supra*, 280 F.3d at 613.

The statutory mitigating factors that are to be weighed against any aggravating circumstances of which a defendant was convicted are set forth in R.C. §2929.04(B). That section provides in relevant part --

> [T]he court, trial jury, or panel of three judges shall consider, and weigh against the aggravating circumstances proved beyond a reasonable doubt, the nature and circumstances of the offense, the history, character, and background of the offender, and all of the following factors:
>
> (1) whether the victim of the offense induced or facilitated it;
>
> (2) whether it is unlikely that the offense would have been committed, but for the fact that the offender was under duress, coercion, or strong provocation;
>
> (3) whether, at the time of committing the offense, the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of the offender's conduct or to conform the offender's conduct to the requirements of the law;
>
> (4) the youth of the offender;
>
> (5) the offender's lack of a significant history of prior criminal convictions and delinquency adjudications;
>
> (6) if the offender was a participant in the offense but not the principal offender, the degree of the offender's participation in the offense and the degree of the offender's *participation in the acts that led to the death of the victim;

> (7) any other factors that are relevant to
> the issue of whether the offender should be
> sentenced to death.

R.C. §2929.04(B).

Petitioner argues that his attorneys conducted an inadequate investigation in preparation for the mitigation phase of his case because they failed to maintain communication with petitioner and failed to interview a reasonable number of people from petitioner's background. With respect to counsel's alleged failure to maintain communication, petitioner argues that counsel failed entirely to forge a meaningful relationship with him and that the mitigation specialist hired by counsel, Dr. Susan Shorr, cited that lack of a meaningful relationship as a primary reason why a proper mitigation investigation could not and did not occur. Petitioner points out that a treating psychiatrist at the Dayton Mental Health Forensic Unit, where petitioner was sent for a few months in 1992, stated that petitioner's attorneys had given him no hope that execution could be avoided. As a result, petitioner argues, he became uncooperative and stopped communicating with counsel, which behavior manifested itself most notably in petitioner's refusal to cooperate with Dr. Tanley, whom counsel had retained to conduct a neuropsychological evaluation of petitioner. Petitioner faults counsel for failing to convey to him the purpose and importance of the neuropsychological evaluation.

With respect to counsel's alleged failure to interview a reasonable number of people from petitioner's background, petitioner argues that even though counsel sought and received funds to employ mitigation specialist Dr. Susan Shorr, they only impeded her investigation despite numerous efforts on her part to

113

improve the situation.  Petitioner argues that defense counsel's own investigation was haphazard and incomplete, insofar as they failed to follow up with petitioner's paternal grandparents after they failed to show up for their scheduled deposition; failed to develop during their interview with Olivia Priest Herndon any information regarding petitioner's commission of the offenses; failed to develop during their interview with Louise Corcoran any information regarding head injuries petitioner suffered that altered his behavior; and failed to depose Kenneth Corcoran, who could have provided information about the head injuries that petitioner suffered.  Petitioner further argues that defense counsel erred to his prejudice in requesting and relying upon a presentence investigation report prepared by the Adult Probation Department.  Petitioner reasons that members of the Adult Probation Department are not trained to conduct mitigation investigations and serve in a neutral capacity as opposed to a defense-oriented capacity, but are often former police officers who are biased in favor of law enforcement.  Further, according to petitioner, presentence investigation reports must be shared with the trier of fact regardless of whether they contain information that would help the petitioner's mitigation case.

Regarding defense counsel's investigation of and preparation for petitioner's mitigation case, the record demonstrates the following.  On July 24, 1992, following the three-judge panel's finding of guilt upon petitioner's no contest pleas, defense counsel sought and received a two-month continuance to prepare for the mitigation phase of petitioner's trial.  (J.A. Vol. I, at 92).  At that time, defense counsel also requested the preparation of a

presentence investigation report and a mental examination. (*Id*. at 93-94). Months prior to that, in November 1991, defense counsel sought and received authorization to arrange a neuropsychological evaluation for petitioner and for funds to employ a mitigation specialist. (J.A. Vol. II, at 116, 245, 266, 268). Ultimately, petitioner refused to cooperate with the neuropsychological evaluation and the record does not reflect with clarity the extent to which defense counsel utilized the services of mitigation specialist Dr. Susan Shorr; Dr. Shorr did not testify at petitioner's mitigation hearing.

At the mitigation hearing, defense counsel introduced eight exhibits, *i.e.*, two photographs, two videotapes with transcripts, one videotape without a transcript, and an FBI print out of petitioner's criminal record establishing that a 1986 aggravated assault charge did not result in a conviction. (J.A. Vol. I, at 97). Defense attorney John Keller, in his opening remarks, set the tone for the mitigation case that defense counsel planned to present, explaining, "What I think we would start off with is the premise that if you believe that people are not born bad then you have to ask the question as to how they became violent. Something happened to John, I think this mitigation process is not one to try to make excuses or to minimize anything that occurred, but to try to educate and inform the Court and to explain how we got to the point we are today." (J.A. Vol. I, at 101-102).

In furtherance of this mitigation strategy, defense counsel presented the testimony of three witnesses via videotaped depositions, two live witnesses, and an unsworn statement by petitioner. First, defense counsel presented the videotaped

115

testimony of Louise Corcoran, a close family friend and best friend
to petitioner's mother, who lived in Florida at the time of the
deposition. (J.A. Vol. I, at 103-159). As a close family friend,
Mrs. Corcoran provided testimony about petitioner's chaotic,
abusive, and alienating upbringing at the hands of his step-father,
Donald Langdon, and then adoptive father, Robert Fautenberry, as
well as testimony about the clinical depression suffered by
petitioner's mother and the effect that her eventual death from
breast cancer had on petitioner. Mrs. Corcoran described the
alcohol and drug abuse that petitioner turned to as a "self-defense
mechanism," (J.A. Vol. I, at 132), and explained that petitioner's
entire life was characterized by rejection and disappointment.
Mrs. Corcoran testified that the John Fautenberry she knew could
not have committed the killings, and she did not think that the
John Fautenberry she knew was completely gone.

Counsel then presented the videotaped testimony of Olivia
Herndon Priest, petitioner's former girlfriend of nearly four
years, who lived in California at the time of the deposition.
(J.A. Vol. I, at 159-240). Mrs. Priest met petitioner in 1987 when
he came to Oregon to reunite with his biological father, John
Yuchinik, to whom Mrs. Priest was married at the time. (Mr.
Yuchinik had abandoned petitioner and his family when petitioner
was three-years-old.) Mrs. Priest and petitioner immediately
struck up a friendship that developed into a romantic relationship
once Mrs. Priest separated from petitioner's father. Mrs. Priest
described John Yuchinik as "a rotten person," (J.A. Vol. I, at
164), and explained how profoundly disappointed petitioner was with
the father he found. Mrs. Priest explained that she and petitioner

116

lived together for nearly four years and that, during that time, petitioner was very protective, never violent, but somewhat possessive. (*Id*. at 184). She stated that he abused drugs and alcohol sporadically, but that, when he was abusing substances, "he really did it up." (*Id*. at 194-95). She testified that petitioner had emotional problems because of his upbringing that prevented him from trusting anyone; had a lot of anger, though it was always controlled in her experience; but was a generous and giving person. When they broke up in the fall of 1990, according to Mrs. Priest, they stayed in contact and remained good friends. Mrs. Priest testified that petitioner seemed troubled and contrite about the killings.

Next, defense counsel presented the live testimony of petitioner's maternal aunt, Mary Slayback. (J.A. Vol. I at 241-51). Mrs. Slayback testified that she was aware that John Yuchinik abused petitioner's mother, that Donald Langdon drank excessively, and that Robert Fautenberry was terribly domineering. After the death of his mother, petitioner lived with Ms. Slayback and her mother (petitioner's grandmother) for awhile in Clermont County, Ohio. During that time, according to Ms. Slayback, petitioner was always thoughtful and cooperative. Mrs. Slayback testified that when petitioner moved to Oregon to reunite with his biological father, it was very important to him and turned out to be such a profound disappointment. As to petitioner's admitted commission of the offenses, Mrs. Slayback testified that she was at a loss for what petitioner had done.

Defense counsel then presented the videotaped testimony of Margaret Berck, the supervising attorney for the Juneua office of

117

the Alaska Public Defender.   (J.A. Vol. I, at 252-273).   She testified that petitioner had pleaded guilty to the killing of Jefferson Diffee in order to speed up the process there to enable him to face charges in other jurisdictions which, according to Ms. Berck, was very important to petitioner.  She also testified that, pursuant to the judgment and under Alaska law, petitioner would have to serve no less than 66 years in Alaska before he would be eligible for release.

Next, defense counsel called petitioner to present his unsworn statement.  (J.A. Vol. I, at 274-295).  Petitioner tried to explain the pain, sense of rejection, and built-up anger he had suffered growing up.  He said if his life was spared that he hoped to be able to serve in some capacity to assist victims of child abuse.

Finally, defense counsel presented the testimony of Dr. Nancy Schmidtgoessling, the Court Clinic psychologist who had conducted a mitigation-phase mental evaluation of petitioner, pursuant to R.C. §2929.03(D), at the request of defense counsel.  She testified that, in addition to administering some tests – *i.e.*, an intelligence  test, a screening test for certain lines of organic functioning,  a test to gauge cognitive functioning, and a personality test – she also had the assistance of a Court Clinic social worker to interview various relatives and acquaintances. Dr. Schmidtgoessling testified that petitioner was of average intelligence, and seemed to be able to recall information well, to process information accurately, and to articulate in a reasonable fashion.  She also testified that he showed no signs of organic impairment, explaining that "[the test] trails were within the average limit so from the psychological testing basically [we]

deduced that there was, to the best we could see, no signs of organic impairment." (J.A. Vol. I, at 298). Dr. Schmidtgoessling provided details on the dysfunctional set of relationships that petitioner had experienced in childhood and as an adult; his feelings of guilt, rejection, worthlessness, inability to trust, and rage; and the various psychological stressors that he was experiencing at the time of the offenses, such as his recent break-ups with two women, the loss of his job, his lack of direction, his lack of human attachments, the repossession of his truck, and his heavy substance abuse. In response to a question about how petitioner had improved his capacity to deal with all of his built-up rage in the future, Dr. Schmidtgoessling stated that he could recognize it, had practiced other behaviors in dealing with it, had developed his articulation and would benefit from group therapy, and that just getting older would assist him in better dealing with his rage. In response to a question about petitioner's capacity to adjust to life in prison, Dr. Schmidtgoessling testified that he had the intelligence to engage in gainful activities, but that there were no parallels from which to gauge how he would adjust because he had never been incarcerated for a long period of time. She also testified, in response to a question about petitioner's escape/hostage plan, that the escape plan formed no basis for predicting how he would adjust to living in prison, since nearly everyone in his situation at that time thinks about escape. (J.A. Vol. I, at 310-11).

On cross-examination, Dr. Schmidtgoessling stated her belief that while petitioner suffered from a severe personality disorder, he did not suffer from a severe mental disease or defect within the

meaning of R.C. §2929.04(B)(3).[10]  (J.A. Vol. I, at 312-13).  Dr. Schmidtgoessling agreed on cross-examination that petitioner had brought many of those psychological stressors on himself, but explained that, sometimes, a person's choices are affected by psychological factors of which he is not aware.  (*Id.* at 316-17). She also agreed that perhaps being arrested or killed were the only things that could have stopped petitioner from committing additional murders.  (*Id.* at 318).  Finally, she opined, in response to a question on cross-examination about petitioner's propensity to commit violent acts in the future, that although he had better insight when she saw him, if past behavior is any indicator of future behavior, there was a risk that he would engage in the same behavior in the future.  (*Id.*).

On re-direct examination, Dr. Schmidtgoessling stated her belief that petitioner suffered from mixed personality disorder with narcissistic and antisocial traits, as well as substance abuse disorder.  (J.A. Vol. I, at 325).  She further stated that, while those disorders might not be on par with diseases such as schizophrenia or bipolar disorder, they nonetheless were defects that prevented petitioner from being characterized as "normal." (*Id.*).

Following presentation of the state's case and the state's closing argument, defense counsel presented their closing argument. There, defense counsel urged the three-judge panel, based on the evidence they had presented, to consider the following mitigating

---

[10]    R.C. §2929.04(B)(3) lists as a mitigating factor, "Whether, at the time of committing the offense, the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of the offender's conduct or to conform the offender's conduct to the requirements of the law."

factors: petitioner's youth (R.C. §2929.04(B)(4)); and petitioner's lack of history of significant criminal convictions, (R.C. §2929.04(B)(5)), since petitioner had one felony conviction for carrying a concealed weapon, for which he received probation, two misdemeanor theft offenses, and possibly a disorderly conduct charge or two. Under the "catch-all" mitigating factor set forth in R.C. §2929.04(B)(7)[11], defense counsel urged the three-judge panel to consider the fact that petitioner confessed to the offense early after being detained and entered no contest pleas to the charges; the fact that petitioner would be required to serve at least 66 years in prison in Alaska before he could be released; testimony from Louise Corcoran, Mary Slayback, Olivia Priest, and Dr. Schmidtgoessling regarding petitioner's sense of rejection, low self-esteem, feelings of anger and rage, the psychological stressors he was experiencing leading up to the offenses, his abuse of alcohol and drugs, and the three psychological disorders from which he suffered; and his ability to adjust to life in prison, which defense counsel emphasized by downplaying petitioner's alleged escape/hostage plan.

Defense counsel obviously conducted some investigation and managed to put forth some meaningful testimony during the mitigation hearing. Through petitioner's unsworn statement and the testimony of Louis Corocoran, and to a lesser degree, the testimony of Olivia Herndon Priest, Mary Slayback, and Dr. Nancy Schmidtgoessling, defense counsel introduced evidence of petitioner's chaotic and often abusive upbringing and the extent to

---

[11]    R.C. §2929.04(B)(7) instructs the sentencer to consider as mitigating, "Any other factors that are relevant to the issue of whether the offender should be sentenced to death."

which that left petitioner with feelings of rejection, worthlessness, and rage, especially with respect to his stepfather, Donald Langdon, his adoptive father, Robert Fautenberry, and his biological father, John Yuchinik. Nearly every witness testified as to petitioner's abuse of alcohol and drugs stemming from his apparent need to cope with his pain, the manner in which his demeanor changed for the worse when he was drinking, and the fact that he was drinking heavily at the time of the offenses. Mrs. Corcoran, Mrs. Priest, and Ms. Slayback all emphasized the extent to which petitioner had looked forward to finding and reuniting with his biological father, and how profoundly disappointed petitioner was with the father that he found. Mrs. Corcoran, Mrs. Priest, and Ms. Slayback also gave testimony to the effect that the John Fautenberry they had known was not capable of committing the offenses to which petitioner had confessed, consistent with defense counsel's mitigation theory that "[s]omething happened to John" that led him to commit the offenses. (J.A. Vol. I, at 101-102). Defense counsel also managed to introduce evidence that petitioner would have to serve no less than 66 years on his sentence in Alaska before he would be eligible for release, that petitioner had improved his capacity for dealing with rage and frustration, that petitioner had the intelligence to engage in gainful activities in prison, that petitioner's alleged escape/hostage plan served as no basis for predicting how he would adjust to life in prison, that petitioner suffered from severe personality disorders which prevented him from being characterized as "normal," and that a person's apparently free choices are sometimes affected by psychological factors of which they are unaware.

122

Thus, as in *Martin*, petitioner's trial attorneys managed to present "something of a mitigating nature" at petitioner's sentencing hearing. *Martin*, 280 F.3d at 613 (quoting *Coleman*, 244 F.3d at 544). While perhaps not as exhaustive as petitioner asserts they should have been, defense counsels' efforts constitute investigation. Thus, like the petitioner in *Martin*, petitioner herein "cannot show that he suffered constructive denial of counsel, so he must show how his counsel's deficiencies prejudiced the outcome of his sentencing proceeding." *Martin*, 280 F.3d at 613 (citing *Strickland*, 466 U.S. at 694).

To satisfy the prejudice prong of *Strickland*, petitioner must demonstrate a reasonable probability that, but for counsel's deficient performance, the sentencer "would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Campbell v. Coyle, supra*, 260 F.3d at 552 (citing *Strickland*, 466 U.S. at 695). In this regard, the question before the court is whether there is a reasonable probability that the three-judge panel would have concluded that the aggravating circumstance did not outweigh the mitigating factors beyond a reasonable doubt, had defense counsel interviewed and presented the witnesses whom petitioner alleges counsel were ineffective for overlooking.

Regarding petitioner's argument that defense counsel failed to maintain communication with him or to develop a meaningful relationship with him, the state courts concluded in postconviction that the Sixth Amendment does not a guarantee criminal defendant a "meaningful relationship" with counsel. (J.A. Vol. XII, at 5-22). This court cannot find that the state courts' decision was contrary

123

to or an unreasonable application of clearly established federal law as determined by the United States Supreme Court. In *United States v. Cronic*, 466 U.S. 648, 657 n.21 (1984), the Supreme Court explained that the focus of the Sixth Amendment is on the fairness of the adversarial process, not the accused's relationship or rapport with his attorney. The Supreme Court has even held that the Sixth Amendment does not guarantee the accused a "meaningful attorney-client relationship." *See Morris v. Slappy*, 461 U.S. 1 12-15 (1983)(discussing the accused's objection to the replacement of his public defender with another public defender less than one month before his trial). As discussed in more detail below, the court cannot find either that defense counsel violated a duty owed to petitioner or that petitioner was somehow prejudiced with respect to the attorney-client relationship.

In the instant case, the breakdown in communication between petitioner and his trial attorneys was temporary in nature, did not prevent defense counsel from fulfilling their duty to investigate and zealously put forth a case in mitigation on petitioner's behalf, and was the result of petitioner's refusal to communicate with defense counsel as opposed to a failure on the part of defense counsel to communicate with petitioner. It appears from the record that for a period of a few months beginning around February of 1992, petitioner refused to speak to his attorneys and, in general, became uncommunicative and withdrawn. *See, e.g.*, J.A. Vol. II, at 291. Initially, it bears reminding that this was not a case of defense counsel failing to visit or communicate with petitioner; rather, it was a case of petitioner refusing to speak to his attorneys, thereby making it somewhat difficult to place blame for

124

the breakdown in communication solely on counsel. It does not appear that, prior to or after this period, there were any such problems between defense counsel and petitioner or that petitioner ever requested new counsel. During the hearing on petitioner's no contest pleas on July 24, 1992, when the three-judge panel inquired whether petitioner had "complete faith and confidence in your two attorneys, Mr. Walton and Mr. Keller this afternoon," petitioner answered under oath, "Yes, sir." (J.A. Vol. I, at 51). Nor does it appear that the breakdown, given that it was temporary in nature, amounted to a complete denial of counsel or rendered counsel unable to investigate or prepare petitioner's case. As the court already detailed above, defense counsel presented a substantial case in mitigation on petitioner's behalf in an effort to establish a nexus between petitioner's upbringing, as well as psychological stressors he was experiencing in October and November of 1990, and petitioner's commission of the offenses. Judge Bettman remarked from the bench, when the three-judge panel announced its sentencing decision, "that defense counsel had done such a thorough job in presenting their mitigating factors..." (J.A. Vol. I, at 395). Thus, the record belies petitioner's assertion, based on the affidavit of mitigation specialist Susan Shorr, (J.A. Vol. IX, at 169-170), that the lack of a meaningful relationship between petitioner and defense counsel prevented the undertaking of a proper mitigation investigation.

As for petitioner's assertion that the lack of a meaningful attorney-client relationship manifested itself most notably in petitioner's refusal to cooperate with the neuropsychological evaluation arranged by defense counsel, the state appellate court

125

concluded in postconviction that counsel had fulfilled the duty they owed to petitioner by retaining a neuropsychologist and that petitioner's subsequent refusal to cooperate with the neuropsychologist did not diminish counsel's fulfillment of their duty to petitioner. (J.A. Vol. XIII, at 371-72). Noting that "the criteria of the best available practice in the defense field" did not apply, the appellate court held that counsel's performance, in not taking extra steps to persuade petitioner to cooperate with the experts, as petitioner argues they were duty-bound to do, did not fall outside the "wide range of reasonable professional assistance." (*Id.* at 372). It tests the limits of credulity to characterize the state courts' conclusion in this regard as contrary to or an unreasonable application of clearly established Supreme Court precedent. Petitioner has not cited, and the court is not aware of, any Supreme Court case holding that the Sixth Amendment requires counsel to persuade a recalcitrant client to do that which he steadfastly refuses to do. Even so, when petitioner first began refusing to speak to his attorneys and became withdrawn in general, defense counsel renewed their motion to have petitioner evaluated for his competency to stand trial, despite previous findings that petitioner was competent. Counsel's renewed motion prompted the trial court to have petitioner transferred to the Dayton Mental Health Center's Forensic Unit for observation and further evaluation. (J.A. Vol. II, at 282, 290, 296). Thus, defense counsel did take precautions when petitioner became uncommunicative, and petitioner will not be heard to argue that counsel somehow performed below Sixth Amendment standards by failing to convince him of the importance of the neuropsychological

evaluation that they had arranged for him.

It appears that petitioner's refusal to cooperate with his attorneys was rooted in feelings of hopelessness about his case and his sense that he could not trust anybody, rather than in a failure on defense counsel's part to visit, maintain communication with, or otherwise reach out to petitioner.[12]  Dr. Samy, who treated petitioner at the Dayton Mental Health Center's Forensic Unit during the time period when petitioner stopped speaking to his attorneys, stated that petitioner's attorneys had given him no hope that there was an alternative to execution in his case. (J.A. Vol. IX, at 112).  A mental evaluation prepared at the Dayton Mental Health Center during the same period likewise attributed petitioner's withdrawal to his feeling of hopelessness about being acquitted.  (J.A. Vol. X, at 196-212).  Olivia Herndon Priest testified, in response to a question on cross-examination, that petitioner stopped talking to his attorneys "because he didn't trust anybody. *** He said he just wasn't going to talk to anybody anymore.  He said, you don't know who you can trust...." (J.A. Vol. I, at 238).  At the risk of sounding somewhat harsh, the court notes that petitioner has not cited, and the court is not aware of, any case holding that an attorney violates a duty by failing to give his client a sense of hope about the outcome of his case.  It bears reminding in this case that the evidence against petitioner was daunting, in light of his multiple admissions to various law

---

[12]    The prosecution suggested on cross examination of Mrs. Priest that petitioner's decision to stop talking to his attorneys and everyone else was his "plan" to "beat this thing in Ohio," but Mrs. Priest denied this suggestion and insisted that petitioner's refusal to speak to his attorneys stemmed from his inability to trust anyone.  (J.A. Vol. I, at 237-38).  Thus, there was no substantial evidence that petitioner's refusal to speak to his attorneys was a ruse on his part to raise questions as to his mental competency.

enforcement officers to the murder and robbery of Joseph Daron.  If anything, counsel has a duty to offer his client a realistic assessment, based on counsel's investigation and expertise, about probable or possible outcomes of the accused's case.  Defense counsel did not perform in an objectively unreasonable manner with respect to the temporary refusal on petitioner's part to speak to them and petitioner was not prejudiced.

With respect to petitioner's assertion that defense counsel failed to interview a reasonable number of people in the mitigation investigation, the court is not persuaded either that defense counsel's performance was deficient or that petitioner suffered any prejudice.  The court hastens to reiterate that, when reviewing claims of ineffective assistance of counsel, courts are cautioned by *Strickland* to avoid the distorting effects of hindsight. *Strickland v. Washington, supra*, 466 U.S. at 689 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."). Petitioner's allegations fly in the face of this *Strickland* cornerstone.  Petitioner argues that defense counsel secured the services of mitigation specialist Dr. Susan Shorr, only to impede her investigation at every turn.  However, neither Dr. Shorr in her affidavits, nor petitioner in his arguments, specify the manner in which defense counsel impeded her investigation.  Further, although it is not entirely clear from the record of the extent to which defense counsel used Dr. Shorr in their preparation for the mitigation phase, this court has already observed that the record

128

demonstrates a comprehensive mitigation investigation on defense counsel's part. Thus, petitioner will not be heard to assert without elaboration that defense counsel impeded the efforts of Dr. Shorr.

Characterizing defense counsel's own investigation efforts as haphazard and incomplete, petitioner also argues that defense counsel failed to follow up with petitioner's paternal grandparents after they failed to show up for their scheduled deposition. However, a review of the record reveals that Robert and Faith Fautenberry had telephoned not only defense counsel, but also the office of the court reporting service where they were scheduled to be deposed, stating clearly that they had no intention of cooperating with the deposition because they were emotionally distraught as a result of petitioner's case. (J.A. Vol. II, at 433-38). The record further indicates that defense counsel telephoned Mr. and Mrs. Fautenberry several times, and sent them a follow-up letter, discussing the scope of their anticipated testimony in an effort to persuade them to cooperate with the deposition. (*Id*. at 438-440). Petitioner will not be heard, therefore, to argue that defense counsel failed to follow up with his grandparents regarding their failure to appear for their scheduled deposition.

Petitioner also alleges that defense counsel failed to develop during their deposition of Olivia Herndon Priest any information regarding his commission of the offenses. Petitioner has not elaborated, and it is not entirely clear to the court, what information counsel should have developed in this regard. If petitioner is suggesting that defense counsel should have prompted

129

Mrs. Priest to elaborate on any confessions that petitioner made to the various homicides and robberies he committed, it is not clear to the court how that would have been helpful to petitioner's mitigation case. If petitioner is suggesting that defense counsel should have prompted Mrs. Priest to offer her opinion as to how petitioner could have committed the various homicides and robberies that he committed, the court is skeptical that such a lay opinion would have been persuasive or valuable to petitioner's mitigation case. In short, petitioner has failed entirely to demonstrate either objectively deficient performance or prejudice on the part of defense counsel in this regard.

Petitioner also argues that defense counsel failed to develop during their deposition of Louise Corcoran any information regarding head injuries suffered by petitioner that altered his behavior. Similarly, petitioner argues that defense counsel failed to depose Kenneth Corcoran, who could have provided information about those head injuries. Petitioner's allegations constitute the very sort of hindsight that *Strickland* cautions reviewing courts to avoid. Using after-the-fact expert opinions, petitioner offers an after-the-fact mitigation theory, *i.e.*, that brain impairment on petitioner's part may very well have contributed to his commission of the offenses or otherwise made him predisposed to commit acts of violence, and argues that defense counsel were ineffective for failing to uncover and develop anecdotal evidence supporting that theory. It is important, in the face of such allegations, to evaluate counsel's conduct in light of the information that counsel had available to them at the time. At the time that defense counsel conducted their mitigation phase investigation, they had

130

available to them multiple reports from experts suggesting that
petitioner showed no signs of brain impairment.  Petitioner has
offered evidence in the way of affidavits and evaluations by
neuropsychologist Jeffrey Smalldon and psychologist Sharon Pearson
questioning the basis for the trial experts' conclusions that
petitioner showed no signs of brain impairment.  But the opinions
of Drs. Smalldon and Pearson are only marginally relevant to the
question of whether defense counsel performed unreasonably and to
petitioner's prejudice in failing to develop anecdotal information
from Louise and Kenneth Corcoran about head injuries suffered by
petitioner that may have caused brain impairment.  In this regard,
it bears reminding that attorneys are not mental health experts and
cannot be expected to question expert opinions.  *See Wilson v.
Greene*, 155 F.3d 396, 403 (4th Cir. 1998)(counsel is not required
to second-guess content of reports concluding that defendant was
not mentally ill); *see also Pruett v. Thompson*, 996 F.2d 1560, 1574
(4th Cir. 1993); *Campbell v. Coyle, supra*, 260 F.3d at 555-56.
Perhaps the neuropsychological evaluation arranged by defense
counsel would have put them on notice of the need to probe
witnesses from petitioner's background about whether petitioner had
suffered any severe head injuries; but petitioner refused to
cooperate with that neuropsychological evaluation and this court
has already determined that petitioner's refusal cannot be
attributed to constitutionally deficient performance on counsel's
part.  As the state court of appeals concluded, "primary
responsibility for the failure of the record to contain such
evidence lies squarely with Fautenberry's own refusal to take
advantage of the testing provided for him."  (J.A. Vol. XIII, at

374).    In short, the court cannot find that counsel performed unreasonably or to petitioner's prejudice in failing to develop from Louise and Kenneth Corcoran information about severe head injuries that petitioner had suffered.

Petitioner also argues, in support of his broader argument that counsel conducted an inadequate mitigation investigation, that counsel erred in requesting and relying upon a presentence investigation report prepared by the Adult Probation Department. The state courts concluded in postconviction that the record actually demonstrated that counsel, rather than relying exclusively on the presentence investigation report, ("PSI report"), secured the appointment of a psychologist, neuropsychologist, and mitigation specialist. (J.A. Vol. XII, at 11).    The state court's conclusion is not unreasonable.    This court's own review of the record confirms that counsel's mitigation investigation obviously went far beyond mere reliance on the PSI report.    The PSI report consists solely of petitioner's criminal record; a brief summary of the offense, petitioner's status prior to being arrested and incarcerated, and prior mental health treatment; and several victim impact statements.    (J.A. Vol. II, at 478-495).    Even a cursory review of the mitigation transcript reveals that counsel did not confine themselves to, or rely exclusively on, the PSI report as their source of information in preparation for the mitigation phase of petitioner's case.

Further, the court is not willing to hold that counsel are ineffective for requesting a PSI report under R.C. §2929.03(D). Ohio courts have consistently rejected the argument that attorneys are constitutionally ineffective for requesting a presentence

investigation report and mental evaluation as provided for under Ohio law. *State v.McNeil*, 83 Ohio St. 3d 438, 450-51, 700 N.E.2d 596 (1998); *State v. Keith*, 79 Ohio St. 3d 514, 684 N.E.2d 47 (1997); *State v. Esparza*, 39 Ohio St. 3d 8, 9, 529 N.E.2d 192 (1988); *State v. Buell*, 22 Ohio St. 3d 124, 138, 489 N.E.2d 795 (1986). That is especially so when any negative information contained in the reports does not harm the defendant and when the report reveals useful evidence in mitigation. In other words, the decision to request a presentence investigation report or mental examination under R.C. §2929.03(D)(1), so long as there was some reasoned basis for it, is generally a tactical decision not to be second-guessed in hindsight. There is no indication from the three-judge panel's sentencing opinion that the presentence investigation report played any role in the trial court's conclusion that the aggravating circumstances outweighed the mitigating factors beyond a reasonable doubt. (J.A. Vol. II, at 443-456). Thus, it would be difficult to second-guess counsel's decision to request that report in hindsight. Defense counsel did not perform in an objectively unreasonable manner with respect to witnesses they interviewed in preparation for the mitigation phase and petitioner was not prejudiced.

For the foregoing reasons, the court rejects petitioner's claim that his attorneys were ineffective for conducting an inadequate mitigation investigation. Sub-part (A) of his twelfth ground for relief is denied.

**2.  Sub-Part (B) — Failure to Retain Necessary Experts.**

Petitioner argues that counsel failed to ensure that necessary and competent evaluations were undertaken and completed. In

support of his argument, petitioner asserts that defense counsel settled for a court-appointed expert to conduct a mitigation-phase mental health instead of seeking appointment of an expert who would have assisted defense counsel. Petitioner further argues that the Court Clinic doctors and staff responsible for conducting his mitigation-phase mental health examination were not qualified or staffed to conduct a proper mitigation-phase evaluation. Finally, petitioner argues that defense counsel erred to his prejudice in failing to explain to him the purpose and importance of the neurological evaluation they had arranged, which evaluation petitioner consequently refused to allow.

A complete discussion of defense counsel's investigation and presentation of petitioner's mitigation case was set forth in detail above in connection with sub-part (A) of petitioner's twelfth ground for relief and will not be recounted here. It is sufficient for purposes of the instant discussion to note the following. On November 1, 1991, defense counsel filed a motion requesting a neurological examination of petitioner, (J.A. Vol. II, at 116). On November 7, 1991, defense counsel filed a motion requesting funds to employ mitigation specialist Dr. Susan Shorr; in the memorandum in support, defense counsel also spelled out their need, in preparation for the mitigation phase, for a neuropsychologist and a psychologist. (J.A. Vol. II, at 245). On November 19, 1991, the trial court issued entries granting defense counsel's motion for a neurological examination, authorizing fees for defense counsel to employ psychologist Dr. Murray Tieger for mitigation purposes, and authorizing fees for defense counsel to employ mitigation specialist Dr. Susan Shorr. (J.A. Vol. II, at

134

266, 267, 268). It is not clear from the record whether or to what extent defense counsel utilized the services of Dr. Shorr and Dr. Tieger. It is well known, however, that petitioner refused to cooperate with the neurological evaluation arranged by defense counsel. It is also a matter of record that, following the entry of petitioner's no contest pleas, defense counsel requested a presentence investigation report and a mental health evaluation pursuant to R.C. §2929.03(D), and that ultimately, defense counsel elected to call Dr. Schmidtgoessling of the Court Clinic to testify at petitioner's mitigation hearing. (J.A. Vol. I, at 93-94, 274-295).

At petitioner's mitigation hearing, Dr. Schmidtgoessling testified that, in addition to administering numerous tests, she also utilized the services of a clinical social worker to put together a comprehensive social history and to contact relatives and friends. (J.A. Vol. I, at 297). Dr. Schmidtgoessling testified that petitioner was of average intelligence, and seemed to be able to recall information well, to process information accurately, and to articulate in a reasonable fashion. She also testified that he showed no signs of organic impairment, explaining that "[the test] trails were within the average limit so from the psychological testing basically [we] deduced that there was, to the best we could see, no signs of organic impairment." (J.A. Vol. I, at 298). Dr. Schmidtgoessling provided details on the dysfunctional set of relationships that petitioner had experienced in childhood and as an adult; his feelings of guilt, rejection, worthlessness, inability to trust, and rage; and the various psychological stressors that he was experiencing at the time of the

offenses, such as his recent break-ups with two women, the loss of his job, his lack of direction, his lack of human attachments, the repossession of his truck, and his heavy substance abuse.

On cross-examination, Dr. Schmidtgoessling stated her belief that while petitioner suffered from a severe personality disorder, he did not suffer from a severe mental disease or defect within the meaning of R.C. §2929.04(B)(3).[13] (J.A. Vol. I, at 312-13). Dr. Schmidtgoessling agreed on cross-examination that petitioner had brought many of those psychological stressors on himself, but explained that, sometimes, a person's choices are affected by psychological factors of which he is not aware. (*Id.* at 316-17).

On re-direct examination, Dr. Schmidtgoessling stated her belief that petitioner suffered from mixed personality disorder with narcissistic and antisocial traits, as well as substance abuse disorder. (J.A. Vol. I, at 325). She further stated that, while those disorders might not be on par with diseases such as schizophrenia or bipolar disorder, they nonetheless were defects that prevented petitioner from being characterized as "normal." (*Id.*).

The question before the court is whether defense counsel performed unreasonably and to petitioner's prejudice in failing to obtain necessary and competent experts. The court answers that inquiry in the negative. The state court of appeals in postconviction concluded with respect to petitioner's claim that his defense attorneys were ineffective for failing to retain a

---

[13]    R.C. §2929.04(B)(3) lists as a mitigating factor, "Whether, at the time of committing the offense, the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of the offender's conduct or to conform the offender's conduct to the requirements of the law."

neuropsychologist and other mental health experts to demonstrate that petitioner suffered from organic brain impairment that counsel had not violated a substantial duty and that, accordingly, the evidence submitted by petitioner in support of his claims was not relevant to his claim of ineffective assistance of counsel. (J.A. Vol. III, at 370-72). The appellate court noted that "the criteria of the best available practice in the defense field" did not apply, and that counsel could not be faulted under Sixth Amendment standards for failing to persuade petitioner to cooperate with the neurological evaluation. (*Id*. at 372). As for petitioner's claim that defense counsel erred to his prejudice in relying on the Court Clinic to conduct his mitigation-phase mental evaluation, the state appellate court reiterated that any failure to develop the evidence that petitioner submitted in support of his argument "lies squarely with Fautenberry's own refusal to take advantage of the testing provided for him." (*Id*. at 374). For the reasons that follow, the court cannot find that the state court's conclusions contravened or unreasonably applied clearly established federal law as determined by the United States Supreme Court.

Initially, with respect to counsel's decision to utilize the services of Dr. Schmidtgoessling instead of employing a "defense" psychologist for the mitigation hearing, the Sixth Circuit has held, "[w]e have never found counsel to be ineffective solely because the expert used was on the State payroll." *Martin v. Mitchell*, 280 F.3d 594, 614 (6th Cir. 2002); *see also Smith v. Mitchell*, 348 F.3d 177, 208 (6th Cir. 2003). Utilizing Dr. Schmidtgoessling's testimony, defense counsel urged the three-judge panel to consider as mitigating factors petitioner's sense of

rejection, low self-esteem, feelings of anger and rage, the psychological stressors he was experiencing leading up to the offenses, his abuse of alcohol and drugs, and the three psychological disorders from which he suffered, as well as his ability to adjust to life in prison. Thus, Dr. Schmidtgoessling provided testimony that was relevant and useful to defense counsel in supporting their mitigation strategy to explain how petitioner had come to commit the offenses.

In support of his assertion that defense counsel should have obtained a "defense" psychologist instead of relying on the Court Clinic, petitioner argues that the Court Clinic doctors and staff responsible for conducting his mitigation-phase evaluation were not qualified to conduct such an evaluation. Petitioner cites as support deposition testimony that Dr. Schmidtgoessling provided in another death penalty habeas corpus case, *Jamison v. Collins*, in which Dr. Schmidtgoessling stated, "Now, we can't do as extensive of an investigation as mitigation experts would...." (J.A. Vol. X, at 48). A complete reading of Dr. Schmidtgoessling's deposition testimony, as well as her testimony during petitioner's penalty hearing, demonstrates on her part a thorough understanding of, and appreciation for, what is required for a proper mitigation investigation. Contrary to petitioner's assertion that the Court Clinic lacks the resources and personnel to conduct a proper mitigation investigation, it is clear from Dr. Schmidtgoessling's deposition testimony that the Court Clinic employs social workers and case managers to develop comprehensive social histories, conduct interviews, and collect records.

New information provided in postconviction affidavits by

138

neuropsychologist Dr. Jeffrey Smalldon and psychologist Dr. Sharon Pearson is only marginally relevant to the question of whether defense counsel's decision to rely on Dr. Schmidtgoessling for their mitigation-phase mental evaluation constituted deficient performance or prejudiced the outcome of petitioner's sentencing proceeding. Keeping in mind the information that counsel had available to them at the time, and avoiding the distorting effects of hindsight, it bears reminding that, prior to the entry of petitioner's no contest pleas, no less than eight mental health evaluations had been performed on petitioner between November 1991 and June 1992. Reports on petitioner's competency to stand trial and mental state at the time of the offense were filed by Drs. Nancy Schmidtgoessling, William Walters, and Emmett Cooper in November 1991. On the basis of those reports, petitioner was found competent on January 15, 1992. (J.A. Vol. II, at 275). Subsequently, upon defense counsel's renewed motion to determine competency on February 14, 1992, and after petitioner's refusal to cooperate with Court Clinic psychologist Nancy Schmidtgoessling, (J.A. Vol. II, at 291-92), petitioner was transported to the Dayton Mental Health Center/Forensic Unit for evaluation. (J.A. Vol. II, at 290). Upon an evaluation performed by Dr. Samy there, petitioner was again found competent to stand trial on June 9, 1992. (J.A. Vol. II, at 299). None of these evaluations suggested that petitioner suffered from some sort of mental disease or defect and, while Drs. Smalldon and Pearson, some years after the fact, called those trial experts' conclusions into question for various reasons, defense counsel could not reasonably have been expected to second-guess those conclusions at the time. The court has already

139

noted that attorneys are not mental health experts and cannot be expected to question expert opinions. *See Wilson v. Greene*, 155 F.3d 396, 403 (4th Cir. 1998)(counsel is not required to second-guess content of reports concluding that defendant was not mentally ill); *see also Pruett v. Thompson*, 996 F.2d 1560, 1574 (4th Cir. 1993). Accordingly, the court cannot find either that defense counsel were unreasonably deficient in utilizing Dr. Schmidtgoessling in lieu of obtaining a "defense" psychologist, or that there is a reasonable probability that the outcome of petitioner's mitigation hearing was prejudiced by counsel's decision in this regard.

The gravamen of petitioner's argument appears to be that defense counsel, by failing to obtain the services of a neuropsychologist and "defense" psychologist, failed to uncover and present evidence that petitioner suffered from organic brain impairment, which, according to petitioner, would have constituted a mental disease or defect sufficient to qualify as a mitigating factor under R.C. §2929.04(B)(3).[14] To the extent petitioner is suggesting that defense counsel had an obligation to "shop" for an expert who would have testified that he suffered from organic brain impairment or some other mental disease or defect, that argument finds no support in case law and the court squarely rejects it. *See Dowthitt v. Johnson*, 230 F.3d 733, 748 (5th Cir. 2000)("Under the circumstances, trial counsel was not deficient by not canvassing the field to find a more favorable defense expert."),

---

[14]    R.C. §2929.04(B)(3) directs the sentencer to consider as a mitigating factor "whether, at the time of committing the offense, the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of the offender's conduct or to conform the offender's conduct to the requirements of the law."

140

*cert. denied*, 532 U.S. 915 (2001); *Fleenor v. Farley*, 47 F.Supp.2d 1021, 1047 (S.D. Indiana 1998)("Fleenor's lawyers undertook a substantial effort to develop defenses based on Fleenor's mental condition, and the results were not promising.  In not drilling more deeply in that well, they did not fail to provide effective assistance of counsel."), *aff'd, Fleenor v. Anderson*, 171 F.3d 1096 (7th Cir.), *cert. denied*, 528 U.S. 891 (1999).  Moreover, as the court has already noted, counsel, based on the information that was available to them at the time that they were preparing for petitioner's mitigation hearing, had no reason to believe that petitioner might suffer from organic brain impairment or some other sort of mental disease or defect sufficient to constitute a mitigating factor under R.C. §2929.04(B)(3).

Further, even assuming this court accepted the conclusions by Drs. Smalldon and Pearson that petitioner suffers from "at least mild functional brain impairment," (J.A. Vol. IX, at 143), this court still would not be in a position to conclude that defense counsel erred to petitioner's prejudice in failing to establish a mitigating factor under R.C. §2929.04(B)(3).  Initially, this court recognizes and accepts as true Dr. Smalldon's diagnosis that petitioner suffers from "at least mild functional brain impairment." (*Id*.).  Without being dismissive of that diagnosis, the court notes, however, that Dr. Smalldon went on to list in the hypothetical the kinds of effects that such brain impairment might have on an individual.  (*Id*. at 146).  Beyond remarking that "[t]here is evidence in the historical information which has been provided for my review that in fact Mr. Fautenberry may have begun to show significant personality changes following an incident in

elementary school where he was knocked unconscious by a swing,"
(*Id.*), Dr. Smalldon never expressly stated that petitioner actually
exhibited any of those effects. Further, neither Dr. Smalldon nor
Dr. Pearson made any statements in their affidavits suggesting that
petitioner would have been able to satisfy the second prong of the
mitigating factor in R.C. §2929.04(B)(3), namely, that he lacked
substantial capacity to appreciate the criminality of his conduct
or to conform his conduct to the requirements of the law. Thus, in
this regard, it cannot be said either that defense counsel
performed deficiently or that there is a reasonable probability
that, but for their allegedly deficient performance, the outcome of
petitioner's mitigation hearing would have been different.

As for petitioner's corollary argument that defense counsel
were ineffective for failing to explain the purpose and importance
of the neurological evaluation that they had arranged and with
which petitioner refused to cooperate, the court has already
determined, in its discussion of sub-part (A) of petitioner's
twelfth ground for relief, that petitioner's refusal to cooperate
with that evaluation cannot be attributed to deficient performance
on defense counsel's part. Further, it would be difficult for
petitioner to establish that he was prejudiced by counsel's failure
to persuade him to cooperate with the neurological evaluation
since, as discussed above, no evidence has been produced suggesting
that petitioner would have been able to satisfy all of the criteria
necessary to establish a mitigating factor under R.C.
§2929.04(B)(3).

For the foregoing reasons, the court rejects petitioner's
claim that his attorneys were ineffective for failing to obtain

142

necessary and competent experts.    Sub-part (B) of his twelfth
ground for relief is denied.

**3.   Sub-Part (C) — Inadequate Presentation of Mitigation Evidence.**

Petitioner argues that, as a result of their failure to
conduct an adequate investigation and their failure to obtain
necessary and competent experts, defense counsel erred to his
prejudice by their inadequate presentation of mitigation evidence.
Petitioner argues that his attorneys did not make reasonable
strategic decisions; rather, they made unreasonable, prejudicial
omissions.

Specifically, petitioner argues that defense counsel should
have presented evidence, by interviewing and calling to the stand
Kenneth Corcoran, that petitioner had suffered numerous,
substantial head injuries during his childhood.  Petitioner argues
that his sister, Kristine Fautenberry Geier, could have testified
about the physical abuse that she and petitioner suffered at the
hands of their various step-fathers.    Petitioner argues that
defense counsel should have introduced his military records which
would have documented the head injury he suffered when his head
became lodged between a pontoon boat and an approaching ship.
Petitioner argues that defense counsel, through their inadequate
investigation into his social history and failure to persuade him
to cooperate with a neuropsychological evaluation, inexcusably
allowed evidence that he did not suffer from brain impairment when
he actually does suffer from brain impairment.

Petitioner goes on to argue that defense counsel failed to
link his upbringing to his commission of the offenses.  Petitioner
argues that defense counsel failed to establish that petitioner's

undiagnosed Attention Deficit/Hyperactivity Disorder, combined with the chronic fear and rage he experienced as a result of his domineering, violent, and critical step-fathers, made him predisposed to commit the violent acts that he committed. Petitioner argues that defense counsel failed to argue that he abused alcohol and drugs to find comfort for his pain, that his personality changed for the worse when he drank, and that he was drinking heavily at the time of the offenses. Petitioner argues that defense counsel failed to explore the impact of petitioner's deep depression on his commission of the offenses, as well as the possibility that there may have been a sexual component to the homicides, made relevant by the emotional, physical, and possibly sexual abuse petitioner suffered at the hands of various males during his upbringing.

Petitioner notes that Dr. Susan Shorr, Dr. Jeffrey Smalldon, and Dr. Sharon Pearson all opined that significant psychological mitigating evidence was available, but not presented, during the mitigation hearing, which evidence would have been highly relevant to the sentencer. Citing *Skaggs v. Parker*, 235 F.3d 261, 270 (6th Cir. 2000), petitioner argues that the failure to discover and present such evidence in mitigation can constitute ineffective assistance of counsel in violation of the Sixth Amendment.

Petitioner also argues that defense counsel not only failed to adduce evidence of a positive mitigating factor, *i.e.*, his capacity to adjust positively to life in prison, but actually managed to introduce prejudicial evidence of a non-statutory aggravating factor, *i.e.*, petitioner's alleged plot or attempt to escape from prison by taking a doctor or one of his lawyers hostage. Citing

144

*Combs v. Coyle*, 205 F.3d 269, 286 (6th Cir. 2000), petitioner argues that the failure to object to improper argument or evidence can constitute ineffective assistance of counsel in violation of the Sixth Amendment.

A complete discussion of defense counsel's investigation and presentation of petitioner's mitigation case was set forth in detail above in connection with sub-part (A) of petitioner's twelfth ground for relief and will not be recounted here. The court noted in its discussion of sub-part (A) of petitioner's twelfth ground for relief that defense counsel obviously conducted some investigation and managed to put forth some meaningful testimony during the mitigation hearing. Defense attorney John Keller, in his opening remarks, set the tone for the mitigation case that defense counsel planned to present, explaining, "What I think we would start off with is the premise that if you believe that people are not born bad then you have to ask the question as to how they became violent. Something happened to John, I think this mitigation process is not one to try to make excuses or to minimize anything that occurred, but to try to educate and inform the Court and to explain how we got the point we are today." (J.A. Vol. I, at 101-102). In their closing argument, defense counsel urged the three-judge panel, based on the evidence they had presented, to consider the following mitigating factors: petitioner's youth (R.C. §2929.04(B)(4)); and petitioner's lack of history of significant criminal convictions, (R.C. §2929.04(B)(5)), since petitioner had one felony conviction for carrying a concealed weapon, for which he received probation, two misdemeanor theft offenses, and possibly a disorderly conduct charge or two. Under

145

the "catch-all" mitigating factor set forth in R.C. §2929.04(B)(7)[15], defense counsel urged the three-judge panel to consider the fact that petitioner confessed to the offense early after being detained and entered no contest pleas to the charges; the fact that petitioner would be required to serve at least 66 years in prison in Alaska before he could be released; testimony from Louise Corcoran, Mary Slayback, Olivia Priest, and Dr. Schmidtgoessling regarding petitioner's sense of rejection, low self-esteem, feelings of anger and rage, the psychological stressors he was experiencing leading up to the offenses, his abuse of alcohol and drugs, and the three psychological disorders from which he suffered; and his ability to adjust to life in prison, which defense counsel emphasized by downplaying petitioner's alleged escape/hostage plan.   Judge Bettman remarked from the bench, when the three-judge panel announced its sentencing decision, "that defense counsel had done such a thorough job in presenting their mitigating factors..." (J.A. Vol. I, at 395).

The question before the court is whether defense counsel performed unreasonably and to petitioner's prejudice in their presentation of petitioner's mitigation case.  The answer to that question clearly is no.

A key component to petitioner's argument is that defense counsel – through their failure to elicit testimony from Louise Corocoran, Kenneth Corcoran, and Kristin Fautenberry Geier, or to introduce military records documenting a head injury petitioner suffered while in the Navy – failed to introduce anecdotal evidence

---

[15]    R.C. §2929.04(B)(7) instructs the sentencer to consider as mitigating, "Any other factors that are relevant to the issue of whether the offender should be sentenced to death."

of head injuries suffered by petitioner. That, combined with defense counsel's failure to persuade petitioner to cooperate with a neurological evaluation, caused defense counsel to allow testimony that petitioner did <u>not</u> suffer from brain impairment when he actually <u>does</u> suffer from brain impairment. The court has already considered and rejected arguments that defense counsel were constitutionally ineffective in this regard.

This court squarely rejected petitioner's argument that defense counsel were constitutionally ineffective in connection with his refusal to participate in the neurological evaluation they had arranged. The state appellate court concluded in postconviction that counsel had fulfilled the duty they owed to petitioner by retaining a neuropsychologist and that petitioner's subsequent refusal to cooperate with the neuropsychologist did not diminish counsel's fulfillment of their duty to petitioner. (J.A. Vol. XIII, at 371-72). Noting that "the criteria of the best available practice in the defense field" did not apply, the appellate court held that counsel's performance, in not taking extra steps to persuade petitioner to cooperate with the experts, as petitioner argues they were duty-bound to do, did not fall outside the "wide range of reasonable professional assistance." (*Id.* at 372). It tests the limits of credulity to characterize the state courts' conclusion in this regard as contrary to or an unreasonable application of clearly established Supreme Court precedent. Petitioner has not cited, and the court is not aware of, any Supreme Court case holding that the Sixth Amendment requires counsel to persuade a recalcitrant client to do that which he steadfastly refuses to do. Thus, petitioner will not be heard

to argue that counsel somehow performed below Sixth Amendment requirements by failing to convince him of the importance of the neuropsychological evaluation that they had arranged for him.

Regarding petitioner's argument that defense counsel were constitutionally ineffective for failing to develop through witness testimony and introduction of military records anecdotal evidence of various head injuries that petitioner suffered, the court noted in its discussion of sub-part (A) of petitioner's twelfth ground for relief that Petitioner's allegations constitute the very sort of hindsight that *Strickland* cautions reviewing courts to avoid. Using after-the-fact expert opinions, petitioner offers an after-the-fact mitigation theory, *i.e.*, that brain impairment on petitioner's part may very well have contributed to his commission of the offenses or otherwise made him predisposed to commit acts of violence, and argues that defense counsel were ineffective for failing to uncover and develop anecdotal evidence supporting that theory. It is important, in the face of such allegations, to evaluate counsel's conduct in light of the information that counsel had available to them at the time. At the time that defense counsel conducted their mitigation phase investigation, they had available to them multiple reports from experts suggesting that petitioner showed no signs of brain impairment. Petitioner has offered evidence in the way of affidavits and evaluations by neuropsychologist Jeffrey Smalldon and psychologist Sharon Pearson questioning the basis for the trial experts' conclusions that petitioner showed no signs of brain impairment. The opinions of Drs. Smalldon and Pearson are only marginally relevant to the question of whether defense counsel performed unreasonably and to

148

petitioner's prejudice in failing to develop anecdotal information from Louise and Kenneth Corcoran about head injuries suffered by petitioner that may have caused brain impairment. In this regard, it bears reminding that attorneys are not mental health experts and cannot be expected to question expert opinions. *See Wilson v. Greene*, 155 F.3d 396, 403 (4th Cir. 1998)(counsel is not required to second-guess content of reports concluding that defendant was not mentally ill); *see also Pruett v. Thompson*, 996 F.2d 1560, 1574 (4th Cir. 1993); *Campbell v. Coyle, supra*, 260 F.3d at 555-56. Perhaps the neurological evaluation arranged by defense counsel would have put them on notice of the need to probe witnesses from petitioner's background about whether petitioner had suffered any severe head injuries. However, petitioner refused to cooperate with that neuropsychological evaluation, and this court has already determined that petitioner's refusal cannot be attributed to constitutionally deficient performance on counsel's part. As the state court of appeals concluded, "primary responsibility for the failure of the record to contain such evidence lies squarely with Fautenberry's own refusal to take advantage of the testing provided for him." (J.A. Vol. XIII, at 374). In short, when viewing counsel's actions and decisions at the time of petitioner's mitigation hearing, the court cannot find that counsel performed unreasonably or to petitioner's prejudice in allowing evidence that petitioner did not suffer from brain impairment when, according to petitioner, he actually does suffer from brain impairment.

Petitioner also argues that defense counsel failed to link his upbringing to his commission of the offenses. Petitioner's argument is belied by the record. It is obvious from the opening

and closing arguments given by defense counsel, as well as the evidence they presented, that defense counsel's sole mitigation theory was to demonstrate from aspects of petitioner's upbringing and development "how we got to the point we are today." (J.A. Vol. I, at 101-102). Obviously, defense counsel did not succeed with this strategy. But petitioner will not be heard to argue that they did not attempt to link his upbringing to his commission of the offenses.

In support of this argument, petitioner also asserts that defense counsel failed to argue that petitioner abused alcohol and drugs to find comfort for his pain, that his personality changed for the worse when he drank, and that he was drinking heavily at the time of the offenses. Again, petitioner's assertion is belied by the record. Defense counsel elicited from Louise Corcoran during her deposition testimony "that he [Fautenberry] drank too much, and I had basically always thought that; but I also thought that that was a self-defense mechanism for John." (J.A. Vol. I, at 132). Defense counsel elicited from Olivia Herndon Priest during her deposition testimony that petitioner's drug and alcohol abuse were sporadic when they were together, "but when he did, he did it good." (J.A. Vol. I, at 194). She explained that, when during those periods when he did use alcohol and drugs, he did so heavily. (*Id*. at 195). She further opined that petitioner abused alcohol and drugs to escape the emotional problems he felt as a result of his upbringing. (*Id*. at 197-98). Dr. Schmidtgoessling testified that petitioner's heavy substance abuse was among the psychological stressors he was experiencing at the time of the offenses that contributed to his commission of the offenses. (J.A. Vol. I, at

304). She later testified that his substance abuse was heavy at the time of the offenses. (*Id*. at 313-14). Moreover, she diagnosed him with substance abuse disorder. (*Id*. at 325). During their closing argument, defense counsel argued that petitioner's abuse of alcohol and drugs was among the psychological stressors that petitioner was experiencing at the time that he committed the offenses. (J.A. Vol. I, at 383). Thus, petitioner will not be heard to argue that defense counsel failed to argue that he abused alcohol and drugs as an escape and that his substance abuse was heavy at the time he committed the offenses.

Petitioner also argues that his defense attorneys failed to explore the impact of his deep depression on his commission of the offenses, as well as the possibility that there may have been a sexual component to the crimes. Petitioner's allegations in this regard constitute the very sort of hindsight that *Strickland* cautions reviewing courts to avoid. Defense counsel formulated and announced a clear mitigation theory at the outset – namely, that a culmination of petitioner's chaotic and abusive upbringing, and numerous psychological stressors that petitioner was experiencing immediately preceding the offenses, resulted in petitioner's commission of the offenses. Defense counsel's theory was the result of reasonable and adequate investigation. Defense counsel called witnesses who furthered this mitigation theory. It is easy enough and all too common for a defendant to criticize after the fact a strategy that did not succeed. Different attorneys may have pursued a different mitigation strategy, but this court cannot say that the mitigation strategy pursued by petitioner's attorneys, or the evidence they presented in support, was objectively

unreasonable and one that no reasonable attorney would have pursued.

Further, as alternative mitigation theories go, petitioner's assertions that his deep depression contributed to his commission of the offenses and that there may have been a sexual component to the crimes find little support in the record. Neither Dr. Smalldon nor Dr. Pearson, who evaluated petitioner and submitted affidavits on his behalf during his state court postconviction proceedings, identified a "deep depression" on petitioner's part – beyond the culmination of psychological stressors identified and asserted by defense counsel – as a primary or driving factor in his commission of the offenses. Further, as the court determined in its discussion of the *Brady* violations alleged in petitioner's fourth ground for relief, during interrogations by Portland Detective Tom Nelson, petitioner denied repeatedly that he had or ever intended to have sexual relations with his victims and petitioner insisted repeatedly that robbery was his motive for the murders he committed. In sum, petitioner has failed entirely to demonstrate either that counsel performed deficiently or to petitioner's prejudice in this regard.

Citing the affidavits of Dr. Susan Shorr, Dr. Jeffrey Smalldon, and Dr. Sharon Pearson, petitioner also argues that, due to counsel's ineffectiveness, significant psychological evidence was available but not presented to the sentencers. This court has already determined, in its consideration of sub-part (A) of petitioner's twelfth ground for relief, that the affidavits and evaluations by neuropsychologist Jeffrey Smalldon and psychologist Sharon Pearson questioning the basis for the trial experts'

conclusions that petitioner showed no signs of brain impairment and offering opinions about psychological evidence that was not presented are only marginally relevant to the question of whether defense counsel performed unreasonably and to petitioner's prejudice in failing to develop anecdotal information about head injuries suffered by petitioner that may have caused brain impairment and in failing to persuade petitioner to cooperate with the neurological evaluation. This court is not dismissing the information offered by Drs. Smalldon, Pearson, and Shorr. However, this court must confine its inquiry to the reasonableness of counsel's actions at the time they investigated and presented the mitigation evidence in petitioner's case. Defense counsel conducted a reasonably adequate mitigation investigation, had the benefit of no less than eight mental health evaluations stating that petitioner suffered from no major mental disorder, utilized the services of Court Clinic psychologist Nancy Schmidtgoessling for mitigation testimony, and arranged for petitioner to undergo a neurological evaluation (with which petitioner refused to cooperate). To the extent that any psychological evidence of significance went undiscovered and unpresented, as suggested by Drs. Smalldon, Pearson, and Shorr, it simply cannot be said that the failure to discover that information was due to deficient performance on defense counsel's part. That being so, petitioner cannot satisfy the deficient-performance prong of the *Strickland* test. Even assuming that defense counsel were deficient in this regard, the court is not persuaded that there is a reasonable probability that the outcome of petitioner's sentencing hearing would have been different had counsel not erred. Neither Dr.

Smalldon nor Dr. Pearson made any statements in their affidavits suggesting that petitioner would have been able to satisfy the second prong of the mitigating factor in R.C. §2929.04(B)(3), namely, that he lacked substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law.

Finally, petitioner argues that defense counsel not only failed to adduce evidence that petitioner would adjust positively to life in prison, but actually managed to introduce prejudicial evidence of a non-statutory aggravating factor, *i.e.*, petitioner's alleged plot or attempt to escape from prison by taking a lawyer or doctor hostage.  Petitioner's argument finds little support in the record.  Petitioner argues that defense counsel, for no apparent reason, introduced evidence regarding his alleged escape plot/attempt by questioning Dr. Schmidtgoessling about the incident on direct examination.

> Q.       Now we have heard through some of the testimony here today, and certainly I have heard this, that earlier or I guess actually maybe around December of last year or January of this year John allegedly had threatened to escape from the jail and apparently some inmates turned him in regarding this attempt to escape. And, ironically, I don't know if ironic is the right word but it was probably I that suggested that it would have been a hostage may have been taken and with typical luck I probably would have been there at that time.  Assume that all that is true that John number one was going to take his attorney, as unfortunate as that might be, as a hostage and try to escape with that attorney, assume that to be true, does that guide us in predicting how John might react to a long term of imprisonment?

(J.A. Vol. I, at 310).  Petitioner argues that it was defense counsel who first brought up this alleged incident by asking Dr. Schmidtgoessling about it on direct examination.  Petitioner's

assertion in this regard simply is not true.

The state asked several witnesses regarding the alleged escape plot/attempt. During cross examination of Louise Corcoran, the prosecution asked: "Are you aware since he's been incarcerated he's tried to escape?" (J.A. Vol. I, at 157). Defense counsel objected, but, since it was a deposition, Mrs. Corcoran went ahead to answer, "Yeah." The questioning continued:

Q.    How did you become aware of the fact that he tried to escape?

MR. KELLER:    I am going to object and continuing objection based on hearsay.

A.    Christine told me.

Q.    What that the – was that in Alaska or Cincinnati?

A.    Cincinnati.

Q.    Did she tell you how he was going to try and escape?

A.    No. I don't know that she knew or that she knows now.

Q.    The John that's in jail now was going to take a doctor or a lawyer, was going to take him as a hostage and use that as a method to escape.

MR. KELLER:    Objection.

Q.    You weren't aware of that until now?

A.    (Nods no.)

(J.A. Vol. I, at 157-58). That deposition testimony was played in its entirety to the three-judge panel. Later, during cross-examination of Olivia Priest Herndon, who also testified via deposition, the prosecution asked: "Did John in either a phone call

155

or a letter to you, die he ever discuss with you his plans to take a hostage and escape from the Cincinnati jail?"  Mrs. Priest answered, "No."  (J.A. Vol. I at 237).  That deposition testimony was played to the three-judge panel.

Thus, it was the prosecution who first introduced evidence of petitioner's alleged escape plot/attempt.  In asking Dr. Schmidtgoessling about the incident on direct examination, defense counsel were only attempting to mitigate or rebut damaging evidence that had already been introduced by the prosecution.  Further, in their closing argument, defense counsel attempted to downplay the incident and urged the three-judge panel not to consider it, stating that neither he nor Mr. Keller were ever afraid that petitioner might actually follow through with the plan.  (J.A. Vol. I, at 385).  It tests the limits of credulity to argue that defense counsel performed deficiently in doing so, or that petitioner was prejudiced as a result.  If anything, defense counsel's performance would have been far more questionable had they done nothing to rebut evidence about the incident.

Contrary to petitioner's assertion, defense counsel did manage to introduce some favorable testimony about petitioner's ability to adjust to a long term of incarceration.  In response to defense counsel's question on direct examination about the alleged escape attempt and whether it would serve as a guide for predicting how petitioner might react to a long term of imprisonment, Dr. Schmidtgoessling answered:

> A.    Not really, it does and it doesn't.  I mean
> the behavior speaks for itself in terms of his wanting to
> escape.  The reality of it is with anybody I have seen in
> his circumstances, they always are thinking about escape
> and so it doesn't surprise me that somebody thinks about

escape.***.

(J.A. Vol. I, at 310).   It is true that Dr. Schmidtgoessling offered on cross examination, in response to a question of whether petitioner was still capable of taking a human life, that, if past behavior was any indicator of future behavior, "I would say I consider him at risk for that behavior again." (J.A. Vol. I, at 318).   However, in response to a question by defense counsel on direct examination about how petitioner was likely to respond in the future to deal with and control his anger, Dr. Schmidtgoessling answered:

> A.    First they have to become aware of it and be able to articulate it and know where it is coming from and why and then they have to practice other behaviors, learn other ways to express that.  In his particular case it would appear that over this year that he has been locked up he is able to tell us more about what happened to him in more detail that he could at the beginning, suggesting that he started that first stage of understanding and being able to put it into words. Before he had had the feelings but not the words.  Now he has got the words.  When you have the words, then you know he is real capable of benefitting like from AA groups or adult children of alcoholic groups or in the prisons they have stress management or anger control groups, he is real capable of benefitting from those.  So that would help him learn new ways to deal with his feelings than he did in the past.  Also as people get older their ability to act out tends to decrease.

(J.A. Vol. I, at 308).  In response to defense counsel's question about how someone with petitioner's "psychological make up" would react to a long term of imprisonment, Dr. Schmidtgoessling answered that although there was no way of knowing how he would adjust since he had never been incarcerated for a long period of time, petitioner had the intelligence to engage in gainful activities, to get a job, to pursue schooling, and to benefit from whatever groups

157

or therapy opportunities there would be in prison.  (*Id*. at 309).
Seizing upon Dr. Schmidtgoessling's testimony and downplaying the
alleged escape plot/attempt, defense counsel urged the three-judge
panel during closing argument to consider that "John would be able
to adjust to a lifetime in prison."  (J.A. Vol. I, at 384-85).

If defense counsel could have introduced more or better
evidence to demonstrate petitioner's ability to adjust positively
to a long term of imprisonment, it nonetheless cannot be said that
they failed to offer any evidence of this mitigating factor.  For
that reason, petitioner will not be heard to argue that defense
counsel failed to introduce any evidence in this regard.

In the absence of evidence demonstrating they conducted no
investigation, this court is left with the presumption of
competency to which attorneys are entitled under *Strickland*, and
the record itself.  The record in this case demonstrates that
defense counsel had a thorough awareness and understanding of
Ohio's mitigation procedures and what would be necessary to
convince the sentencers that the aggravating circumstances in
petitioner's case did not outweigh the mitigating factors beyond a
reasonable doubt.  Counsel demonstrated a comprehensive knowledge
of and appreciation for petitioner's background and the factors in
petitioner's background and emotional state just before the
offenses that appeared to contribute to his commission of the
offenses.  Counsel formulated a mitigation strategy based on their
investigation and presented witnesses who gave testimony that was
relevant and persuasive as to the mitigating factors defense
counsel sought to prove.  The touchstone of whether counsel's
performance was deficient under the first prong of *Strickland* is

the reasonableness of counsel's conduct, viewed from counsel's perspective at that time. It is easy enough, after the fact, to criticize a strategy that did not succeed. That sort of second-guessing and finger-pointing constitute the very hindsight that *Strickland* cautioned against. The most that petitioner has demonstrated is that counsel could have done more, which is almost always the case. For the foregoing reasons, sub-part (C) of petitioner's twelfth ground for relief is denied.

**4. Conclusion**

For the foregoing reasons, petitioner's twelfth ground for relief is denied as without merit. The state courts' conclusions in rejecting claims raised by petitioner in his postconviction action were not contrary to or an unreasonable application of clearly established Supreme Court precedent, nor did they rely on an unreasonable determination of the facts based on the evidence that was presented.

**G. Thirteenth Ground for Relief**

Petitioner's thirteenth ground for relief reads in relevant part:

> John Fautenberry's death sentences are constitutionally infirm because the trial court considered and weighed invalid or improper aggravating circumstances and failed to meaningfully consider mitigating evidence.
>
> A. The trial court improperly relied upon nonstatutory aggravating circumstances.
>
> C. The trial court improperly converted the lack of mitigation into a nonstatutory aggravating circumstance.
>
> D. The trial court improperly ignored mitigating evidence offered by Mr. Fautenberry.
>
> E. The cumulative effect of the errors in the trial

159

court's sentencing opinion requires the granting of habeas relief.[16]

Petitioner contends in his thirteenth ground for relief that the trial court improperly considered nonstatutory aggravating factors and failed to adequately weigh mitigating factors.

## 1. Consideration of Nonstatutory Aggravating Circumstances

In Subpart A of his claim, petitioner contends that the court improperly considered and converted the facts and circumstances of the case into nonstatutory aggravating circumstances. Petitioner notes the following portion of the opinion of the three-judge panel:

> However, these mitigating factors pale before the simple fact that defendant's actions were plotted, vicious, persistent and utterly callous. Joseph Daron was shot not once, but twice. His belongings[,] including money[,] credit cards, bible[,] and even his vehicle[,] were stolen by the defendant. Then his body was thrown into a wooded area near the Ohio River.
>
> The actions of the defendant were contemplated and calculating as he asked Joseph Daron to drive twenty miles out of his way, all the time knowing he would kill Daron and steal his belongings. John Fautenberry's calculation continued after the shooting as he drove to the Ohio River looking for a place to hide Joseph Daron's body.

Appx. Vol. II, pp. 454-55.

Petitioner made this argument before the court of appeals. That court rejected petitioner's argument, noting that a three-judge panel may rely upon and cite the nature and circumstances of the offense as reasons supporting its finding that the aggravating circumstances were sufficient to outweigh the mitigating factors.

---

[16] This court has previously determined subpart B of this claim to be procedurally defaulted. *See* Opinion and Order of December 26, 2001, pp. 35-36.

*Fautenberry*, 1994 WL 35023 at *5, (citing *State v. Stumpf*, 32 Ohio St.3d 95, 512 N.E.2d 598 (1987)).  The court noted that considering the nature and circumstances of the offense is not per se error. *Id*. (citing *State v. Jester*, 32 Ohio St.3d 147, 512 N.E.2d 962 (1987)).  The court held that the trial court "did not consider the nature and circumstances of the crime as aggravating circumstances, but that it merely utilized the nature and circumstance of the offense to support the conclusion reached in its weighing process." *Id*. (citing *State v. Lorraine*, 66 Ohio St.3d 414, 421-22, 613 N.E.2d 212 (1993)).

The Ohio Supreme Court also disagreed with petitioner's argument.  That court noted that the three-judge panel identified the statutory aggravating circumstances which were at issue in the case. *Fautenberry*, 72 Ohio St.3d at 440.  The court stated, "It is well settled that, '[u]nder R.C. 2929.03(F), a trial court or three-judge panel may rely upon and cite the nature and circumstances of the offense as reasons supporting its finding that the aggravating circumstances were sufficient to outweigh the mitigating factors.'" *Id*. at 440-41 (citing *Stumpf*, 32 Ohio St.3d, syllabus para. 1).  The court concluded that the "trial court in the case at bar clearly understood the difference between statutory aggravating circumstances and additional facts which depicted the nature and circumstances of the murder" and further that "the nature and circumstances of the offense were simply utilized to support the trial court's finding that the aggravating circumstances outweighed the mitigating factors." *Id*. at 441.

The states have wide latitude to structure sentencing procedures.  *See Boyde v. California*, 494 U.S. 370, 376 (1990);

161

*Smith v. Mitchell*, 348 F.3d 177, 210 (6th Cir. 2003). Even the use of the nature and circumstances of the offense as an aggravating factor is not in itself constitutionally prohibited. *See Tuilaepa v. California*, 512 U.S. 967, 975-76 (1994). However, the state has a duty to tailor and apply its laws in a manner which avoids the arbitrary and capricious infliction of the death penalty. *Godfrey v. Georgia*, 446 U.S. 420, 428 (1980). A defendant's due process rights may be infringed by a state's failure to adhere to its own sentencing statutes. *Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980); *Fox v. Coyle*, 271 F.3d 658, 665 (6th Cir. 2001).

Under the Ohio death penalty scheme, the trial court "shall consider, and weigh against the aggravating circumstances proved beyond a reasonable doubt, the nature and circumstances of the offense, the history, character, and background of the offense," and all of the statutory mitigating factors. Ohio Rev. Code §2929.04(B). The Ohio Supreme Court has held that under §2929.04(B), the nature and circumstances of the offense "may only be 'weighted' against the R.C. 2929.04(A) specifications of aggravating circumstances the defendant was found guilty of committing." *State v. Wogenstahl*, 75 Ohio St.3d 344, 354, 662 N.E.2d 311 (1996). Thus, it is improper to consider the nature and circumstances of the offense as aggravating circumstances. *Id.* at 355.

However, the Ohio Supreme Court also stated in *State v. Jester*, 32 Ohio St.3d 147, 153, 512 N.E.2d 962 (1987):

> Discussion of circumstances other than statutory aggravating circumstances is not per se error. Juries and judges must consider the nature and circumstances of the offense, as well as the statutory aggravating circumstances, in determining whether the death penalty

162

> is appropriate.  Only in this fashion is it possible to prevent a rigid and mechanistic sentencing scheme. *Barclay v. Florida*(1983), 463 U.S. 939, 103 S.Ct. 3418, 77 L.Ed.2d 1134.

*See also State v. Gumm*, 73 Ohio St.3d 413, 417, 653 N.E.2d 253 (1995)(noting that the Supreme Court has "consistently recognized that the determination as to the imposition of a death sentence should hinge on 'an individualized determination' based on 'the character of the individual and the circumstances of the crime.'")(quoting *Zant v. Stephens*, 462 U.S. 862, 879 (1983)).

Thus, the Ohio Supreme Court has held that the nature and circumstances of the offense must be examined to ascertain whether they would provide evidence in mitigation, and it is not improper for a court to note that the nature and circumstances of the offense offer nothing in the way of mitigating features. *See State v. Steffen*, 31 Ohio St.3d 111, 116-17, 509 N.E.2d 383 (1987).  The Ohio Supreme Court has also held that it is permissible for the trial court to rely upon and cite the nature and circumstances of the offense in support of the finding that the aggravating circumstances outweigh the mitigating factors. *State v. Lott*, 51 Ohio St.3d 160, 171, 555 N.E.2d 293 (1990)(mere reference to nature and circumstances of offense in trial panel's opinion did not convert them into nonstatutory aggravating circumstance; facts and circumstances of offense were integral part of aggravating specification, and panel could rely upon and cite them in support of finding that aggravating circumstance outweighed mitigating factors); *State v. Stumpf*, 32 Ohio St.3d at 99-100.  *See also State v. Moore*, 81 Ohio St.3d 22, 38, 689 N.E.2d 1 (1998)(court's discussion of nature and circumstances of offense was permissible

163

discussion of facts in support of finding that aggravating circumstances outweighed mitigating factors; court did not consider heinousness of crimes as aggravating circumstance, but "merely reviewed the nature and circumstances of the crimes, as it is required to do, in order to determine whether the death penalty was appropriate.")

In *Fox*, 271 F.3d at 669, the Sixth Circuit noted that it is "entirely permissible under Ohio law for courts to consider the nature and circumstances of an offense in determining whether the aggravating factor(s) outweigh the mitigating circumstances."

In this case, the three-judge panel discussed the nature of the offense, noting that the circumstances of the offense offered nothing in the way of mitigation. *See* Appx. Vol. II, p. 451. This was permissible under Ohio law. In the two paragraphs noted by petitioner, at Appx. Vol. II, pp. 454-55, the panel recited facts which supported the panel's finding on the felony murder specification, including the commission of the offense by petitioner as the principal offender and petitioner's commission of the offense with prior calculation and design. *See* Ohio Rev. Code §2929.04(A)(7). This was a permissible explanation of why this specification outweighed the mitigating factors offered in evidence.

This court concludes that the state courts correctly determined under Ohio law that the three-judge panel did not improperly consider the nature and circumstances of the offense as a nonstatutory aggravating circumstance. As noted by the Sixth Circuit, rejecting a similar argument in *Smith*, 348 F.3d at 210, this claim "is foreclosed by well established Supreme Court

164

precedent."

**2. Consideration of Mitigating Factors Not Raised By Defense**

In Subpart C of this ground for relief, petitioner alleges that the trial court improperly addressed statutory mitigating factors which were not at issue. At the mitigation phase of his trial, petitioner presented evidence relevant to certain statutory mitigating factors. Petitioner relied on Ohio Rev. Code §2929.04(B)(4), the "youth of the offender" provision, and Ohio Rev. Code §2929.04(B)(5), the "lack of a significant history of prior criminal convictions and delinquency adjudications" provision. Petitioner presented evidence of the abuse inflicted upon him as a child by two stepfathers and his resulting distrust, feelings of rejection and suppressed rage. This was considered by the panel under Ohio Rev. Code §2929.04(B)(2), relating to the commission of the offense while under duress, coercion or strong provocation.

Petitioner also presented evidence under Ohio Rev. Code §2929.04(B)(7), the "catch-all" provision which mandates consideration of "[a]ny other factors that are relevant to the issue of whether the offender should be sentenced to death." This included evidence of petitioner's drug and alcohol abuse and the fact that petitioner would serve a minimum of 66 years before he would be eligible for parol on his Alaska sentence.

Petitioner notes that the three-judge panel listed and addressed all of the statutory mitigating factors in its decision, even those that were not applicable to his case. Petitioner argues that this procedure of listing and rejecting nonapplicable mitigating factors resulted in the conversion of these inapplicable

mitigating factors into nonstatutory aggravating factors.

On direct appeal, the court of appeals agreed with petitioner that the trial panel's comments regarding mitigating factors not relied on by petitioner constituted error under *State v. DePew*, 38 Ohio St.3d 275, 289, 528 N.E.2d 542 (1989). *Fautenberry*, 1994 WL 35023 at *7. However, the court concluded that any error was harmless because the panel is presumed to have based its opinion only on relevant factors, and because the independent review of the sentence by the court of appeals would rectify any sentencing error that may have occurred. *Id.* (citing *State v. Smith*, 61 Ohio St.3d 284, 574 N.E.2d 510 (1991)). The Ohio Supreme Court agreed with the reasoning of the court of appeals and concluded that the trial court's reference to other mitigating factors did not constitute reversible error. *Fautenberry*, 72 Ohio St.3d at 442.

It is well established that "it is not the province of a federal habeas court to reexamine state-court determinations of state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). As the Supreme Court noted in *Mullaney v. Wilber*, 421 U.S. 684, 691 (1975), "state courts are the ultimate expositors of state law[.]"

The Ohio courts determined that the violation of state law committed by the trial court was harmless. As judges, the members of the three-judge panel are presumed to know the law. They were simply being "conscientious and thorough" in explaining why certain statutory mitigating factors did not apply, and [b]y so commenting, the court did not convert inapplicable mitigating factors into

166

nonstatutory aggravating circumstances." *See State v. Hill*, 73 Ohio St.3d 433, 442, 653 N.E.2d 271 (1995). Even assuming that it is within the province of this court to disagree with the opinion of the Ohio appellate courts concerning whether the trial court adequately complied with Ohio law, this court sees no basis in the record for concluding that the alleged error was prejudicial.

In addition, the court notes that petitioner asserts no error in regard to the weighing process conducted by the court of appeals and by the Ohio Supreme Court. The Ohio Supreme Court has implemented the rule announced in *Clemons v. Mississippi*, 494 U.S. 738, 750 (1990), in which the Supreme Court held that certain errors in the weighing of aggravating circumstances against mitigating factors may be cured by independent review at the appellate level. In *Lott*, the Ohio Supreme Court stated, "Indeed, it is within the province of this court to conduct its own careful appellate reweighing of aggravating circumstances against mitigating factors to produce a 'measured consistent application' of the death penalty which would be in no way unfair to the defendant." *Id.*, 51 Ohio St.3d at 170 (citing *Clemons*). In petitioner's case, the Ohio Supreme Court stated that "our independent review of the sentence can rectify any sentencing errors that may have occurred." *Fautenberry*, 72 Ohio St.3d at 442. The First District Court of Appeals and the Ohio Supreme Court upheld the death penalty in petitioner's case after conducting their own weighing process pursuant to Ohio Rev. Code §2929.05.

Petitioner has not established that the Ohio courts' resolution of this issue resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established

167

federal law.  This branch of petitioner's claim is not well taken.

### 3. Failure to Properly Weigh Mitigating Evidence

Petitioner argues in Subpart D that the trial court ignored or improperly weighed the mitigation evidence presented by him. Specifically, in regard to the youth of the offender, §2929.04(B)(4), the trial court stated that "this is not a factor here, the defendant being 27 years old at the time of the offense." Appx. Vol. II, p. 452.  In regard to the factor in §2929.04(B)(5), lack of a significant criminal history--petitioner had a record of one prior felony conviction for carrying a concealed weapon and misdemeanor charges--the court's decision stated that the "panel did not feel this was a mitigating factor."  Appx. Vol. II, p. 452. Petitioner argues that this language indicates that the panel did not consider youth or lack of criminal record as a mitigating factor at all, and that the panel should have at least considered these factors, even if the panel ultimately gave them little or no weight.

Petitioner further argues that the panel gave too little weight to other mitigating factors, including petitioner's drug and alcohol use and his confession and cooperation with the authorities, which the panel referred to as being of "minimal" effect. Appx. Vol. II, pp. 452-53. Petitioner also notes that the panel's decision does not specifically discuss the fact that he entered a no contest plea, thereby sparing the victim's family a trial and media attention.  Petitioner also argues that the panel erroneously gave no weight to the fact that he would serve sixty-six years on his sentence imposed for the Alaska offense before he would be eligible for parole.  He further contends that the panel's

opinion (immediately after the statement concerning petitioner's confession and cooperation with the authorities) refers to the fact that petitioner had shown no remorse, thereby converting lack of remorse into an aggravating factor.

The court of appeals rejected the petitioner's arguments in regard to the panel's consideration of the mitigating evidence. In regard to petitioner's argument concerning the panel's failure to consider his youth as a mitigating factor, the court stated, "We read the opinion to mean that the panel considered Fautenberry's age of 27 to be inappropriate for characterizing him as a youthful offender in the mitigating sense, ... and, therefore, the court gave no weight to that factor, as opposed to not considering it at all as a mitigating factor. *Fautenberry*, 1994 WL 35023 at *6, n.2 (citations omitted). The court also rejected petitioner's argument that the panel failed to consider lack of criminal history as a mitigating factor. The court noted that "while being imprecise by saying Fautenberry's felony conviction and misdemeanor charges '[were] not a mitigating factor,' the panel was clearly presenting Fautenberry's criminal history as a potential mitigating factor, but giving it no weight." *Id.*

The court of appeals noted that the panel considered petitioner's age, his history of prior criminal convictions, his cooperation with law enforcement, and his history, character and background. The court held that the fact that petitioner was displeased with the weight given to these factors by the panel did not make the panel's weighing process invalid. *Id.*, 1994 WL 35023 at * 6 (citing *State v. Lorraine*, 66 Ohio St.3d 414, 422, 613 N.E.2d 212 (1993)(weight to be given to specific mitigating

169

evidence is left to discretion of sentencing authority)). In regard to the fact that petitioner would be required to serve sixty-six years of his Alaska sentence before being eligible for parole, the court held that the panel was not required to accept as mitigating everything offered by the petitioner. *Id.* (citing *State v. Steffen*, 31 Ohio St.3d 111, 509 N.E.2d 383 (1987)).

The Ohio Supreme Court also addressed this claim in its decision. The court upheld the panel's conclusion that petitioner's age and lack of criminal record were not mitigating factors in his case as being consistent with prior decisions, stating, "Clearly both age and prior criminal record were considered in the mitigation process, but they were simply negated by the facts at hand." *Fautenberry*, 72 Ohio St.3d at 441-42. That court also rejected the argument that the panel did not properly consider his cooperation with the police or his history, character and background, noting that the panel was not required to accept as mitigating everything offered by the petitioner. *Id.* at 442. Finally, the court noted that any error would be negated by the court's own independent review. *Id.*

This court sees no basis for disagreeing with the assessment of the Ohio appellate courts that the panel did not erroneously reject mitigating factors offered by petitioner or fail to give sufficient weight to the mitigating evidence. "[O]nce a defendant is found eligible for death based on a constitutionally sufficient narrowing circumstance, the sentencer's discretion is virtually unlimited." *Smith*, 348 F.3d at 210 (citing *Zant v. Stephens*, 462 U.S. 862, 878-79 (1983)). The record reveals that the panel acted within its discretion in discounting petitioner's age, criminal

170

record, personal history, and drug and alcohol use as grounds for mitigation.

The panel did not specifically refer in its opinion to counsel's argument that petitioner's no contest plea should be considered in mitigation, *see* Appx. Vol. I, p. 380. However, this evidence falls within the same category as petitioner's confession to all the murders and his cooperation with law enforcement, which were mentioned in the opinion as being of "minimal" effect. Likewise, although the panel did not specifically mention petitioner's Alaska sentence in the section of the opinion which discussed the weighing process, this information is included in the section of the panel's opinion which discussed the evidence presented in mitigation. *See* Appx. Vol. II, p. 447. The weighing process, which referenced "the mitigating factors (discussed fully above)," *see* Appx. Vol. II, p. 454, took all of the mitigating evidence, including petitioner's Alaska sentence, into account.

The panel complied with the requirements of Ohio Rev. Code §2929.03(F), which requires the panel to state "its specific findings as to the existence of any of the mitigating factors" in its opinion. Even assuming that the panel did not fully comply with §2929.03(F), the failure to strictly comply with that section is not prejudicial error in light of Ohio's scheme of independent weighing by the appellate courts. *See State v. Keith*, 79 Ohio St.3d 514, 533, 684 N.E.2d 47 (1997)(inadequate explanations of weighing process do not constitute reversible error because any error may be readily cured by independent appellate review); *State v. Maurer*, 15 Ohio St.3d 239, 246-47, 473 N.E.2d 768 (1984)(defendant is not presumptively prejudiced by a trial court's

171

failure to follow the dictates of § 2929.03(F) because independent review at appellate level may cure any error). The Sixth Circuit has held that habeas relief for noncompliance with §2929.03(F) is therefore not available. *See Fox*, 271 F.3d at 665 n.2. As noted above, petitioner has asserted no objection to the independent weighing analysis performed by the court of appeals and by the Ohio Supreme Court. Three Ohio courts have now had the opportunity to engage in the statutory weighing process, and have found against the petitioner. The decisions of these courts are not contrary to federal law, nor do they constitute an unreasonable application of clearly established federal law.

### 4. Cumulative Effect of Errors

Petitioner argues in Subpart E that the cumulative effect of the errors alleged above denied him due process of law. The court finds that the errors alleged above, when considered individually and in combination, do not warrant habeas relief. The thirteenth ground for relief is denied.

### H. Fourteenth and Fifteenth Grounds for Relief

Since petitioner's fourteenth and fifteenth grounds for relief are related, the court will address them together. Petitioner's fourteenth ground for relief is as follows:

> John Fautenberry's convictions and sentences are constitutionally infirm because he was not afforded the effective assistance of counsel on his direct appeal as of right to the Hamilton County Court of Appeals.

Petitioner's fifteenth ground for relief states:

> John Fautenberry's convictions and sentences are constitutionally infirm because he was not afforded the effective assistance of counsel on his direct appeal as of right to the Ohio Supreme Court.

172

In his fourteenth ground for relief, petitioner raises multiple allegations of ineffective assistance of appellate counsel during his direct appeal of right to the state court of appeals. In his fifteenth ground for relief, petitioner raises the same allegations of ineffective assistance of appellate counsel during his direct appeal of right to the Supreme Court of Ohio. In his traverse, he specifies that his appellate attorneys failed to raise the following meritorious issues:

1.  The Hamilton County Officials Discriminated On The Basis Of Gender And Race In Selecting The Foreperson For John Fautenberry's Grand Jury. (Petitioner's first ground for relief)

2.  The Trial Court Forced John Fautenberry To Proceed To Trial Wearing Jail Garb and Shackles. (Petitioner's sixth ground for relief)

3.  There Was Insufficient Evidence To Support The Trier Of Fact's Guilty Verdict As To Aggravated Murder And The Attached Specification. (Petitioner's eighth ground for relief)

4.  Trial Counsel Did Not Reasonably Advise John Fautenberry Concerning His No Contest Pleas. (Petitioner's ninth ground for relief)

5.  The Trial Court Failed To Appoint Reasonably Competent Experts. (Petitioner's tenth ground for relief)

6.  The Trial Court Improperly Admitted Evidence Of Mr. Fautenberry's Purported Dangerousness. (Petitioner's eleventh ground for relief)

7.  The Trial Court Improperly Admitted Voluminous Testimony Concerning The Facts And Circumstances Of All The Homicides. (Petitioner's eleventh ground for relief)

In its *Opinion and Order* of December 26, 2001, this court determined that the claims of ineffective assistance of appellate counsel set forth in petitioner's fourteenth ground for relief,

173

*i.e.*, claims of appellate counsel ineffectiveness during his direct appeal of right to the state court of appeals, appeared to be procedurally defaulted because they had not been presented to the state courts in a timely application for reopening of the direct appeal -- the procedure in Ohio for raising claims of ineffective assistance of appellate counsel.[17]    *See* Ohio R. App. P. 26(B). (Doc. No. 52, at 36-45).    The court went on to conclude that petitioner had established cause for the default of his appellate counsel ineffectiveness claims -- namely, the failure of the attorneys who were charged with filing his Rule 26(B) application for reopening to do so in a timely manner. *See White v. Schotten*, 201 F.3d 743, 752-53 (6th Cir. 2000).    The court was then left with the task of determining whether petitioner could satisfy the prejudice prong as to the default of his appellate counsel ineffectiveness claims, which task called upon the court to determine whether there was a reasonable probability that the outcome of petitioner's Rule 26(B) application for reopening, had it been filed in a timely manner, would have been different.    That determination essentially required the court to assess the relative strength of the claims appellate counsel had omitted from the direct appeal -- a task the court was unable to perform at the time that it decided the procedural default issues, because the parties had not yet filed their merits briefs.    Those briefs having been

---

[17]    As for petitioner's fifteenth ground for relief, *i.e.*, ineffective assistance of appellate counsel on appeal to the Supreme Court of Ohio, the court determined that petitioner's claim was not procedurally defaulted, since petitioner violated no state procedural rule in presenting those claims to the Ohio Supreme Court in a motion for reconsideration.    (Doc. No. 52, at 46-47). But this court expressed no opinion as to the merits of petitioner's claims or whether there even exists in Ohio a right to effective assistance of counsel during a second appeal of right in a death penalty case.

filed, the court is now in a position to determine, ultimately, whether petitioner has demonstrated cause and prejudice to excuse the default of the appellate counsel ineffectiveness claims set forth in his fourteenth claim for relief.

In the same *Opinion and Order*, the court rejected the procedural default argument raised by respondent against petitioner's fifteenth ground for relief. (Doc. No. 52, at 46-47). In so holding, the court expressed no opinion as to the merits of petitioner's claim or whether petitioner even had a right to the effective assistance of counsel on his second appeal of right to the Supreme Court of Ohio.

In determining whether cause and prejudice exists, the court may not simply dispense with the analysis by finding that the defaulted claim is without merit. In *Scott v. Mitchell, supra*, 209 F.3d at 872, the Sixth Circuit explained, in determining whether cause and prejudice existed to excuse procedural default, "Of course, evaluating the merits to determine the applicability of procedural default is circular and undermines the federalism concerns behind the doctrine."

The *Strickland* test applies to appellate counsel. *Burger v. Kemp*, 483 U.S. 776 (1987). Counsel must provide reasonable professional judgment in presenting the appeal. *Evitts v. Lucey*, 469 U.S. 387, 396-97 (1985). Generally, "'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986)(quoting *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983)). *But see Smith v. Anderson*, 104 F.Supp.2d 773, 839 (S.D. Ohio

2000)("This Court believes that, in capital cases, appellate counsel should approach the traditional process of winnowing out claims with extreme caution."); *Jamison v. Collins*, 100 F.Supp.2d 647, 740-41 (S.D. Ohio 2000)("we believe that any 'winnowing' or narrowing of issues must be done very cautiously when a person's life is at stake."). The Court of Appeals for the Sixth Circuit has identified the following considerations that ought to be taken into account in determining whether counsel on direct appeal performed reasonably competently:

1. Were the omitted issues "significant and obvious?"

2. Was there arguably contrary authority on the omitted issues?

3. Were the omitted issues clearly stronger than those presented?

4. Were the omitted issues objected to at trial?

5. Were the trial court's rulings subject to deference on appeal?

6. Did appellate counsel testify in a collateral proceeding as to his appeal strategy and, if so, were the justifications reasonable?

7. What was appellate counsel's level of experience and expertise?

8. Did the petitioner and appellate counsel meet and go over possible issues?

9. Is there evidence that counsel reviewed all the facts?

10. Were the omitted issues dealt with in other assignments of error?

11. Was the decision to omit an issue an unreasonable one which only an incompetent attorney would adopt?

*Mapes v. Coyle, supra*, 171 F.3d at 427-28.  The Sixth Circuit cautioned, however, that this list is not exhaustive and need not produce a certain "score."  *Id.* at 428.

With these principles in mind, the court will now turn to petitioner's allegations of ineffective assistance of appellate counsel.  It bears reminding, though, that with respect to petitioner's fourteenth ground for relief, the scope of this court's review is limited to determining whether, but for counsel's failure to file petitioner's Rule 26(B) application in a timely fashion, there is a reasonable probability that the outcome of petitioner's Rule 26(B) application would have been different. Only if the court answers that query in the positive will petitioner be able to demonstrate cause and prejudice sufficient to excuse the default of the appellate counsel ineffectiveness claims set forth in his fourteenth ground for relief so as to entitle those claims to a full review on the merits.

1.  **Failure to Challenge Grand Jury Selection Process.**

Petitioner argues that appellate counsel should have raised on direct appeal a claim alleging that the Hamilton County officials discriminated on the basis of race and gender in selecting the foreperson for petitioner's grand jury.  (Traverse, Doc. No. 86, at 124-25).  According to petitioner, between 1982 and 1998, there were 87 grand juries that returned 134 capital indictments. According to petitioner, only four African-Americans served as forepersons during that time period, "less than a quarter as many [] as would be expected, based upon the percentage of African Americans in Hamilton County."  (*Id.*).  Petitioner goes on to argue that, only 19 females served as forepersons during that same time

period, "less than half as many [] as would be expected, based on the percentage of [females] in the population of Hamilton County." (*Id.* at 125).

Petitioner's arguments regarding the grand jury foreperson selection process were presented to this court in his first ground for relief. In its *Opinion and Order* of December 26, 2001, this court dismissed petitioner's first ground for relief as procedurally defaulted because it had never been presented to the state courts. In so holding, the court noted that the claim should have been developed at trial and then raised on direct appeal, but was not. (Doc. No. 52, at 12). Given that the facts and data giving rise to petitioner's allegations were not developed at trial, and were therefore not part of the trial record, logically, appellate counsel cannot be faulted for failing to raise on direct appeal a claim that did not appear on the trial record. That is, appellate counsel has no duty to raise on direct appeal an issue that does not appear on the face of the record. Indeed, Ohio law generally does not permit litigants on direct appeal to supplement the appellate record with evidence or facts that were not part of the trial record. *State v. Ishmail*, 54 Ohio St. 2d 402, paragraph one of the syllabus, 377 N.E.2d 500 (1978)(holding that an appellate court "cannot add matter to the record before it, which was not part of the trial proceedings, and then decide the appeal on the basis of the new matter.").

In sum, this claim of appellate counsel ineffectiveness is without merit. Thus, petitioner cannot demonstrate cause and prejudice to excuse this component of his fourteenth ground for relief. That is, even assuming that his attorneys had timely filed

178

his Rule 26(B) application to raise this claim of appellate counsel ineffectiveness, there is not a reasonable probability that petitioner's Rule 26(B) application would have been decided differently as to this claim. Moreover, assuming for purposes of this discussion that petitioner has a right to the effective assistance of counsel on a second appeal of right to the Supreme Court of Ohio, appellate counsel did not perform deficiently or to petitioner's prejudice in failing to raise the grand jury foreperson challenge.

For the foregoing reasons, this component of petitioner's fourteenth ground for relief is denied as procedurally defaulted. Further, this component of petitioner's fifteenth ground for relief is denied as without merit.

## 2.  Failure to Challenge Jail Garb and Shackles at Trial.

Petitioner argues that appellate counsel should have raised on direct appeal a claim alleging that he was forced to appear at his no contest plea hearing in jail garb and shackles. (Traverse, Doc. No. 86, at 125). Petitioner's allegations that he was forced to appear at his no contest plea hearing in jail garb and shackles were presented to this court in his sixth ground for relief. In its *Opinion and Order* of December 26, 2001, this court concluded that petitioner's claim was procedurally defaulted because, contrary to petitioner's assertion that he had presented the substance of this claim during his postconviction proceedings, review of his postconviction action revealed that his allegations had not been fairly presented to the state courts. (Doc. No. 52, at 14-16). Petitioner now appears to be arguing that the allegations should have raised on direct appeal.

179

Petitioner waived his right to a jury and appeared for his no contest plea hearing and his sentencing hearing before a three-judge panel. It is reasonable to presume that a trial panel, as opposed to a jury, will be scrupulous enough to avoid admitting or considering improper evidence or circumstances in its decision upon a no contest plea or its sentencing decision. *See State v. Lott*, 51 Ohio St. 3d 160, 176, 555 N.E.2d 293 (1990); *see also State v. Post*, 32 Ohio St 3d 380, 383-84, 513 N.E.2d 754 (1987)(holding that error in admitting victim impact statement did not warrant reversal because the case was tried before a three-judge panel rather than a jury). Such has been the state of the law in Ohio since 1968. In *State v. White*, 15 Ohio St. 2d 146, 151, 239 N.E.2d 65 (1968), the Ohio Supreme Court noted that it would indulge "in the usual presumption that in a bench trial in a criminal case the [trial] court considered only the relevant, material, and competent evidence in arriving at its judgment unless it affirmatively appears to the contrary." Federal circuits considering this question indulge the same presumption. *United States v. Busch*, 758 F.2d 1394, 1398 (10th Cir. 1985); *United States v. Impson*, 562 F.2d 970, 971 (5th Cir. 1977), *cert. denied*, 434 U.S. 1050 (1978); *United States ex rel. Placek v. Illinois*, 546 F.2d 1298, 1304-1305 (7th Cir. 1976).

Further, the three-judge panel in this case was well aware that petitioner had confessed to committing multiple murders in multiple states and had already been convicted and sentenced for the murder he had committed in Alaska. Thus, it tests the limits of credulity to suggest that appearing before the three-judge panel in jail garb and shackles somehow cloaked petitioner with a veil of

guilt sufficient to find that, had he appeared in civilian clothes and without shackles, the outcome of his no contest plea hearing would have been different. *See, e.g., Simmons v. Taylor*, 195 F.3d 346, 349 (8th Cir. 1999)(overwhelming evidence of guilt made it impossible for petitioner to demonstrate under *Strickland* that he was prejudiced by counsel's failure to object to prison clothes), *cert. denied*, 528 U.S. 1194 (2000).

In sum, this claim of appellate counsel ineffectiveness is without merit. It cannot be said that appellate counsel performed unreasonably or to petitioner's prejudice in failing to raise this issue on appeal, in light of the fact that it had virtually no chance of prevailing and was scarcely worth preserving, even in a capital case. Thus, petitioner cannot demonstrate cause and prejudice to excuse this component of his fourteenth ground for relief. That is, even assuming that his attorneys had timely filed his Rule 26(B) application to raise this claim of appellate counsel ineffectiveness, there is not a reasonable probability that petitioner's Rule 26(B) application would have been decided differently as to this claim. Moreover, assuming for purposes of this discussion that petitioner has a right to the effective assistance of counsel on a second appeal of right to the Supreme Court of Ohio, appellate counsel did not perform deficiently or to petitioner's prejudice in failing to raise a claim regarding petitioner's appearance at his no contest plea hearing in jail garb and shackles.

For the foregoing reasons, this component of petitioner's fourteenth ground for relief is denied as procedurally defaulted. Further, this component of petitioner's fifteenth ground for relief

181

is denied as without merit.

3.  **Failure to Challenge Sufficiency of Evidence.**

Petitioner argues that there was insufficient evidence to support the trier of fact's guilty verdict as to the aggravated murder and attached death penalty specification, and that his appellate attorneys were ineffective for failing to raise this issue on appeal.  (Traverse, Doc. No. 86, at 125-26). Specifically, petitioner argues that the prosecution's oral unsworn statement and the exhibits referenced therein did not offer sufficient evidence as to the state and county where the murder occurred.  Petitioner's allegations that the state provided insufficient evidence on the essential element of venue were presented to this court in his eighth ground for relief.  In its *Opinion and Order* of December 26, 2001, this court concluded that petitioner's claim was procedurally defaulted because it had never been presented to the state courts on direct appeal.  (Doc. No. 52, at 17-18).

Upon entry of petitioner's no contest pleas, the prosecution gave a recitation of facts, and supplied exhibits, to establish a factual basis for petitioner's no contest pleas.  Regarding the issue of where the murder of Joseph Daron had occurred, the prosecution stated:

> Joseph Daron drove the defendant approximately twenty miles out of his way to a restaurant and motel parking lot just past the junction of I-71 and I-275. Upon exiting the vehicle of the victim Fautenberry reached back in and shot Joseph Daron twice in the right chest with the same Jennings model J .22 that he had used to kill Gary Farmer just days earlier, which is marked as State's exhibit number 3.
>
> Fautenberry then drove back to 36 mile post on U.S.

182

       52 East where he threw the body of Joseph Daron into a
wooded area on the north bank of the Ohio River.  And we
will mark as exhibit number 6 the crime scene of the body
of Joseph Daron is found on the north bank of the Ohio
River.***

(J.A. Vol. I, at 67-68).

      The exhibits that were submitted by the state and admitted by
the trial court included copies of all of the statements that
petitioner had made to law enforcement officers. (J.A. Vol. I, at
74, Exh. 17).  Included among those statements was petitioner's
statement to Portland Detective Tom Nelson on March 19, 1991,
during which petitioner provided considerable detail as to where
exactly he had shot Joseph Daron.  Detective Nelson was able to
learn that petitioner was hitchhiking when Daron picked him up
"[o]n the on-ramp to 275 off of Highway 125 which is Beech Point
Avenue." (J.A. Vol. V, at 191).  Petitioner went on to state that
he rode with Daron for about twenty miles north toward Columbus,
Ohio, and that Daron eventually dropped him off in a motel or
restaurant parking lot about five to ten miles north of Milford,
just past the junction of I-71, "[u]p off of 275." (*Id.* at 191-
92).  Petitioner stated clearly that he did not shoot Daron in the
location where he eventually dumped Daron's body.

      This claim of appellate counsel ineffectiveness is without
merit.  Even assuming that it could be said that appellate counsel
performed deficiently, in light of the school of thought suggesting
that appellate counsel in a capital case should err on the side of
raising every non-frivolous issue instead of winnowing out weaker
arguments, it cannot be said that petitioner was prejudiced by
counsel's failure to raise an issue challenging the sufficiency of
the evidence on the issue of venue.  The face of the record

contains sufficient evidence establishing that petitioner killed Joseph Daron in Hamilton County, Ohio.  Thus, petitioner cannot demonstrate cause and prejudice to excuse this component of his fourteenth ground for relief.  That is, even assuming that his attorneys had timely filed his Rule 26(B) application to raise this claim of appellate counsel ineffectiveness, there is not a reasonable probability that petitioner's Rule 26(B) application would have been decided differently as to this claim.  Moreover, assuming for purposes of this discussion that petitioner has a right to the effective assistance of counsel on a second appeal of right to the Supreme Court of Ohio, appellate counsel did not perform to petitioner's prejudice in failing to raise a claim regarding the sufficiency of the evidence on the issue of venue.

For the foregoing reasons, this component of petitioner's fourteenth ground for relief is denied as procedurally defaulted. Further, this component of petitioner's fifteenth ground for relief is denied as without merit.

**4.  Failure to Reasonably Advise Petitioner on No Contest Pleas.**

Petitioner argues that his appellate attorneys performed unreasonably and to his prejudice in failing to argue on direct appeal that trial counsel did not reasonably advise him concerning his no contest pleas.  (Traverse, Doc. No. 86, at 126-27). Specifically, petitioner argues that his trial attorneys allowed him to plead no contest to two counts of aggravated murder, even though Joseph Daron died only once, and that counsel misinformed petitioner that, if he entered no contest pleas, (1) the three-judge panel would spare his life; (2) the three-judge panel would not be apprised of the other homicides he had committed; (3) the

184

three-judge panel would perceive the no contest pleas as mitigating; and (4) the no contest pleas would preserve all of the issues that were raised in pretrial motions filed on petitioner's behalf.

These allegations regarding trial counsel's performance in this regard were presented to this court in sub-sections (B) and (C) of petitioner's ninth ground for relief. It its *Opinion and Order* of December 26, 2001, this court concluded that petitioner's allegations were procedurally defaulted because they were not fairly presented either in petitioner's applications for reopening of his direct appeals or in his postconviction action. (Doc. No. 52, at 20-25). Specifically, this court found that petitioner's allegations regarding his trial counsel's performance in this regard were not preserved in his applications for reopening of his direct appeals because those state court actions are designed for raising claims of appellate counsel ineffectiveness, and therefore could not logically be used to preserve anything but appellate counsel ineffectiveness claims. The court went on to determine that the precise allegations set forth in sub-sections (B) and (C) of his ninth ground for relief had not been presented to the state courts in petitioner's postconviction action.

Petitioner's claims do not appear on the face of the record. That is, there is no evidence on the trial record concerning what trial counsel did or did not advise petitioner about the benefits and consequences of entering no contest pleas. Such conversations typically occur in private and presumably, that is what occurred in this case. That being so, logically, appellate counsel cannot be faulted for failing to raise on direct appeal a claim that did not

185

appear on the trial record, since appellate counsel has no duty to raise on direct appeal an issue that does not appear on the face of the record.  As noted *supra*, Ohio law generally does not permit litigants on direct appeal to supplement the appellate record with evidence or facts that were not part of the trial record.  *State v. Ishmail,* 54 Ohio St. 2d at 402, paragraph one of the syllabus.

In sum, this claim of appellate counsel ineffectiveness is without merit.  Thus, petitioner cannot demonstrate cause and prejudice to excuse this component of his fourteenth ground for relief.  That is, even assuming that his attorneys had timely filed his Rule 26(B) application to raise this claim of appellate counsel ineffectiveness, there is not a reasonable probability that petitioner's Rule 26(B) application would have been decided differently as to this claim.  Moreover, assuming for purposes of this discussion that petitioner has a right to the effective assistance of counsel on a second appeal of right to the Supreme Court of Ohio, appellate counsel did not perform deficiently or to petitioner's prejudice in failing to raise a challenge to trial counsel's performance with respect to advising petitioner about entering his no contest pleas.

For the foregoing reasons, this component of petitioner's fourteenth ground for relief is denied as procedurally defaulted. Further, this component of petitioner's fifteenth ground for relief is denied as without merit.

## 5.  **Failure to Challenge the Trial Court's Denial of Experts.**

Petitioner argues that his appellate attorneys performed unreasonably and to his prejudice in failing to challenge on direct appeal the trial court's refusal to appoint a reasonably competent

expert to assist defense counsel by conducting a competent evaluation of petitioner and actively helping defense counsel marshal evidence and contest the state's case. (Traverse, Doc. No. 86, at 127). Petitioner argues that the trial court appointed Dr. Nancy Schmidtgoessling of the Court Clinic, who, according to petitioner, admitted that the Court Clinic did not have the resources to perform a proper mitigation evaluation. Petitioner complains that Dr. Schmidtgoessling testified that petitioner did not suffer from organic brain damage or have a §2929.04(B)(3) mental impairment when, according to petitioner, he suffers from both.

These allegations concerning the trial court's failure to appoint a reasonably competent expert were presented to this court in petitioner's tenth ground for relief. In its *Opinion and Order* of December 26, 2001, this court concluded that petitioner's claim was procedurally defaulted because it had never been presented to the state courts – a fact that petitioner conceded. (Doc. No. 52, at 25-27). In so holding, the court noted that the claim should have been developed at trial and then raised on direct appeal, but was not. (Doc. No. 52, at 26). Given that the facts giving rise to petitioner's allegations were not developed at trial, and were therefore not part of the trial record, logically, appellate counsel cannot be faulted for failing to raise on direct appeal a claim that did not appear on the trial record. That is, appellate counsel has no duty to raise on direct appeal an issue that does not appear on the face of the record. As noted previously, Ohio law generally does not permit litigants on direct appeal to supplement the appellate record with evidence or facts that were

187

not part of the trial record. *State v. Ishmail,* 54 Ohio St. 2d at 402, paragraph one of the syllabus.

In sum, this claim of appellate counsel ineffectiveness is without merit. Thus, petitioner cannot demonstrate cause and prejudice to excuse this component of his fourteenth ground for relief. That is, even assuming that his attorneys had timely filed his Rule 26(B) application to raise this claim of appellate counsel ineffectiveness, there is not a reasonable probability that petitioner's Rule 26(B) application would have been decided differently as to this claim. Moreover, assuming for purposes of this discussion that petitioner has a right to the effective assistance of counsel on a second appeal of right to the Supreme Court of Ohio, appellate counsel did not perform deficiently or to petitioner's prejudice in failing to argue on direct appeal that the trial court erred in refusing to appoint a reasonably competent mental health expert to assist petitioner with his mitigation hearing.

For the foregoing reasons, this component of petitioner's fourteenth ground for relief is denied as procedurally defaulted. Further, this component of petitioner's fifteenth ground for relief is denied as without merit.

**6. Failure to Challenge Admission of Future Dangerousness.**

Petitioner argues that his appellate attorneys performed unreasonably and to his prejudice in failing to raise an issue challenging the trial court's admission of evidence during the mitigation hearing of his future dangerousness. (Traverse, Doc. No. 86, at 128). Allegations that the trial court erred in admitting evidence of petitioner's future dangerousness were

presented to this court in sub-part (B) of petitioner's eleventh ground for relief. In its *Opinion and Order* of December 26, 2001, this court found that petitioner's allegations were procedurally defaulted because petitioner's attempt to raise them in his applications to reopen his direct appeals were insufficient to satisfy the fair presentment requirement. (Doc. No. 52, at 28-30).

Petitioner complains that the prosecution introduced, and the trial court admitted, evidence of petitioner's future dangerousness during cross-examination of the mental health expert called by defense counsel, Dr. Nancy Schmidtgoessling:

> Q.    Would you agree with me the only reason that the number, the highest number on here is five, the only reason we end at five is because he was arrested in Juneau and put in jail. I mean this would still be going on, wouldn't you agree there was nothing that stopped him?
>
> A.    I think the thing that stopped him he either be arrested or kill himself. Now in my mind there is a question as to whether he was going to Alaska to kill himself. But I do agree with you that it would have to be something outside of himself that would stop him in terms of the spree that he was on.
>
> Q.    He's capable of taking a human life today, wouldn't you agree? I mean he has received, he hasn't changed in any large manner since you first encountered him, isn't that also a fact?
>
> A.    I think he has better insight but the best predictor of future behavior is past behavior and so I would say I would consider him at risk for that behavior again.
>
> Q.    I know there is only five murders before this Court to let them consider, but didn't John Fautenberry also tell you that he had killed a sixth man several years prior to all this in a logging camp in Roseburg, Oregon?
>
> A.    I remember he said it was in Oregon, yes.

189

(J.A. Vol. I, at 317-18).  Defense counsel did not object.

During closing arguments, the prosecution suggested several times that petitioner would kill again, if given the opportunity. (J.A. Vol. I, at 388, 392).  Again, defense counsel did not object. In so arguing, the prosecution never urged the three-judge panel to consider that evidence as non-statutory aggravating circumstance.

Defense counsel questioned Dr. Schmidtgoessling during direct examination about petitioner's ability to adjust positively to long term incarceration.  In response, Dr. Schmidtgoessling stated that petitioner's alleged escape plot/attempt was not necessarily indicative of how he would react to long term incarceration, (J.A. Vol. I, at 310), that petitioner was developing the means to control his anger, (*Id*. at 308), and that petitioner had the intelligence and capacity to engage in gainful activities in prison, (*Id*. at 309).  During closing arguments, defense counsel downplayed petitioner's alleged escape plot/attempt and encouraged the three-judge panel to consider as mitigating evidence petitioner's ability to adjust positively to long term incarceration.  (*Id*. at 384-85).

For the following reasons, the court is not persuaded that there is any merit to petitioner's claim that appellate counsel should have raised an issue challenging the trial court's admission of evidence of petitioner's future dangerousness.  Even assuming that it could be said that counsel performed unreasonably in failing to raise the issue, in light of the school of thought suggesting that appellate attorneys in capital cases should err on the side of raising every non-frivolous issue instead of winnowing out weaker arguments – an assumption that this court makes only for

190

purposes of this discussion – it cannot be said that petitioner was prejudiced by appellate counsel's omission.

Initially, the court notes that the issue was not preserved for appeal because defense counsel did not object either to the prosecution's questioning of Dr. Schmidtgoessling or to the prosecution's references in closing arguments to petitioner's future dangerousness. Thus, even assuming appellate counsel had raised the issue on appeal, the issue would have been reviewed only for plain error.

Further, it does not appear that the trial court relied improperly on evidence of petitioner's future dangerousness it its decision to sentence him to death. That is, the trial court did not consider evidence of petitioner's future dangerousness as a non-statutory aggravating circumstance. In its sentencing decision, the only aggravating factors considered by the trial court were that petitioner had committed the murder during a course of conduct involving the purposeful killing of two or more people, (R.C. §2929.04(A)(5)), and that the murder had been committed during the commission of an aggravated robbery, (R.C. §2929.04(A)(7)). (J.A. Vol. II, at 449). Only in discounting the value of the mitigation evidence offered by petitioner did the trial court did note, among other things, that petitioner would have continued killing and robbing people had he not been caught. (*Id.* at 453).

Another factor diminishing the value of raising this issue on appeal is the fact that the state of the law did not clearly favor petitioner's position. In *State v. Wiles*, 59 Ohio St. 3d 71, 89, 571 N.E.2d 97 (1991), the Supreme Court of Ohio suggested that

evidence of a capital defendant's future dangerousness was permissible if introduced not to establish a non-statutory aggravating circumstance, but to rebut mitigating evidence offered by the defendant, such as evidence of remorsefulness. In *State v. Beuke*, 38 Ohio St. 3d 29, 33, 526 N.E.2d 274 (1988), the Ohio Supreme Court held that it was permissible for the prosecution to argue evidence of the defendant's future dangerousness, so long as the jury was not instructed or urged to consider the evidence as a non-statutory aggravating circumstance. This court has already noted that the prosecution did not offer, and the trial court did not consider, evidence of petitioner's future dangerousness as a non-statutory aggravating circumstance.

Finally, it bears reminding that petitioner was sentenced by a three-judge panel as opposed to a jury. As this court has noted, it is reasonable to presume that a trial panel, as opposed to a jury, will be scrupulous enough to avoid admitting or considering improper evidence or circumstances in its decision upon a no contest plea or its sentencing decision. *See State v. Lott*, 51 Ohio St. 3d 160, 176, 555 N.E.2d 293 (1990); *see also State v. Post*, 32 Ohio St 3d 380, 383-84, 513 N.E.2d 754 (1987)(holding that error in admitting victim impact statement did not warrant reversal because the case was tried before a three-judge panel rather than a jury). Such has been the state of the law in Ohio since 1968. In *State v. White*, 15 Ohio St. 2d 146, 151, 239 N.E.2d 65 (1968), the Ohio Supreme Court noted that it would indulge "in the usual presumption that in a bench trial in a criminal case the [trial] court considered only the relevant, material, and competent evidence in arriving at its judgment unless it affirmatively

192

appears to the contrary." Federal circuits considering this question indulge the same presumption. *United States v. Busch*, 758 F.2d 1394, 1398 (10th Cir. 1985); *United States v. Impson*, 562 F.2d 970, 971 (5th Cir. 1977), *cert. denied*, 434 U.S. 1050 (1978); *United States ex rel. Placek v. Illinois*, 546 F.2d 1298, 1304-1305 (7th Cir. 1976).

Thus, this claim of appellate counsel ineffectiveness is without merit. Even assuming that it could be said that appellate counsel performed deficiently – a finding that this court does not endorse – it cannot be said that petitioner was prejudiced by counsel's failure to raise an issue challenging the trial court's admission of evidence of petitioner's future dangerousness. That being so, petitioner cannot demonstrate cause and prejudice to excuse this component of his fourteenth ground for relief. In other words, even assuming that his attorneys had timely filed his Rule 26(B) application to raise this claim of appellate counsel ineffectiveness, there is not a reasonable probability that petitioner's Rule 26(B) application would have been decided differently as to this claim. Moreover, assuming for purposes of this discussion that petitioner has a right to the effective assistance of counsel on a second appeal of right to the Supreme Court of Ohio, appellate counsel did not perform to petitioner's prejudice in failing to raise a claim challenging the trial court's admission of evidence of petitioner's future dangerousness.

For the foregoing reasons, this component of petitioner's fourteenth ground for relief is denied as procedurally defaulted. Further, this component of petitioner's fifteenth ground for relief is denied as without merit.

193

7.  **Failure to Challenge Admission of Evidence of Other Homicides.**

Petitioner argues that his appellate attorneys performed unreasonably and to his prejudice in failing to raise an issue challenging the trial court's admission of voluminous testimony concerning the facts and circumstances of the other homicides. (Traverse, Doc. No. 86, at 128-29).  Petitioner reasons that, although he did not contend during his mitigation case-in-chief that he had not committed the other homicides, the prosecution, in rebuttal, called six witnesses who provided detailed information as to each of the five homicides.  Petitioner argues that such testimony rebutted nothing and therefore changed the focus of the sentencing hearing from the selection of an appropriate sentence to a re-litigation of petitioner's guilt.

Allegations that the trial court erred in admitting evidence of the facts and circumstances of the other homicides were presented to this court in sub-part (C) of petitioner's eleventh ground for relief.  In its *Opinion and Order* of December 26, 2001, this court found that petitioner's allegations were procedurally defaulted because they had never been presented to the state courts – a finding that petitioner conceded.  (Doc. No. 52, at 30-31).

Petitioner complains that the prosecution, in its rebuttal case during the sentencing hearing, called six witnesses who testified in detail about the other homicides that petitioner had committed.  The prosecution called Oregon Detective John Turner to testify regarding the murder of Donald Nutley, (J.A. Vol. I, at 327-331); New Jersey Detective Ken Decker to testify regarding the murder of Gary Farmer, (*Id.* at 332-34); Hamilton County Detective Tom Boeing to testify regarding the murder of Joseph Daron, (*Id.* at

194

335-38); Portland Detective Tom Nelson to testify regarding the murder of Christine Guthrie, (*Id*. at 339-356), Juneau Detective Walt Boman to testify regarding the murder of Jefferson Diffee, (*Id*. at 357-362); and FBI Agent Larry Ott to testify regarding petitioner's inculpatory statement to him, (*Id*. at 362-370). Defense counsel did not object to any of this testimony.

During closing arguments, Mr. Tolbert, arguing on behalf of the prosecution, remarked that, "[t]he aggravation you heard about it again this morning, five people, Donald Nutley, Gary Farmer, Joe Daron, Christine Guthrie and Jeff Diffee are all dead so this man could rob them of their money and travel about the country." (*Id*. at 373). He noted that petitioner killed all five people for money, and "[t]hose are the aggravating circumstances." (*Id*. at 373-74). In rebuttal, following defense counsel's closing argument, Mr. Deters mentioned "five cold blooded executions that he committed over a four month period," (*Id*. at 389), and went on to argue essentially that the five murders committed by petitioner far outweighed "the total lack of mitigation we heard yesterday...." (*Id*. at 391). Defense counsel did not object to these arguments.

For the following reasons, the court is not persuaded that there is any merit to petitioner's claim that appellate counsel should have raised an issue challenging the trial court's admission of evidence of the other homicides committed by petitioner. Even assuming that it could be said that counsel performed unreasonably in failing to raise the issue, in light of the school of thought suggesting that appellate attorneys in capital cases should err on the side of raising every non-frivolous issue instead of winnowing

out weaker arguments – an assumption that this court makes only for purposes of this discussion – it cannot be said that petitioner was prejudiced by appellate counsel's omission.

Initially, the court notes that the issue was not preserved for appeal because defense counsel did not object either to the prosecution's presentation of the six witnesses who testified about the other homicides or to the prosecution's references in closing arguments to those homicides. Thus, even assuming appellate counsel had raised the issue on appeal, the issue would have been reviewed only for plain error.

Further, it does not appear that the trial court relied improperly on evidence of petitioner's commission of the other homicides it its decision to sentence him to death. It bears reminding that petitioner was convicted of two death penalty specifications, *i.e.*, that petitioner had committed the murder during a course of conduct involving the purposeful killing of two or more people, (R.C. §2929.04(A)(5)), and that petitioner had committed the murder during the commission of an aggravated robbery, (R.C. §2929.04(A)(7)). Those were the only aggravating circumstances considered by the trial court. (J.A. Vol. II, at 449). That is, it does not appear that the trial court considered as a non-statutory aggravating factor the actual facts and circumstances of the other homicides.

Petitioner has not convinced this court that the trial court's admission of evidence of the facts and circumstances concerning the other homicides was error. In *State v. Jalowiec*, 91 Ohio St. 3d 220, 232-33, 744 N.E.2d 163 (2001), citing *State v. Dunlap*, 73 Ohio St. 3d 308, 316, 652 N.E.2d 988 (1995), the Supreme Court of Ohio

reiterated that the trial court has discretion to determine the relevancy of evidence offered by the prosecution during the sentencing phase of a capital trial. The Ohio Supreme Court went on to note that the prosecution, in discharging its burden to prove that the aggravating circumstances outweigh the mitigating factors, may present evidence to rebut the mitigating factors introduced by the defendant. *Jalowiec*, 91 Ohio St. 3d at 233, citing *State v. DePew*, 38 Ohio St. 3d 275, 285-86, 528 N.E.2d 542 (1988). The Ohio Supreme Court cautioned that rebuttal testimony offered by the prosecution cannot amount to the introduction of a non-statutory aggravating circumstance. *Jalowiec*, 91 Ohio St. 3d at 233, citing *State v. Gumm*, 73 Ohio St. 3d 413, syllabus , 653 N.E.2d 253 (1995). The court has already noted that it does not appear that the trial court considered the facts and circumstances of the other homicides as a non-statutory aggravating circumstance. Further, although petitioner did not dispute during his case-in-chief that he had committed the other homicides, he arguably opened the door to rebuttal evidence when he urged the trial court to consider as mitigating his youth; his lack of significant history of prior convictions; that he had cooperated with law enforcement officers by confessing and pleading no contest to the murder of Joseph Daron; that he would have to serve at least 66 years in Alaska; that he was laboring under a number of psychological stressors at the time he committed the murders; and that he had the capacity to adjust positively to life imprisonment. The prosecution was entitled to present evidence in an effort to persuade the trial court why the aggravating circumstances outweighed the mitigating evidence offered by petitioner. Moreover, as the court has already

197

noted, petitioner did not object to the admission of evidence of the facts and circumstances concerning the other homicides.

Finally, the court notes again that petitioner was sentenced by a three-judge panel as opposed to a jury, and that it is reasonable to presume that a trial panel, as opposed to a jury, will be scrupulous enough to avoid admitting or considering improper evidence or circumstances in its decision upon a no contest plea or its sentencing decision.

Thus, this claim of appellate counsel ineffectiveness is without merit. Even assuming that it could be said that appellate counsel performed deficiently – a finding that this court does not endorse – it cannot be said that petitioner was prejudiced by counsel's failure to raise an issue challenging the trial court's admission of evidence of evidence detailing the facts and circumstances of the other homicides. That being so, petitioner cannot demonstrate cause and prejudice to excuse this component of his fourteenth ground for relief. In other words, even assuming that his attorneys had timely filed his Rule 26(B) application to raise this claim of appellate counsel ineffectiveness, there is not a reasonable probability that petitioner's Rule 26(B) application would have been decided differently as to this claim. Moreover, assuming for purposes of this discussion that petitioner has a right to the effective assistance of counsel on a second appeal of right to the Supreme Court of Ohio, appellate counsel did not perform to petitioner's prejudice in failing to raise a claim challenging the trial court's admission of evidence detailing the facts and circumstances of the other homicides.

For the foregoing reasons, this component of petitioner's

fourteenth ground for relief is denied as procedurally defaulted. Further, this component of petitioner's fifteenth ground for relief is denied as without merit.

## 8. Conclusion

In sum, the court concludes that petitioner's fourteenth ground for relief must be denied as procedurally defaulted. The court further concludes that petitioner's fifteenth ground for relief must be denied as without merit.

## I. Sixteenth Ground For Relief

Petitioner's sixteenth ground for relief states as follows:

John Fautenberry's convictions and sentences are constitutionally infirm because the state court failed to conduct an adequate meaningful and fair proportionality review of his death sentences.

Petitioner challenges the adequacy of the proportionality review conducted in his case, specifically, the appropriateness review process. Petitioner contends that the Ohio statute violates the requirements of due process and equal protection because the statute only requires the appellate courts to determine whether the death sentence is appropriate compared to other cases in which a death sentence was imposed, rather than a comparison to all similar cases, regardless of the penalty imposed.

Petitioner contends that the review process in his case was flawed because the court of appeals and the Ohio Supreme Court only compared his case with other cases in which the death penalty had been imposed. Petitioner claims in his petition that the Ohio courts during the past nineteen years have failed to find even one death sentence to be disproportionate. Petition, ¶ 263. He also alleges that before petitioner's indictment, at least ten

defendants were convicted in Hamilton County, Ohio of aggravated murder during the commission of aggravated robbery, but were not charged with death specifications. Petition, ¶ 265.    He assumes that these ten defendants could have been charged with death specifications.  Petition, ¶ 266.  However, he has presented no evidence to support his contention that these cases could have been indicted as death penalty cases.

Petitioner also notes in his traverse certain statements made by Justice Paul Pfeifer of the Ohio Supreme Court during a newspaper interview, in which Justice Pfeifer expressed the opinion that Ohio's proportionality review was inadequate.  However, he cites no authority indicating that the views of Justice Pfeifer have ever been adopted by a majority of the Ohio Supreme Court.

Proportionality review is not constitutionally required. *Pulley v. Harris*, 465 U.S. 37, 44-51 (1984). Since proportionality review is not required by the Constitution, states have great latitude in defining the pool of cases used for comparison.  *Buell v. Mitchell*, 274 F.3d 337, 369 (6th Cir. 2001).

The relevant provisions governing proportionality review are found in Ohio Rev. Code §2929.05(A).  The portion of §2929.05(A) relevant to petitioner's argument provides:

> In determining whether the sentence of death is appropriate, the court of appeals, in a case in which a sentence of death was imposed for an offense committed before January 1, 1995, and the supreme court shall consider whether the sentence is excessive or disproportionate to the penalty imposed in similar cases.

The Ohio Supreme Court has construed the proportionality review requirements of §2929.05(A) as follows:

> We hold, therefore, that the proportionality review required by R.C. 2929.05(A) is satisfied by a review of

200