FILED
JAMES 90NINI
CLERK

08 JAN 28 AM 10: 20

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 05-3568

JOHN FAUTENBERRY,
     Petitioner - Appellant,

v.

BETTY MITCHELL, Warden,
     Respondent - Appellee.

FILED

JAN 2 5 2008

LEONARD GREEN, Clerk

Before:  BATCHELDER, MOORE, and GILMAN, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION WHEREOF, it is ORDERED that the judgment of the district court is AFFIRMED.

**ENTERED BY ORDER OF THE COURT**

Leonard Green, Clerk

*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 08a0045p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---



JOHN FAUTENBERRY,

                    *Petitioner-Appellant,*

    *v.*

BETTY MITCHELL, Warden,

                    *Respondent-Appellee.*

No. 05-3568

---

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 00-00332—James L. Graham, District Judge.

Argued: July 26, 2007

Decided and Filed: January 25, 2008

Before: BATCHELDER, MOORE, and GILMAN, Circuit Judges.

---

## COUNSEL

---

**ARGUED:** Dennis Lyle Sipe, BUELL & SIPE CO., Marietta, Ohio, for Appellant. Steven W. Schierholt, ATTORNEY GENERAL'S OFFICE OF OHIO, Columbus, Ohio, for Appellee. **ON BRIEF:** Dennis Lyle Sipe, BUELL & SIPE CO., Marietta, Ohio, for Appellant. Matthew C. Hellman, ATTORNEY GENERAL'S OFFICE OF OHIO, Columbus, Ohio, Lisa M. Stickan, ATTORNEY GENERAL'S OFFICE OF OHIO, Cleveland, Ohio, for Appellee.

    BATCHELDER, J., delivered the opinion of the court, in which GILMAN, J., joined. MOORE, J. (pp. 21-30), delivered a separate dissenting opinion.

---

## OPINION

---

    ALICE M. BATCHELDER, Circuit Judge. Petitioner John Fautenberry ("Fautenberry"), a prisoner in the state of Ohio awaiting execution, appeals the district court's denial of his petition for writ of habeas corpus. Fautenberry raises eight issues on appeal. Finding no merit in any of them, we **AFFIRM** the judgment of the district court.

### I.

    In November 1990, Fautenberry, who had recently quit his job as a cross-country truck driver, met Donald Nutley at a truck stop outside Portland, Oregon, and the two men went target shooting

together. After they had finished and were leaving the range, Fautenberry shot Nutley in the head and stole $10,000 from him. Fautenberry then drove to Cincinnati, Ohio, where he stayed with his sister for a short time before traveling to Connecticut to visit an old friend. In February 1991, while en route back to Cincinnati, Fautenberry — out of money and in need of gasoline to continue his travels — stopped at a truck stop in New Jersey. There he met Gary Farmer, who, after learning of Fautenberry's need for money, offered to buy Fautenberry breakfast and give him money in exchange for sex. Fautenberry got into the cab of Farmer's truck, shot Farmer in the head, and took his wallet. Fautenberry then returned to his sister's residence in Cincinnati.

On February 17, 1991, after another brief stay in Cincinnati, Fautenberry again left his sister's residence, this time on foot, in search of money. Fautenberry walked down Highway 125, in the eastern suburbs of Cincinnati, stopped at the on-ramp to Interstate 275, and began hitchhiking. Joseph Daron offered to give Fautenberry a ride. Daron intended to travel only ten miles north to his home in Milford, Ohio, but, upon learning that Fautenberry wanted to go north to Columbus, Ohio, he drove Fautenberry an extra ten miles and dropped him near the intersection of Interstate 275 and Interstate 71, which goes directly to Columbus. As he exited Daron's vehicle, Fautenberry reached back into the car and shot Daron twice in the chest. Fautenberry then drove Daron's car south to Cincinnati, and threw Daron's body into a wooded area on the north bank of the Ohio River, where it was eventually found more than a month later by the local authorities. Fautenberry took Daron's car, wallet, briefcase, wristwatch, and Bible, and returned to Oregon.

Fautenberry arrived in Portland on February 24, 1991, and spent the next few days at the Oregon coast with some old friends and acquaintances, including a woman named Christine Guthrie. Guthrie accompanied Fautenberry back to Portland from the coast, and along the way, they stopped on an old logging road. Fautenberry escorted Guthrie to a secluded portion of the woods, shot her three times in the back of the head, and stole her bank card. A few days later, after withdrawing cash from her bank account, Fautenberry traveled to Juneau, Alaska, where he began working aboard a fishing boat. On March 13, 1991, Fautenberry met Jefferson Diffee at a local bar, and the two men went to Diffee's apartment. While there, Fautenberry beat Diffee, handcuffed him, and stabbed him seventeen times, which resulted in his death. The local police discovered Fautenberry's fingerprints at the scene of the crime, and on March 16, 1991, they arrested him for the murder of Diffee. The police then searched Fautenberry's storage locker and hotel room, where they found Daron's briefcase, wristwatch, and Bible.

On March 17, 1991, while in police custody, Fautenberry called Federal Bureau of Investigation ("FBI") Agent Larry Ott and left a message indicating that he wanted to talk. Agent Ott went to the jail, informed Fautenberry of his *Miranda* rights (which Fautenberry subsequently waived), and recorded Fautenberry's confession to the murders of Nutley, Farmer, Daron, and Guthrie. Fautenberry accurately described the wounds inflicted upon each victim, and indicated that robbery was the motive for each killing. A few days later, Fautenberry called his old girlfriend, Olivia Priest-Herndon, and told her that he was "only after . . . money" and that he "did it[,] so [he] gotta pay the price now." Fautenberry also confessed to Tom Nelson of the Portland Police Department, informing Nelson where the bodies of Nutley and Guthrie were located. In August 1991, Fautenberry pleaded guilty in an Alaskan state court to the murder of Jefferson Diffee, and the court sentenced him to 99 years' imprisonment.

In September 1991, the Alaskan authorities transferred Fautenberry to Hamilton County, Ohio, the county in which Cincinnati is located, where a grand jury had returned a five-count indictment charging Fautenberry with two counts of aggravated murder (both pertaining to the death of Daron), aggravated robbery, theft of a motor vehicle, and theft of a credit card. The aggravated murder charges included two specifications, either of which would render Fautenberry eligible for the death penalty under Ohio law: (1) killing Daron while committing aggravated robbery; and (2) killing Daron as part of a course of conduct involving the purposeful killing of two or more

persons. *See* Ohio Rev. Code § 2929.04(A). Fautenberry waived his right to a trial by jury and later proffered a no-contest plea to all counts and specifications in the indictment.

The prosecution presented the three-judge panel[1] with evidence, including the murder weapon, various other pieces of physical evidence, and transcripts of Fautenberry's confessions to Agent Ott, Officer Nelson, and Ms. Priest-Herndon. After reviewing this evidence, the court concluded beyond a reasonable doubt that Fautenberry was guilty of all counts and specifications in the indictment, and accepted his plea. In September 1992, the three-judge panel held a sentencing hearing. The defense presented its mitigating evidence, which included testimony from Fautenberry, Dr. Nancy Schmidtgoessling, and friends who knew Fautenberry well. Those friends included Louise Corcoran (a long-time friend of Fautenberry's family), Ms. Priest-Herndon (Fautenberry's former girlfriend with whom he had lived), and Mary Theresa Slayback (a friend with whom Fautenberry lived during his early twenties). After hearing all of this evidence, as well as the testimony of the six law-enforcement officers presented during the mitigation hearing by the prosecution, the three-judge panel imposed the death penalty, finding that, despite the defense's "thorough job in presenting the[] mitigating factors," it was beyond a reasonable doubt that the aggravating factors sufficiently outweighed the mitigating factors.

Fautenberry appealed to the state appellate court, which affirmed his conviction and sentence in 1994. *See State v. Fautenberry*, No. C-920734, 1994 WL 35023 (Ohio Ct. App. February 9, 1994). The Ohio Supreme Court also affirmed on direct appeal, *see State v. Fautenberry*, 650 N.E.2d 878 (Ohio 1995), and the United States Supreme Court denied Fautenberry's request for review, *see Fautenberry v. Ohio*, 516 U.S. 996 (1995). In March 1996, Fautenberry filed a motion for reconsideration with the Ohio Supreme Court, arguing that he had received ineffective assistance of appellate counsel during his direct appeal to that court. That motion was summarily denied in May 1996. *See State v. Fautenberry*, 677 N.E.2d 1194 (Ohio 1997). In July 1996, Fautenberry filed, pursuant to Ohio App. R. 26(B), an application for reopening (i.e., a motion for delayed reconsideration) with the state court of appeals, alleging ineffective assistance of appellate counsel during his direct appeal to that court. This application was denied because Fautenberry "failed to demonstrate that there [was] good cause for filing []his application more than two years after th[e] court's judgment was journalized." The Ohio Supreme Court affirmed that decision. *See State v. Fautenberry*, 677 N.E.2d 1194 (Ohio 1997). Also in July 1996, Fautenberry filed his petition for post-conviction relief. The trial court denied the petition, and the court of appeals affirmed that denial. *See State v. Fautenberry*, No. C-971017, 1998 WL 906395 (Ohio Ct. App. December 31, 1998). The Ohio Supreme Court then declined to review Fautenberry's petition, *see State v. Fautenberry*, 709 N.E.2d 849 (Ohio 1999), and refused Fautenberry's request for reconsideration, *see State v. Fautenberry*, 711 N.E.2d 1015 (Ohio 1999).

In May 2000, Fautenberry filed his petition for a writ of habeas corpus with the federal district court, asserting nineteen grounds for relief. The State moved to dismiss, contending that many of Fautenberry's claims had been procedurally defaulted. The district court partially granted the State's motion and dismissed some of Fautenberry's claims. In a later opinion and order, the district court addressed the substance of Fautenberry's non-defaulted claims, found them to be without merit, and denied Fautenberry's petition for habeas relief. The district court issued a certificate of appealability on nine of Fautenberry's claims (two of which relate to his claim for ineffective assistance of trial counsel during the pretrial and plea hearing, and which Fautenberry has

---

[1] Under Ohio law, a capital defendant who waives his right to trial by jury and elects to be tried by the court, is actually tried by a three-judge panel. *See* Ohio Rev. Code § 2945.06. Furthermore, even on a no-contest plea, the prosecution must produce evidence to prove aggravated murder with the specified aggravating circumstances. *See* Ohio R. Crim. Pro. 11(c)(3).

consolidated for purposes of this appeal). Fautenberry asserts eight claims on appeal, and we will address them separately.

## II.

"We review de novo the district court's denial of . . . [a] petition for a writ of habeas corpus." *Clinkscale v. Carter*, 375 F.3d 430, 435 (6th Cir. 2004). Fautenberry filed his habeas petition after the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"); we will therefore review his claims under the standards set forth in that statute. *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997). AEDPA permits a federal court to grant a writ of habeas corpus only where the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). "A federal habeas court may issue the writ under the 'contrary to' clause if the state court applies a rule different from the governing law set forth in [Supreme Court] cases, or if it decides a case differently than [the Supreme Court has] done on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694 (2002). "The [federal] court may grant relief under the 'unreasonable application' clause if the state court correctly identifies the governing legal principle from [Supreme Court] decisions but unreasonably applies it to the facts of the particular case." *Id.* "An *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002) (quotations omitted). We may not issue the writ "simply because [we] conclude[] in [our] independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams v. Taylor*, 529 U.S. 362, 411 (2000). Instead, we must find that "the state court's application of clearly established federal law [was] objectively unreasonable." *Cone*, 535 U.S. at 694. When identifying the relevant, controlling federal law for purposes of AEDPA analysis, we look to "the holding, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decisions." *Williams*, 529 U.S. at 412.

## A.    Ineffective Assistance of Trial Counsel During the Penalty Phase of the Proceedings

Fautenberry's primary argument — to which he devoted most of his time at oral argument — is that his trial counsel rendered ineffective assistance during the penalty phase of his proceedings. An ineffective-assistance claim has two components: (1) counsel's performance must have been deficient, and (2) counsel's deficient performance must have prejudiced the defendant. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "[T]he proper standard for attorney performance is that of reasonably effective assistance," *id.*, as measured by "prevailing professional norms." *Rompilla v. Beard*, 545 U.S. 374, 380 (2005) (quotation marks and citations omitted). To establish deficient performance, the habeas petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687-88. When evaluating counsel's performance, we "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Darden v. Wainwright*, 477 U.S. 168, 186 (1986).

"A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Strickland*, 466 U.S. at 690. Fautenberry contends that his trial counsel rendered deficient performance by: (1) failing to communicate meaningfully with him, (2) failing to conduct a "reasonable" investigation for mitigating evidence, and (3) failing to retain "reasonable and necessary" experts. The state court rejected this claim, relying primarily on Fautenberry's refusal to cooperate. We address Fautenberry's three allegations in turn.

First, Fautenberry contends that his counsel failed to communicate meaningfully with him. The Sixth Amendment, however, protects the criminal defendant's right to "adversarial process";

that is, to "have counsel[,] acting in the role of advocate[,] . . . require the prosecution's case to survive the crucible of meaningful adversarial testing." *United States v. Cronic*, 466 U.S. 648, 656 (1984) (quotation marks and citations omitted).

> [T]he appropriate inquiry focuses on the adversarial process, not on the accused's relationship with his lawyer as such. If counsel is a reasonably effective advocate, he meets constitutional standards irrespective of his client's evaluation of his performance. It is for this reason that we attach no weight to either respondent's expression of satisfaction with counsel's performance at the time of his trial, or to his later expression of dissatisfaction.

*Id.* at 657 n.21 (citations omitted). Thus, at its root, the ineffective-assistance analysis is based on "an objective standard of reasonableness." *Strickland*, 466 U.S. at 688.

The record shows that any communication problems between Fautenberry and his attorneys were the result of Fautenberry's own determined refusal to communicate, not a lack of availability of, or effort by, counsel. The record contains abundant evidence indicating that Fautenberry independently resolved not to communicate or cooperate with anyone, including his lawyers. Fautenberry's former girlfriend, Ms. Priest-Herndon, testified that Fautenberry told her of his tactical decision not to communicate with his attorneys because he "thought that was his best way to beat this thing." As the district court aptly noted, Fautenberry "has not cited, and the court is not aware of, any Supreme Court case holding that the Sixth Amendment requires counsel to persuade a recalcitrant client to do that which he . . . refused to do." We find nothing objectively unreasonable in these attorneys' inability to communicate meaningfully with Fautenberry, who steadfastly refused to communicate with them. *See Strickland*, 466 U.S. at 691 ("The reasonableness of counsel's actions may be determined or substantially influenced by the [accused's] own statements or actions.").

The evidence proffered to demonstrate that counsel had failed to communicate with Fautenberry is wholly unpersuasive. Fautenberry relies heavily upon statements in the medical notes recorded during his pretrial incarceration, in which he said, "I just want to be treated like a human being," and "I[ am] as good as dead now." When considered in their proper context, these statements, contrary to Fautenberry's contention, do not demonstrate a dysfunctional attorney-client relationship. Instead, they display Fautenberry's despondency because of the situation at hand — he had been incarcerated for six months awaiting trial for a murder that he had already (on at least three occasions) confessed to committing. Fautenberry also relies on the affidavit of Dr. Susan D. Shorr, a mitigation specialist who assisted his attorneys during their preparation for the sentencing hearing, in which she opined that Fautenberry became uncooperative and noncommunicative only "[a]s a result of the breakdown of the relationship between . . . Fautenberry and his attorneys." This unsubstantiated statement contradicts Ms. Priest-Herndon's testimony that Fautenberry had told her of his independent, tactical decision not to communicate with his lawyers, but it substantiates all other accounts that Fautenberry, in fact, refused to communicate. Fautenberry's attempts to blame his counsel for his own recalcitrance and unwillingness to communicate do not demonstrate that counsel were deficient in failing to communicate meaningfully with Fautenberry.

Second, Fautenberry argues that his attorneys rendered ineffective assistance by failing to conduct a "reasonable" mitigation investigation that would have discovered his organic brain damage.[2] Fautenberry contends that further investigation would have revealed his past head injuries

---

[2] The State disputes whether Fautenberry actually suffers from a functional brain impairment. Because it is not dispositive to our analysis of this ineffective-assistance claim, we will assume without deciding that Fautenberry does in fact have some sort of organic brain damage.

and alerted his attorneys to the likelihood that he had permanent brain damage. We conclude, contrary to Fautenberry's assertion, that counsel did in fact conduct a reasonable mitigation investigation.

Defense counsel interviewed and procured extensive testimony from lay witnesses, including Louise Corcoran (a close family friend) and Ms. Priest-Herndon (Fautenberry's former girlfriend). These women testified regarding Fautenberry's unstable family environment and emotionally abusive upbringing. Defense counsel also garnered the assistance of numerous experts, including Dr. Nancy Schmidtgoessling and Dr. James Tanley. In fact, counsel hired Dr. Tanley for the express purpose of conducting a neuropsychological examination — the most effective means possible of determining whether Fautenberry had a brain impairment. But Fautenberry refused to submit to the examination. Counsels' inability to discover or establish organic brain damage is directly attributable to Fautenberry's refusal to cooperate, rather than any insufficiency in the investigation. Had Fautenberry not impeded Dr. Tanley's examination, the doctor presumably would have discovered, verified, and revealed any such brain damage. We will not find counsel deficient simply because they did not succeed in discovering his brain damage or pursue unspecified, alternate avenues (which may or may not have revealed the brain damage). In light of the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," *Darden*, 477 U.S. at 186, Fautenberry's attorneys conducted a sufficient and reasonable mitigation investigation under the circumstances Fautenberry created.

Third, Fautenberry contends that his counsel failed to retain "reasonable and necessary" experts, asserting that neither Dr. Schmidtgoessling nor Dr. Tanley provided him with a reasonable level of assistance. We find this argument baseless. Dr. Tanley provided as much assistance as was possible under the circumstances: He attempted to examine Fautenberry to determine whether he suffered from a brain impairment, but Fautenberry refused to participate in the examination. Thus, any deficiencies in Dr. Tanley's assistance were the result of Fautenberry's admitted refusal to cooperate, rather than any shortcoming of Dr. Tanley or any flaw in his work. We conclude as well that any alleged defect in Dr. Schmidtgoessling's assistance cannot be attributed to counsel.

Fautenberry argues that Dr. Schmidtgoessling misdiagnosed his mental condition when she concluded that he did not suffer from organic brain damage.[3] Even if we assume that Dr. Schmidtgoessling did misdiagnose Fautenberry, "[a] licensed practitioner is generally held to be competent, unless counsel has good reason to believe to the contrary." *Lundgren v. Mitchell*, 440 F.3d 754, 772 (6th Cir. 2006). Fautenberry has not shown that counsel had "good reason" to believe that Dr. Schmidtgoessling was incompetent, and we conclude that it was objectively reasonable for counsel to rely upon the doctor's opinions and conclusions. *See Campbell v. Coyle*, 260 F.3d 531, 555 (6th Cir. 2001) (holding, in a case where there was "no evidence that [the expert] was incompetent[] or that [the petitioner's] lawyers had any reason to question [the expert's] professional qualifications," that "it was objectively reasonable for . . . trial counsel to rely upon [the expert's] diagnosis"). Under these circumstances, any inadequacies in Dr. Schmidtgoessling's expert assistance — assuming there were any — cannot be the basis for a meritorious ineffective-assistance claim. Accordingly, we find no deficiency in counsels' performance.

Even if Fautenberry could show that his counsels' performance was deficient, he has not established that he was prejudiced by that performance. The prejudice prong requires the petitioner to show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Darden*, 477 U.S. at 184. "When a [petitioner] challenges a death sentence such as the one at issue in this case, the question is whether there is a

---

[3] We have assumed for the sake of argument that Fautenberry does have some sort of organic brain damage. *See* n.2, *supra*.

reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695. We thus "reweigh the evidence in aggravation against the totality of available mitigating evidence," which, in this case, includes the mitigation evidence that was omitted because of counsel's alleged deficiencies. *See Wiggins v. Smith*, 539 U.S. 510, 534 (2003). A petitioner does not establish the prejudice element where he shows only that his counsel failed to present "cumulative" mitigation evidence, that is, evidence already presented to the jury. *Broom v. Mitchell*, 441 F.3d 392, 410 (6th Cir. 2006). Rather, "to establish prejudice, the new evidence that a habeas petitioner presents must differ in a substantial way — in strength and subject matter — from the evidence actually presented at sentencing." *Clark v. Mitchell*, 425 F.3d 270, 286 (6th Cir. 2005).

Fautenberry argues that he was prejudiced because, due to counsel's alleged deficiencies, the jury did not hear evidence about (1) his personal struggle with, and his family's history of, depression, (2) the connection between his abusive childhood and the commission of these murders, (3) his head injuries and resulting organic brain damage, and (4) the sexual aspects of the murders he committed. But, Corcoran and Priest-Herndon testified extensively regarding Fautenberry's rough upbringing, his difficult family life, his poor relationships with the father figures in his life, his mother's constant struggle with depression, and his longing for acceptance. After hearing this testimony, as well as all the other mitigating evidence, the three-judge panel concluded that the mitigating factors included: (1) Fautenberry's "past history"; (2) his "abuse[] as a child"; (3) the "rage of his childhood"; (4) his abuse of drugs and alcohol; and (5) his "low self-esteem and rejection." The omitted mitigation evidence of Fautenberry's depression, his family's history of depression, and his abusive childhood mirrors the evidence actually presented at the sentencing hearing, and therefore its omission cannot be held to have prejudiced his mitigation defense. *See Broom*, 441 F.3d at 410. Furthermore, the three-judge panel had already heard some evidence about the sexual nature of the murders. At the guilt phase, the prosecutor had informed the court that prior to Fautenberry's murder of Farmer in New Jersey, Fautenberry agreed to have sex with him in exchange for money. *See Gillard v. Mitchell*, 445 F.3d 883, 896 (6th Cir. 2006) (stating that the sentencer was "privy" to evidence introduced during the guilt phase of trial and that counsel need not reintroduce it during the sentencing hearing). Thus, the court was aware that at least one of Fautenberry's murders contained a sexual element, and, to the extent that Fautenberry relies upon this already-disclosed evidence, we find that it is cumulative and insufficient to establish prejudice.

Inclusion of the non-cumulative evidence (i.e., evidence of organic brain damage and the sexual nature of some of the murders) — which purportedly would have explained his impulsive and violent nature, inability to tolerate frustration, and sexual confusion — does not create "a reasonable probability that . . . the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *See Strickland*, 466 U.S. at 695. Furthermore, we question whether evidence of the sexual nature of the murders is even mitigating. The three-judge panel might just as well have viewed Fautenberry's apparent strategy of preying on gay victims as an aggravating factor. Nor do the side-effects of organic brain damage significantly mitigate Fautenberry's actions. According to Fautenberry's medical reports, "[b]rain impairment of the sort . . . apparent in . . . Fautenberry's case can . . . cause serious problems in such areas of day-to-day functioning as impulse control[,] modulation of affect[,] planning[,] problem-solving[,] and the capacity to tolerate frustration." It is highly unlikely that this sort of evidence would have altered the three-judge panel's decision to impose the death sentence for Fautenberry's murder of Daron, which they found was "contemplated and calculating" — a conclusion that is not at all mitigated or reduced by the traits associated with or the side effects of organic brain disorder. In short, when we aggregate all the mitigating evidence, including Fautenberry's brain disorder and the sexual nature of the crimes (to the extent that those are even mitigating), and reweigh this evidence against the aggravating factors, we find that "these mitigating factors pale before the simple fact that [Fautenberry's] actions were plotted, vicious, persistent[,] and utterly callous," which was the finding

of the three-judge panel. Accordingly, even if trial counsel rendered deficient performance, we find that those deficiencies did not prejudice Fautenberry.[4]

## B.    Trial Counsel's Alleged Conflict of Interest

Fautenberry next contends that one of his trial counsel labored under a conflict of interest, which rendered his assistance per se ineffective and violated Fautenberry's Sixth Amendment rights. Fautenberry argues that attorney Michael Walton had a conflict of interest because he was a trustee for Anderson Township, the township in which Daron's body was found; as a trustee, Walton had a fiduciary duty to the citizens of that township to ensure that the criminal laws were upheld; and Walton's duty to the citizens of that township conflicted with his duty to Fautenberry. The state trial court addressed this claim, contained in Fautenberry's petition for post-conviction relief, and found the following facts: (1) "No evidentiary documents demonstrate that Anderson Township or the Anderson Township Trustees had an interest in the outcome of [Fautenberry's] trial"; and (2) "No evidentiary documents demonstrate that service as a Township Trustee hampered [Fautenberry's] attorneys in any way." The state appellate court determined that, "absent evidence of an actual conflict, there is no presumption of prejudice arising from the mere fact that defense counsel also serves in some capacity as a public official." *Fautenberry*, 1998 WL 906395, at *5. The court then rejected Fautenberry's claim, finding that Fautenberry had "not presented any evidence to support the conclusion that Walton's position on the board [of trustees] in any way influenced his ability to defend Fautenberry at trial." *Id.*

A habeas petitioner asserting an ineffective-assistance claim generally must show that his counsel's performance was deficient and that the deficiency resulted in prejudice. *Strickland*, 466 U.S. at 687. But a habeas petitioner can establish an ineffective-assistance claim without having to show prejudice if he demonstrates that his counsel labored under an "actual conflict" of interest. *See Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980); *Strickland*, 466 U.S. at 692 ("Prejudice is presumed only if [the petitioner] demonstrates that counsel actively represented conflicting interests and that an actual conflict of interest adversely affected his lawyer's performance.") (quotations omitted). "An 'actual conflict,' for Sixth Amendment purposes, is a conflict of interest that adversely affects counsel's performance." *Mickens v. Taylor*, 535 U.S. 162, 171 n.5 (2002).

Fautenberry has not established an "actual conflict." He does not challenge the state court's factual findings that "[n]o evidentiary documents demonstrate that . . . the Anderson Township Trustees had an interest in the outcome of [his] trial" or that "[n]o evidentiary documents demonstrate that service as a Township Trustee hampered [his] attorneys in any way." *See* 28 U.S.C. § 2254(e)(1) (providing that "a determination of a factual issue made by a [s]tate court shall be presumed to be correct" unless the habeas petitioner "rebut[s] the presumption of correctness by clear and convincing evidence"). After independently reviewing the record, we find that Fautenberry has failed to demonstrate that his "counsel actively represented conflicting interests" or that any alleged conflict "adversely affected his lawyer's performance." *See Strickland*, 466 U.S. at 692. Accordingly, we find this claim baseless.

---

[4] At one point in his brief, Fautenberry implies that the state court's denial of his ineffective-assistance claim was contrary to the Supreme Court's decision in *Rompilla v. Beard*, 545 U.S. 374 (2005). This argument is wholly meritless. Federal law for purposes of AEDPA is defined as "the holding, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decisions." *Williams*, 529 U.S. at 412. First, *Rompilla* was decided in 2005, long after Fautenberry had concluded his proceedings in state court. Second, the holding in *Rompilla* is inapposite here. Contrary to Fautenberry's argument, the Court in *Rompilla* did not hold that counsel, even though faced with his client's uncooperative and obstructive behavior, rendered deficient performance by failing to conduct additional mitigation investigation. The court made no such statement, holding instead that "the lawyers were deficient in failing to examine the court file on [the petitioner's] prior conviction." *Rompilla*, 545 U.S. at 383.

**C.      The Prosecution Withheld Material Exculpatory Evidence in Violation of *Brady***

Fautenberry next argues that the prosecution withheld material exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). The State argues that this claim has been procedurally defaulted. A claim is procedurally defaulted and is thus unreviewable by a federal habeas court where the "habeas petitioner fail[ed] to obtain consideration of [that] claim by a state court . . . due to [his] failure to raise that claim before the state courts while state-court remedies [were] still available." *Seymour v. Walker*, 224 F.3d 542, 549-50 (6th Cir. 2000). Fautenberry admits that he did not present his *Brady* claim to the state courts, but argues that the prosecution's failure to disclose the evidence is both the cause of and the prejudice resulting from the default. *See Wainwright v. Sykes*, 433 U.S. 72, 87 (1977) (discussing "cause" and "prejudice"). A habeas petitioner shows "cause" where he demonstrates that he failed to raise a constitutional issue because it was "reasonably unknown to him" at the time. *Amadeo v. Zant*, 486 U.S. 214, 222 (1988). The district court found that most of the challenged *Brady* evidence had not been disclosed to Fautenberry during his state-court proceedings, and the State does not directly dispute the "cause" element. Thus we will assume without deciding that Fautenberry satisfied that element.

The question of whether we may excuse Fautenberry's procedural default, therefore, turns on the issue of prejudice. "Prejudice, for purposes of procedural default analysis, requires a showing that the default of the claim not merely created a possibility of prejudice to the defendant, but that it worked to his actual and substantial disadvantage, infecting his entire trial with errors of constitutional dimensions." *Jamison v. Collins*, 291 F.3d 380, 388 (6th Cir. 2002) (citing *United States v. Frady*, 456 U.S. 152, 170-71 (1982)). Procedural default analysis on the issue of prejudice mirrors *Brady* materiality analysis, *see id.*, so in determining whether Fautenberry has procedurally defaulted his *Brady* claim, we will follow the Supreme Court's example and proceed under a *Brady* materiality analysis. *See Strickler v. Greene*, 527 U.S. 263, 282 (1999). Evidence is deemed material for purposes of *Brady* "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). In a case such as this, involving a guilty or no-contest plea, the habeas petitioner may establish prejudice by showing that there is a reasonable probability that, but for the non-disclosure of evidence, "he would not have [entered his plea] and would have insisted on going to trial." *See Hill v. Lockhart*, 474 U.S. 52, 59 (1985). Alternatively, he can show that the findings and decision by the three-judge panel "would have been different." *Bagley*, 473 U.S. at 436. Our analysis must consider the totality of the undisclosed evidence, not each item in isolation. *Id.*

Fautenberry contends that the prosecution failed to produce five categories of exculpatory evidence: (1) evidence suggesting that FBI Agent Ott violated Fautenberry's Fifth Amendment right to counsel by contravening the rule announced in *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981) (upon requesting counsel, an accused may not be subjected to further questioning until counsel is provided, unless the accused reinitiates the questioning); (2) evidence indicating that the State of Ohio lacked jurisdiction and that venue was improper in Hamilton County, Ohio; (3) evidence demonstrating that victim Joseph Daron had verbal arguments with his girlfriend and another friend just prior to his disappearance; (4) evidence relating to the sexual nature of the murders; and (5) evidence indicating that Fautenberry was depressed and suicidal just prior to the murders. For the following reasons, we find that Fautenberry has failed to establish that any of this evidence is material for purposes of *Brady*.

First, the undisclosed documents concerning Fautenberry's interaction with Agent Ott do not establish an *Edwards* violation. Fautenberry was arrested on May 16, 1991, and sometime during the following day, while in police custody, he invoked his Fifth Amendment right to counsel. According to *Edwards* and its progeny, an accused in police custody who has invoked his Fifth Amendment right to counsel is protected from further police questioning so long as "the accused himself [does not] initiate[] further communication, exchanges, or conversations with the police."

*Edwards*, 451 U.S. at 484-85; *see also Van Hook v. Anderson*, 488 F.3d 411, 415 (6th Cir. 2007) (*en banc*). Here, the evidence shows that it was Fautenberry himself who initiated communications with Agent Ott, after invoking his right to counsel. Sometime in the evening of May 17, 1991, a few hours after asking to speak with a lawyer, Fautenberry called Agent Ott and left a message indicating that he wanted to talk. At this point, Fautenberry had clearly initiated further communications with the police, and Agent Ott did not violate Fautenberry's Fifth Amendment right to counsel by questioning him at that time. The alleged *Brady* evidence shows only that Agent Ott returned Fautenberry's call a few hours later and left a message stating that Fautenberry should call him if he still wanted to talk. After waiting for two hours without hearing from Fautenberry, Agent Ott called the jail, made arrangements to visit Fautenberry, spoke with Fautenberry (apparently without any objection or refusal on the part of Fautenberry), and received Fautenberry's confession to the four murders.

Fautenberry contends that this newly discovered evidence establishes an *Edwards* violation. We disagree. Fautenberry's mere failure to return Agent Ott's call and "confirm" his desire to speak does not negate Fautenberry's prior, unambiguous initiation of further communication. To be sure, had Fautenberry reinvoked his Fifth Amendment right to counsel after initiating communication with Agent Ott, he would have been protected from further questioning, but Fautenberry does not assert that he did so and the alleged *Brady* evidence does not demonstrate that he did so. In order to invoke one's Fifth Amendment right to counsel, the "suspect must unambiguously request counsel," meaning that "he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Davis v. United States*, 512 U.S. 452, 459 (1994) (holding that an ambiguous mention of an attorney is not a request for counsel). The alleged *Brady* evidence does not indicate that Fautenberry renewed his request for an attorney, unambiguously or otherwise, and is therefore insufficient to establish an *Edwards* violation or to require the suppression of his confession to Agent Ott. Moreover, all of the events that transpired during this time were known to Fautenberry and there is no basis for assuming that the non-disclosure of this evidence affected his decision to enter his no-contest plea. *See Bagley*, 473 U.S. at 682.

Second, the undisclosed evidence does not establish that Ohio lacked jurisdiction or that Hamilton County was not the proper venue for prosecution. The state court found that Fautenberry entered Daron's car at "the on-ramp to [Interstate] 275 off of Highway 125," *see Fautenberry*, 1994 WL 35023, at *2, which is located to the east of Cincinnati, near the border of Hamilton County, Ohio, and Clermont County, Ohio. The state court concluded that Daron drove north on Interstate 275 to a destination "some ten miles north of Milford, Ohio," *see id.,* and dropped Fautenberry at a "restaurant near the junction of Interstate 71," *see Fautenberry*, 650 N.E.2d at 880. The state court determined that Fautenberry shot Daron at this location, *see id.,* which is in Hamilton County, Ohio; and that Fautenberry dumped Daron's body on the north bank of the Ohio River, near the intersection of Highway 52 and Interstate 275, *see Fautenberry*, 1994 WL 35023, at *2, which is also in Hamilton County, Ohio. The body was later found in this general vicinity. It is therefore clear, based on the facts as found by the state court, that Ohio had jurisdiction over this murder, *see* Ohio Rev. Code §§ 2901.11(A)(1), 2901.11(B) (stating that a "person is subject to criminal prosecution and punishment in [Ohio] if . . . [t]he person commits an offense under the laws of [Ohio], any element of which takes place in [Ohio]," and that the elements of a homicide offense "include[ ] the act that causes death"), and that Hamilton County was the proper venue. *See* Ohio Rev. Code § 2901.12(A) (noting that venue is proper "in the territory of which the offense or any element of the offense was committed"). None of the proffered *Brady* material rebuts any of these factual findings by clear and convincing evidence; thus we must presume that these factual findings are correct. *See* 28 U.S.C. § 2254(e)(1).

Fautenberry argues that two pieces of evidence indicate that the murder occurred in the Commonwealth of Kentucky. First, the prosecutor, in his recitation of the facts during the plea

hearing, stated that the murder occurred at "a restaurant and motel parking lot just past the junction of I-71 and I-275." Fautenberry emphasizes that Interstate 275 — a highway that circles Cincinnati — and Interstate 71 intersect twice, once in the State of Ohio and once in the Commonwealth of Kentucky. This argument, of course, entirely ignores the overwhelming evidence indicating that Daron picked up Fautenberry in an eastern suburb of Cincinnati, Ohio, and drove north to Columbus, Ohio. This one arguably ambiguous statement by the prosecutor is woefully insufficient to rebut the abundant evidence indicating that this murder occurred near the intersection of Interstate 275 and Interstate 71 in Hamilton County, Ohio. Second, a psychiatric report, which contains a second-hand account of Fautenberry's description of the murder, states that Fautenberry "drove to Kentucky[,] pulled over[,] . . . [and] shot the man in the chest a couple of times." This hearsay statement is contradicted by all the evidence in the record and does not amount to clear and convincing evidence to rebut the state court's factual findings.

The alleged *Brady* evidence consists of FBI intra-department communications indicating uncertainty about jurisdiction and venue, and instructing the officers to obtain more evidence on these issues. These documents do not establish that jurisdiction or venue were proper elsewhere; at best, they call these issues into question. Even if we were to assume, as alleged by Fautenberry, that this evidence creates a genuine ambiguity as to the location of the murder, both jurisdiction and venue would nevertheless be proper in Hamilton County, Ohio. Ohio law provides that "[w]hen the offense involves the death of a person, and it cannot reasonably be determined in which jurisdiction the offense was committed, the offender may be tried in the jurisdiction in which the dead person's body or any part of the dead person's body was found." Ohio Rev. Code § 2901.12(J). It is undisputed that Daron's body was found on the north bank of the Ohio River in Hamilton County, Ohio. Therefore, even if the evidence as to the location of the murder were unclear, both jurisdiction and venue would lie in Hamilton County. We conclude that this evidence was not material because it did not establish an error in jurisdiction or venue.

The remainder of the alleged *Brady* evidence — evidence regarding Daron's arguments prior to his disappearance, the sexual nature of the murders, and Fautenberry's depression and suicidal inclinations — is not material for *Brady* purposes. In fact, the evidence is virtually insignificant in light of the overwhelming evidence both of guilt (i.e., the confessions to Agent Ott, Officer Nelson, and Ms. Priest-Herndon and the physical evidence connecting Fautenberry to Daron's murder) and the sentencing specifications (i.e., the three-judge panel's finding that the "mitigating factors pale before the simple fact that [Fautenberry's] actions were plotted, vicious, persistent[,] and utterly callous"). Considering as we must the cumulative effect of all the alleged *Brady* evidence, we conclude that Fautenberry has failed to establish a "reasonable probability" that the disclosure of this evidence would have altered either his decision to enter a no-contest plea or the three-judge panel's sentence of death. *See Bagley*, 473 U.S. at 682. Because this evidence is not material under *Brady*, Fautenberry cannot show prejudice to excuse his procedural default. *See Jamison*, 291 F.3d at 388. And because Fautenberry cannot establish prejudice to excuse his procedurally defaulted *Brady* claim, he is not entitled to habeas relief on that basis.[5]

---

[5] Fautenberry's *Brady* claim with regard to most of this evidence fails for an additional reason: The *Brady* rule applies only to evidence that was "known to the prosecution but *unknown to the defense*." *United States v. Agurs*, 427 U.S. 97, 103 (1976) (emphasis added); *see also United States v. Mullins*, 22 F.3d 1365, 1371 (6th Cir. 1994). Regardless of his guilt in the commission of the murders, Fautenberry knew the details about his interaction with Agent Ott and his own state of mind (i.e., his depression and suicidal tendencies). Furthermore, by pleading no contest, Fautenberry admitted the facts charged in the indictment, so he also knew the location where he shot Joseph Daron and any pertinent sexual aspects of the murders. With the lone exception of the evidence pertaining to Joseph Daron's relationships, Fautenberry or his counsel had knowledge of all this "undisclosed evidence."

## D.    Ineffective Assistance of Trial Counsel During the Pretrial Preparation and Plea Hearing

Fautenberry argues that his trial counsel rendered ineffective assistance during their pretrial preparation and at the plea hearing. In his habeas petition, Fautenberry presents three subparts to this ineffective-assistance claim: (A) counsel failed to engage in an adequate investigation, (B) counsel provided him with erroneous information regarding the implications of pleading no contest to the charges against him, and (C) counsel failed to hold the prosecution to its burden of proof at the plea hearing. The district court determined that each subpart of this ineffective-assistance claim had been procedurally defaulted. The court granted Fautenberry a certificate of appealability only on Subparts A and C, so we do not address the allegations asserted under Subpart B.

The State argues that we should affirm the district court's conclusion that Fautenberry procedurally defaulted this claim. A habeas petitioner procedurally defaults a claim where "a state procedural rule . . . prevents the state courts from reaching the merits of the petitioner's claim." *Seymour*, 224 F.3d at 549-50. Federal courts must consider four factors when determining whether a habeas petitioner has procedurally defaulted a claim. *Gonzales v. Elo*, 233 F.3d 348, 353 (6th Cir. 2000); *see also Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986).

> First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule. Second, the court must decide whether the state courts actually enforced the state procedural sanction. Third, the court must decide whether the state procedural forfeiture is an "adequate and independent" state ground on which the state can rely to foreclose review of a federal constitutional claim.

*Jacobs v. Mohr*, 265 F.3d 407, 417 (6th Cir. 2001) (quoting *Maupin*, 785 F.2d at 138) (alterations omitted). "Once the court determines that a state procedural rule was not complied with and that the rule was an adequate and independent state ground," the court must move to the fourth factor. *Maupin*, 785 F.2d at 138. The fourth factor allows a petitioner to avoid or excuse procedural default if he demonstrates "that there was cause for him to not follow the procedural rule and that he was actually prejudiced by the alleged constitutional error." *Id.* (quotation omitted).

Under Subpart A of this claim, Fautenberry contends that his counsels' performance was deficient because: (1) they did not interview a sufficient number of the prosecution's potential witnesses, (2) they did not object to venue in Hamilton County, and (3) they did not file a motion to suppress Fautenberry's confession to Agent Ott. Fautenberry presented this claim to the state court in his petition for post-conviction relief, but he alleged only that counsel were ineffective because they failed to object to venue; he did not challenge counsels' failure to interview a sufficient number of witnesses or to file a suppression motion. Because Fautenberry undeniably did not present these allegations to the state courts, we find that the district court correctly held that they were procedurally defaulted. *See Seymour*, 224 F.3d at 549-50.

The state appellate court addressed the only allegation presented to it, namely, that counsel did not object to venue, and held, pursuant to *State v. Cole*, 443 N.E.2d 169 (Ohio 1982), that "this is a claim which could and should have been raised by Fautenberry on direct appeal and is, therefore, barred by the doctrine of res judicata." *Fautenberry*, 1998 WL 906395, at *3. In *Cole*, the Ohio Supreme Court held that res judicata is a proper basis upon which to dismiss an ineffective-assistance claim in a petition for post-conviction relief where a defendant who is represented by new counsel on direct appeal fails to raise that claim and the basis for that claim "could fairly be determined without examining evidence outside the record." 443 N.E.2d at 171. We have in the past recognized that Ohio's application of res judicata pursuant to *Cole* is an actually enforced, adequate and independent state ground upon which the Ohio state courts consistently refuse to

review the merits of a defendant's claims. *See Byrd v. Collins*, 209 F.3d 486, 521-22 (6th Cir. 2000) ("Ohio state courts consistently invoke *Cole* and apply res judicata when a defendant, who is represented by new counsel on direct appeal, fails to raise at that stage of the litigation an ineffective assistance of trial counsel claim appearing on the face of the record."); *see also Mapes v. Coyle*, 171 F.3d 408, 421 (6th Cir. 1999) (rejecting the habeas petitioner's attempt to "demonstrate Ohio's wavering commitment to its procedural default rules"). We therefore conclude that Fautenberry has procedurally defaulted the allegation that counsel failed to object to venue. In short, then, Fautenberry has procedurally defaulted all the claims of deficiency raised in Subpart A.[6]

Even if we were to conclude that Fautenberry did not procedurally default Subpart A of this ineffective-assistance claim, we would find it to be without merit. First, Fautenberry argues that his counsel did not interview a sufficient number of the prosecution's potential witnesses. Noting that his attorneys billed most of their investigation time in one-hour increments, he surmises that they were not interviewing any of the out-of-state witnesses. This argument is based on sheer speculation; it does not account for the reasonable inference that counsel interviewed some of the witnesses (including out-of-state witnesses) via phone. Fautenberry does not indicate how many witnesses were actually interviewed or how many more should have been interviewed. Fautenberry has the burden of establishing his counsel's deficiency, and this speculative argument is insufficient to support an ineffective-assistance claim. Second, Fautenberry cannot establish that he was prejudiced by counsel's failure to raise the venue issue because the evidence overwhelmingly indicated that the murder occurred in Hamilton County and, to the extent that the evidence was less than conclusive on this issue, venue was proper in the jurisdiction where Daron's body was found, which was Hamilton County. *See* Ohio Rev. Code § 2901.12(J). Finally, Fautenberry cannot establish prejudice from counsel's failure to file a motion to suppress the statements made to Agent Ott because he cannot prove that conversation was improper, as there is no evidence of an *Edwards* violation. *See Edwards*, 451 U.S. at 484-85.

In Subpart C of this claim, Fautenberry alleges that his trial counsel should not have stipulated to the prosecution's evidence at the plea hearing. Fautenberry readily admits that he did not raise that portion of his claim on direct appeal or during post-conviction proceedings, but contends that he preserved this issue by raising it in his motion for reconsideration with the Ohio Supreme Court and his application for reopening with the Ohio Court of Appeals. Both Fautenberry's motion for reconsideration with the Ohio Supreme Court and his application for reopening with the court of appeals alleged ineffective assistance of *appellate* counsel. This claim, on the other hand, alleges ineffective assistance of *trial* counsel. The district court correctly concluded that the allegations in Fautenberry's motions for reconsideration and reopening, which argued only ineffective assistance of appellate counsel, did not fairly present his ineffective assistance of trial counsel claim to the state court, and that Fautenberry had defaulted Subpart C of this claim.

### E.    Waiver of Right to a Jury Trial During the Penalty Phase of the Proceedings

Fautenberry argues here that although he waived his right to a jury trial during the guilt phase of his proceedings, he did not waive his right to a jury trial during the penalty phase. The substance of this argument is entirely different from the "waiver of jury trial" argument he presented to the state trial court in his petition for post-conviction relief, in which he alleged that: (1) his attorneys failed to gain his trust and thus failed to provide him with the necessary information regarding his

---

[6] Fautenberry argues that because most of the evidence supporting the allegations in Subpart A of this ineffective-assistance claim was the alleged *Brady* evidence, the prosecution's failure to provide him with this evidence constitutes the cause and prejudice to excuse his procedural default. Because, as already noted, Fautenberry's *Brady* claim lacks merit, that claim cannot constitute cause and prejudice to excuse procedural default.

constitutional rights; (2) his attorneys provided him with incorrect information about the waiver; and (3) he was psychologically and mentally unable to waive his right to a jury trial. The state trial court made the following findings of fact: (1) "[Fautenberry] was competent when the jury waiver occurred"; (2) "[Fautenberry] acknowledged discussing the [waiver] with both attorneys"; and (3) "[t]he court went over the law regarding the waiver and the proceedings before a three[-]judge panel with petitioner[,] and petitioner acknowledged that he fully understood what he was doing." The state trial court concluded that this claim "could have been raised at trial or on direct appeal" and therefore was "barred by res judicata." The state appellate court, however, did not consider whether this claim was procedurally barred, but addressed the merits of the claim and rejected it because "the record on review show[ed] that Fautenberry was engaged in a colloquy by the judge[] and indicated squarely that he understood that he was waiving his right to a jury trial and that no promises had been made to him." *Fautenberry*, 1998 WL 906395, at *7.

In his habeas petition, Fautenberry argues that he did not waive his right to a jury trial on the penalty phase of his prosecution. This claim that he did not knowingly waive his right to be sentenced by a jury is materially different from the claim he raised in the state court, which challenged his competence and knowledge in connection with the waiver of his right to a trial by jury and did not distinguish between the waiver of his right to a jury at the guilt phase and the waiver of his right to a jury at the penalty phase. The argument Fautenberry raises in these habeas proceedings, on the other hand, effectively concedes that he waived his right to a jury trial but contends that he did not knowingly or voluntarily waive his right to be sentenced by a jury.

Before us, the State argues that Fautenberry's claim that he did not waive his right to a jury trial on the penalty phase has been procedurally defaulted because the state court applied res judicata and refused to address the merits. "In determining whether state courts have relied on a procedural rule to bar review of a claim, we look to the last reasoned opinion of the state courts . . . ." *Mason v. Mitchell*, 320 F.3d 604, 635 (6th Cir. 2003). Because the state appellate court's decision is the "last reasoned opinion of the state courts," we must look to that decision. That decision, however, did not mention res judicata but addressed the merits of the waiver claim that Fautenberry raised in his post-conviction proceedings. But that decision did not address at all the claim that Fautenberry makes in his habeas petition and in this appeal, because Fautenberry never presented that claim to the state post-conviction courts. We therefore conclude that although the State's reason for claiming procedural-default argument is incorrect, this claim is nonetheless defaulted. *See Seymour*, 224 F.3d at 549-50.

Even if we were to reach the substance of this claim, we would find it to be without merit. Fautenberry has not presented, and we have not discovered, any Supreme Court precedent establishing that a capital defendant has a constitutional right to be sentenced by a jury in state court. Fautenberry argues, relying on *Hicks v. Oklahoma*, 447 U.S. 343 (1980), that Ohio statutory law creates a right to be sentenced by a jury and that the Fourteenth Amendment protects that right. Fautenberry's reliance on *Hicks* is misplaced. In *Hicks*, it was undisputed that the defendant had a statutory right to be sentenced by the jury; the issue in that case was whether the state court violated the defendant's due process rights by restricting the jury's discretion through a habitual-offender statute that was later declared to be unconstitutional. *Id.* at 345-46. Here, however, Fautenberry did not have a statutory right to be sentenced by a jury. The applicable Ohio statute states:

> [I]f the offender is found guilty of both the [aggravated murder] charge and one or more of the specifications, the penalty to be imposed on the offender . . . shall be determined by one of the following:

> (a)    By the panel of three judges that tried the offender upon the offender's waiver of the right to trial by jury;

(b)      By the trial jury and the trial judge, if the offender was tried by jury.

Ohio Rev. Code § 2929.03(C)(2) (1981).[7]  *See also* Ohio R. Crim. Pro. 11(c)(3).

Fautenberry clearly and expressly waived his right to a jury trial. His waiver stated: I, John Fautenberry, . . . hereby knowingly, intelligently[,] and voluntarily waive and relinquish my right to a trial by Jury, and elect to be tried by a Judge of the Court in which the said cause be pending." The trial court explained Fautenberry's rights and asked him if it was his desire to knowingly, intelligently, and voluntarily relinquish his right to a jury trial; he responded in the affirmative. The trial court also informed Fautenberry that if his waiver were accepted and if he pleaded guilty to the charges against him, he would be sentenced by a three-judge panel (rather than a jury). We find, as did the state court, that Fautenberry knowingly and voluntarily waived his right to a jury trial. We conclude further that he did not have a statutory right (let alone a constitutionally protected right) to be sentenced by a jury. This case, therefore, is distinguishable from *Hicks*, and we find no basis upon which to grant habeas relief.

## F.      Knowing and Voluntary Nature of the No-Contest Plea

Fautenberry next argues that he did not knowingly or voluntarily enter his no-contest plea. The state trial court, in resolving Fautenberry's petition for post-conviction relief, made the factual finding that "the plea was properly accepted," and arrived at the legal conclusion that the plea was knowingly, intelligently, and voluntarily entered. The state appellate court, in affirming the trial court's decision, evaluated Fautenberry's three evidentiary bases for this claim: (1) the affidavit of mitigation specialist, Dr. Shorr, which stated that defense counsel failed to "maintain a positive, working relationship with . . . Fautenberry"; (2) documents concerning Fautenberry's psychological condition prior to his plea; and (3) Fautenberry's own affidavit stating that his attorneys did not adequately apprise him of the consequences of his plea. *Fautenberry*, 1998 WL 906395, at *6. The court concluded that Dr. Schorr's opinion was insufficient to rebut the abundant evidence in the record demonstrating that his plea was knowingly and voluntarily entered. *Id.* at *7. The court found the documents concerning his psychological condition to be unpersuasive because he "was twice found competent to stand trial." *Id.* And the court refused to give much weight to Fautenberry's self-serving affidavit. *Id.*

A guilty or no-contest plea involves a waiver of many substantial constitutional rights, *see Boykins v. Alabama*, 395 U.S. 238, 243 (1969), and a court may accept a guilty or no-contest plea only where it is a "voluntary[,] . . . knowing, intelligent act[] done with sufficient awareness of the relevant circumstances and likely consequences," *see Brady v. United States*, 397 U.S. 742, 748 (1970). On appeal, Fautenberry asserts that his plea was not knowing and voluntary for four reasons: (1) his trial counsel incorrectly informed him that if he pleaded no contest, the three-judge panel would not learn that he committed other murders, the three-judge panel would perceive his no-contest plea as mitigating, and he would preserve his right to appeal the denial of his pretrial motions; (2) he was unaware of exculpatory evidence impermissibly withheld by the prosecution (i.e., the alleged *Brady* evidence); (3) he suffered from serious mental illnesses at the time of his plea; and (4) during the plea colloquy, the court "was disorganized[,] . . . failed to [engage] in a meaningful dialogue," and failed to correct the misinformation provided by trial counsel.

Each asserted basis for this claim is without merit. First, aside from Fautenberry's unsubstantiated, self-serving affidavit, there is no evidence in the record indicating that trial counsel incorrectly advised him of the implications of entering a no-contest plea. During the plea colloquy,

---

[7] The quoted passage was in effect at the time of Fautenberry's trial and sentencing in 1992. The current statute, amended as of 1995, is identical.

trial counsel indicated that they "explained to [Fautenberry] in detail what the plea of no contest means" and that "he underst[ood] . . . that by pleading no contest . . . he [was] in essence giving up [a] substantial number of rights, particularly those that may be available to him at the appellate level if he were to go to trial." We agree with the state courts that Fautenberry's own self-serving affidavit is insufficient to rebut the contrary evidence in the record or to undermine the knowing and intelligent nature of his plea. Second, we have already concluded, in the context of the *Brady* claim, that there is no reasonable likelihood that the disclosure of the undisclosed evidence would have altered Fautenberry's decision to enter his plea because that evidence was not material to his defense. Third, none of the psychological evidence indicates that Fautenberry was mentally incapable of understanding, appreciating, and waiving his constitutional rights, and he does not challenge the state court's finding that he was twice found competent to stand trial. Fourth, and most importantly, the state court's plea colloquy was methodical and thorough, not "disorganized" or "failing to result in a meaningful dialogue" as alleged by Fautenberry. And, at the plea hearing, Fautenberry indicated that he did not have any questions about his rights. In sum, we reject this claim as unfounded, and instead agree with the state court that Fautenberry knowingly and voluntarily waived his rights during the entry of his guilty plea.

## G.    Admission of Victim Impact Evidence

Fautenberry argues that the state court violated his Eighth Amendment rights by admitting victim-impact evidence. Fautenberry specifically challenges the admission of statements from Daron's friends and family recommending that he receive the maximum available sentence: (1) Daron's ex-wife stated that Fautenberry "should receive the maximum possible sentence"; (2) Daron's father stated that Fautenberry is "an animal with no conscience" and that "the maximum possible sentence is the only appropriate punishment"; and (3) Daron's supervisor at work stated that Fautenberry committed "an extremely brutal offense" and he "should receive a maximum penalty." The Ohio Supreme Court addressed this argument on direct appeal and found "error in the admission of . . . the victim-impact statements [that] relate to sentencing recommendations." *Fautenberry*, 650 N.E.2d at 882. The court nevertheless was "not persuaded that such error warrant[ed] reversal" because there was no indication that the three judges who sentenced Fautenberry "contemplated or relied upon the victim-impact evidence which was available to them." *Id.*

In *Booth v. Maryland*, 482 U.S. 496, 509 (1987), the Supreme Court held that the introduction of victim-impact evidence "at the sentencing phase of a capital murder trial violates the Eighth Amendment." *Id.* Just a few years later, however, the Court retreated from this holding, declaring that "if the State chooses to permit the admission of victim impact evidence . . . , the Eighth Amendment erects no *per se* bar." *Payne v. Tennessee*, 501 U.S. 808, 827 (1991). The *Payne* Court noted that it overturned only that part of *Booth* that disallowed "evidence . . . relating to the victim and the impact of the victim's death on the victim's family." *Id.* at 830 n.2. The Court did not disturb that portion of *Booth* that forbids "a victim's family members' characterization and opinions about the crime, the defendant, and the appropriate sentence." *Id.*; *see also Welch v. Sirmons*, 451 F.3d 675, 703 (10th Cir. 2006) (recognizing that many circuits have found that this portion of *Booth*'s holding "survived the ruling in *Payne* and remains valid"). We agree with the Ohio Supreme Court that the state trial court erred in admitting this evidence.

The issue, then, is whether the Ohio Supreme Court's reasoning that this error did not "warrant reversal" was contrary to or involved an unreasonable application of Supreme Court precedent. Fautenberry argues that the Ohio Supreme Court's decision was an unreasonable application of *Booth* because it employed a sort of "harmless error" analysis, whereas *Booth* did not require the defendant to demonstrate "actual prejudice."

We find helpful the Tenth Circuit's decision in *Hain v. Gibson*, 287 F.3d 1224, 1239-40 (10th Cir. 2002), and our unpublished decision in *Brewer v. Anderson*, 47 F. App'x 284, 287-88 (6th

Cir. 2002) (unpublished case). In *Hain*, the Tenth Circuit noted that "[t]he decision in *Booth* does not expressly indicate whether the Court believed such errors to be trial errors subject to harmless error review, or structural error[s] requiring automatic reversal." *Hain*, 287 F.3d at 1239 n.11. The *Hain* court thus concluded that the state court in its case did not "unreasonably appl[y] *Booth* in concluding that such errors [were] subject to harmless error review." *Id.* In *Brewer*, we reviewed, as we do here, the admission of victim-impact evidence before a three-judge panel. The Ohio Supreme Court, both in *Brewer* and in the present case, relied on *State v. Post*, 513 N.E.2d 754, 759 (Ohio 1987), which states: "Absent an indication that the panel was influenced by or considered the victim impact evidence in arriving at its sentencing decision, the admission of the victim impact statement . . . did not constitute prejudicial error." *Id.* And both here and in *Brewer*, the Ohio Supreme Court found no indication that the three-judge panel considered or contemplated the victim-impact evidence available to them.[8] We concluded in *Brewer*, 47 F. App'x at 288, that the state court's application of *Booth* was not unreasonable and we reach the same conclusion here.

"An *unreasonable* application of federal law is different from an *incorrect* application of federal law," *Woodford*, 537 U.S. at 25 (quotation marks omitted); in order to grant habeas relief under the "unreasonable application" clause, we must determine that "the state court's application of clearly established federal law [was] objectively unreasonable," *Cone*, 535 U.S. at 694. Contrary to Fautenberry's argument, *Booth* does not indicate whether the erroneous admission of victim-impact evidence warrants automatic reversal or whether such errors are subject to harmless-error review. *See Hain*, 287 F.3d at 1239 n.11. Therefore, the Ohio Supreme Court's decision to engage in a form of harmless-error analysis does not constitute an unreasonable application of *Booth* because *Booth* did not address that issue.

Moreover, we question whether *Booth* even applies here. *Booth* involved the improper admission of victim-impact evidence to a jury, whereas this case involves the improper admission of victim-impact evidence to a three-judge panel. The Court in *Booth* was greatly concerned that the victim-impact evidence might (1) "distract the sentencing jury from its constitutionally required task [of] determining whether the death penalty is appropriate in light of the background and record of the accused and the particular circumstances of the crime," *Booth*, 482 U.S. at 507, (2) "divert the jury's attention away from the defendant's background and record[] and the circumstances of the crime," *id.* at 505, or (3) "create an impermissible risk that the capital sentencing decision will be made in an arbitrary manner." *Id.* Those considerations are severely diminished — if not entirely obviated — when the sentencer is a judge or a three-judge panel, rather than a lay jury. We conclude that *Booth* has minimal relevance when the victim-impact evidence is presented to a three-judge panel, *see Brewer*, 47 F. App'x at 287-88 (affirming, as a reasonable application of Supreme Court precedent, the Ohio Supreme Court's conclusion that "*Booth* does not apply to situations where a defendant is tried by a three-judge panel rather than a jury"), and hold that the Ohio Supreme Court did not unreasonably apply Supreme Court precedent.

## H.    Ineffective Assistance of Appellate Counsel

Fautenberry contends that he received ineffective assistance of counsel during his direct appeal to the state court of appeals. The district court found that this claim had been procedurally defaulted because Fautenberry did not present it to the state appellate court in a timely application

---

[8] As we noted in *Brewer*, the Ohio Supreme Court's finding that there was no indication that the three-judge panel relied on the victim-impact evidence was a "factual finding that is presumed to be correct under the AEDPA." *See Brewer*, 47 F. App'x at 288. Fautenberry has failed to challenge this factual finding on appeal, much less to establish that it was clearly erroneous, and our review of the record persuades us that the finding is correct. *See Cooey v. Coyle*, 289 F.3d 882, 910-11 (6th Cir. 2002) (affirming the district court's giving deference to the Ohio Supreme Court's factual finding that there was "no affirmative indication that the victim impact statements were considered in sentencing [the petitioner] to death").

for reopening, which is the proper procedure in Ohio for raising ineffective assistance of appellate counsel claims.

The State urges us to affirm the district court's conclusion that this claim has been procedurally defaulted. Under Ohio law, a criminal defendant must raise his ineffective assistance of appellate counsel claim in an application for reopening (i.e., a motion for delayed reconsideration) filed "in the court of appeals where the alleged error took place." *State v. Murnahan*, 584 N.E.2d 1204, 1209 (Ohio 1992). Ohio App. R. 26(B)(1) states that an application for reopening "shall be filed in the court of appeals where the appeal was decided within ninety days from journalization of the appellate judgment unless the applicant shows good cause for filing at a later time." The state court of appeals rejected Fautenberry's direct appeal in February 1994, and the Ohio Supreme Court denied his appeal in 1995. In January 1996, after the conclusion of Fautenberry's direct appeal, the state court appointed new counsel to represent Fautenberry during his post-conviction proceedings. In March 1996, Fautenberry, through his new counsel, filed a motion for reconsideration with the Ohio Supreme Court, alleging ineffective assistance of appellate counsel during his direct appeal to that court; the motion was denied in May 1996. In July 1996, Fautenberry filed an application for reopening with the state court of appeals, asserting ineffective assistance of appellate counsel during his direct appeal to the court of appeals. The court of appeals denied that application because Fautenberry "failed to demonstrate that there [was] good cause for filing []his application more than two years after th[e] court's judgment was journalized." The court further reasoned that Fautenberry could have raised the issue of ineffective assistance of appellate counsel in his "previous application for reopening in the Supreme Court" and "provided no explanation as to why the application of res judicata would be unjust." The Ohio Supreme Court affirmed this decision in April 1997 "for the same reasons articulated by the court of appeals." *Fautenberry*, 677 N.E.2d at 1195.

We hold that Fautenberry has procedurally defaulted this claim. The state appellate court denied his direct appeal in February 1994, and Fautenberry waited more than two years to file his application for reopening with that court. Fautenberry demonstrated good cause for not filing his application prior to January 1996, because until that point he was represented by the same counsel on appeal and we conclude that it would be unreasonable to expect counsel to raise an ineffective assistance claim against himself. But Fautenberry did not show good cause for failing to file his application until July 1996, six months after the appointment of new counsel. Additionally, he did not explain why he failed to raise this claim in his motion for reconsideration filed with the Ohio Supreme Court in March 1996. We conclude that Fautenberry did not comply with the timeliness requirements in Ohio App. R. 26(B) and that those time constraints are an actually enforced, adequate and independent state ground upon which the Ohio courts consistently refuse to address ineffective assistance of appellate counsel claims. *See Coleman v. Mitchell*, 244 F.3d 533, 539-40 (6th Cir. 2001) (finding that the petitioner procedurally defaulted his claim because he failed to comply with the requirements in Ohio App. R. 26(B)); *Wickline v. Mitchell*, 319 F.3d 813, 823 (6th Cir. 2003) (finding that the petitioner's ineffective assistance of appellate counsel claims were procedurally defaulted because he failed to comply with the rule set forth in *Murnahan*).

Fautenberry argues that the timeliness requirements in Ohio App. R. 26(B) are not "adequate and independent" state grounds upon which to find that his claims have been procedurally defaulted. *Maupin*, 785 F.2d at 138. "To be adequate, a state procedural rule must be firmly established and regularly followed . . . ." *Hutchison v. Bell*, 303 F.3d 720, 737 (6th Cir. 2002) (quotation marks omitted). Fautenberry relies on our decision in *Franklin v. Anderson*, 434 F.3d 412, 418-21 (6th Cir. 2006), to argue that an untimely application for reopening pursuant to Ohio App. R. 26(B) is not a "firmly established and regularly followed" procedural rule, *id.* at 418, particularly emphasizing the *Franklin* court's statement that "[a] review of the relevant case law reveals that the Ohio Supreme Court has been erratic in its handling of untimely Rule 26(B) applications in capital cases." *Id.* at 420. Fautenberry wishes to elevate this statement to an all-encompassing, ever-applicable legal proposition that will forever (or at least for a very long time) bar the federal courts from finding that

an ineffective assistance of appellate counsel claim has been procedurally defaulted where the state court refused to address the merits of that claim because of the time constraints in Ohio App. R. 26(B). But the "firmly established and regularly followed" inquiry cannot be made once and for all. Instead we must consider whether the "adequate and independent state procedural bar . . . [was] 'firmly established and regularly followed' *by the time as of which it [was] to be applied*." *Ford v. Georgia*, 498 U.S. 411, 424 (1991) (emphasis added). *Cf. Rogers v. Howes*, 144 F.3d 990, 994 n.5 (6th Cir. 1998) ("[T]he question is not whether the state courts consistently apply the procedural bar in the *present*."). Put differently, we ask "whether, at the time of the petitioner's actions giving rise to the default, the petitioner could . . . be deemed to have been apprised of the rule's existence." *Hutchison*, 303 F.3d at 737 (quotations and alterations omitted).

We find that, as of the time that Fautenberry should have filed his application for reopening (i.e., when he acquired new counsel in January 1996), the time constraints in Ohio App. R. 26(B) were firmly established and regularly followed, and he was or should have been apprised of the rule's existence. The *Franklin* decision is not to the contrary. To begin with, the facts in that case are materially different from those here. In *Franklin*, the defendant had filed his application for reopening with the court of appeals one year after the Ohio Supreme Court issued its decision in *Murnahan* and just prior to the effective date of Ohio App. R. 26(B). The Ohio procedural rule in effect at the time *Murnahan* was decided required that such an application be filed within ten days from the entry of the opinion for which reconsideration was sought; *Murnahan* itself did not set any time frame within which such an application was required to be filed, but opined that courts should take a more lenient approach with regard to the time for filing. Ohio App. R. 26(B) was then created to provide the time frame for these applications. As we observed in *Franklin*, at the time Franklin filed his application for delayed reconsideration, the law regarding the time period within which ineffective assistance of appellate counsel claims were required to be filed was unclear. But we specifically noted in *Franklin* that "[f]or several years following the enactment of amended Rule 26(B) [in July 1993], the Ohio Supreme Court regularly enforced the rule's timeliness requirements." *Franklin*, 434 F.3d at 420 (citing a string of Ohio Supreme Court cases).

Fautenberry's circumstances are significantly different from those in *Franklin*. Fautenberry did not obtain new counsel (and thus cannot be held responsible for failing to file an application for reopening) until January 1996, which is almost four years after *Murnahan* was decided, and two-and-a-half years after Ohio App. R. 26(B) became effective. By that time, the 90-day time limit in Ohio App. R. 26(B) was clearly established and Fautenberry was or should have been apprised of its existence. Nevertheless, after obtaining his new counsel, Fautenberry waited six months — during which he filed a motion for reconsideration with the Ohio Supreme Court in which he could have raised this claim but did not— before filing his application for reopening. We conclude that the holding of *Franklin* — in which the court stated that "Rule 26(B) is not an adequate and independent state rule that can preclude consideration of Franklin's ineffective assistance of appellate counsel claim," *id.* at 421 — is inapplicable here. Fautenberry has procedurally defaulted his ineffective assistance of appellate counsel claim.

But even if this claim was not procedurally defaulted, it must fail because it is meritless. A defendant is entitled to effective assistance of counsel during his first appeal of right, *Evitts v. Lucey*, 469 U.S. 387, 396 (1985), but effective assistance does not require counsel to raise every nonfrivolous argument on appeal, *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983). "[O]nly when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of [appellate] counsel be overcome." *Monzo v. Edwards*, 281 F.3d 568, 579 (6th Cir. 2002).

Fautenberry argues that his appellate counsel rendered ineffective assistance because they raised only seven issues on direct appeal, and, more specifically, they failed to present four allegedly meritorious claims on appeal: (1) the trial court's failure to review evidence as required by Ohio Crim. R. 11(C)(3); (2) ineffective assistance of trial counsel; (3) Ohio's discriminatory method for

selecting grand-jury forepersons; and (4) the fact that Fautenberry was forced to wear shackles in the presence of the trial court. The mere fact that appellate counsel confined their appeal to seven issues does not establish that counsel were ineffective; it is often best to filter out less meritorious issues so that counsel can emphasize those that present the best opportunity for relief on appeal. *See Jones*, 463 U.S. at 752 ("There can hardly be any question about the importance of having the appellate advocate examine the record with a view to selecting the most promising issues for review."). And the four "ignored issues" were not "clearly stronger than those presented." The first of the four appears to be baseless. Contrary to Fautenberry's argument, the trial court did in fact review evidence as required by Ohio Crim. R. 11(C)(3); most notably, the prosecutor introduced and the trial court reviewed the transcripts of Fautenberry's confessions to Agent Ott, Officer Nelson, and Ms. Priest-Herndon. We have already concluded that the second omitted issue — i.e., ineffective assistance of trial counsel — is baseless. The third omitted claim, which alleges the impropriety of Ohio's selection of grand-jury forepersons, was not apparent from the record on direct appeal, and thus we do not fault appellate counsel for failing to raise that claim. Moreover, the case upon which Fautenberry relies to challenge Ohio's grand-jury foreperson selection process, *Campbell v. Louisiana*, 523 U.S. 392, 398 (1998), was not decided until 1998, long after Fautenberry's direct appeal had concluded. Finally, the fourth omitted claim — that Fautenberry was prejudiced by the wearing of shackles before the trial court — would not have had any merit on direct appeal because under Ohio law the appellate court "presum[es] that in a bench trial in a criminal case[,] the court consider[s] only the relevant, material, and competent evidence in arriving at its judgment unless it affirmatively appears to the contrary." *Post*, 513 N.E.2d at 759.

**III.**

After carefully reviewing the record and evaluating Fautenberry's arguments on appeal, we conclude that the district court properly denied Fautenberry's petition for habeas relief. Accordingly, we **AFFIRM** the judgment of the district court.

### DISSENT

KAREN NELSON MOORE, Circuit Judge, dissenting. When an attorney calls forward an expert, especially an expert asked to provide mitigating evidence when a defendant's life hangs in the balance, the attorney has an obligation to ensure that the expert knows about that which she speaks. When the majority declares that "[w]e will not find counsel deficient simply because they did not succeed in discovering his brain damage or pursue unspecified, alternate avenues (which may or may not have revealed the brain damage)," Maj. Op. at 6, they find no fault in the actions of counsel who, in the face of numerous indicators of brain damage, inexcusably failed to ensure that their expert actually tested for the organic brain disorder that she claimed to be unable to find. I believe that the majority's elevation of form over substance wrongly excuses ineffective assistance of counsel; simply presenting an expert who is a doctor does not absolve counsel from an obligation to grasp the bare rudiments of the expert's testimony. Because I conclude that Fautenberry's counsel was ineffective in the penalty stage of his trial, I respectfully dissent.

In order to establish ineffective assistance of counsel on post-conviction review, "[f]irst, petitioner must show that 'counsel's representation fell below an objective standard of reasonableness.' Second, petitioner must show that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Darden v. Wainwright*, 477 U.S. 168, 184 (1986) (citations omitted) (quoting *Strickland v. Washington*, 466 U.S. 668, 668, 694 (1984)).

Because this case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), codified principally at 28 U.S.C. § 2254(d), we can grant relief only if the state-court proceedings "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). However, where "the state court did not assess the merits of a claim properly raised in a habeas petition, the deference due under AEDPA does not apply." *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003). I believe that Fautenberry has established both deficient performance of counsel and that the deficient performance prejudiced the mitigation phase of his trial. Furthermore, I conclude that the Ohio courts' determination that his counsel was not deficient was contrary to clearly established federal law.

### I. Deficient Performance of Counsel

Despite the majority's attempts to portray Fautenberry's claim as a simple question of whether or not his counsel exerted the appropriate level of effort in investigating potential mitigation defenses, this case actually presents a different question: Does counsel have an obligation to ensure that their own expert witness has fully investigated whether the defendant suffers from an organic brain impairment before the expert witness can testify that he does not? While the majority is content to state that "any inadequacies in Dr. Schmidtgoessling's expert assistance . . . cannot be the basis for a meritorious ineffective-assistance claim," Maj. Op. at 6, I believe that simply hiring any so-called expert, regardless of the quality of the expert's work, does not entitle counsel to a free pass with regards to their own performance at the mitigation phase.

### A. Notice of Brain Damage

When defense counsel is on notice of past incidents that would suggest brain damage, "[w]e can conceive of no rational trial strategy that would justify the failure of [defense] counsel to investigate and present evidence of his brain impairment . . . ." *Frazier v. Huffman*, 343 F.3d 780,

794 (6th Cir. 2003) (discussing how counsel did no investigation into the presence of an organic brain impairment after learning from medical records that the defendant fell from a ladder), *cert. denied,* 541 U.S. 1095 (2004). In this case, however, we are not asked to decide whether counsel investigated—Fautenberry's counsel did seek psychiatric evaluations from both Dr. Nancy Schmidtgoessling ("Dr. Schmidtgoessling") and Dr. James Tanley ("Dr. Tanley")—instead we must peer into the adequacy of counsel's investigation.

"In assessing counsel's performance, a court must thus consider whether counsel adequately followed up on the 'leads' that were available to them." *Haliym v. Mitchell,* 492 F.3d 680, 712 (6th Cir. 2007). One such lead for defense attorneys is a history of head injuries; "head injuries were a 'red flag' to those in the area of psycho-social investigation, signifying the need for additional testing . . . ." *Id.* at 710 (crediting an expert's view regarding the salience of a defendant's head injuries). For instance, in *Haliym,* "Petitioner's attorneys were on notice that Petitioner had shot himself in the left temple, which should have strongly suggested the need to investigate whether Petitioner had a mental defect." *Id.* at 714.

Fautenberry's counsel, while perhaps lacking the smoking gun of a brain injury present in *Haliym,* certainly had ample notice of the stark facts of Fautenberry's life that strongly suggested the possibility of brain damage. First, his counsel was aware that physical abuse was a frequent element in Fautenberry's childhood. Fautenberry suffered abuse at the hands of several people over the course of his youth. *See, e.g.,* J.A. at 649 (Mitig. Hr'g of Sept. 14, 1992, Unsworn Stmt. of John J. Fautenberry at 277:3-18); J.A. at 652 (Fautenberry at 280:7-23). A family friend testified that one abuser, Donald Langdon, "back-handed [Fautenberry]'s head against the wall several times. [Fautenberry] would appear disoriented after Donald hit him." J.A. at 1996 (Aff. of Kenneth Corcoran at ¶ 4). The abuse was so frequent "[a]ccording to [Fautenberry's sister], she and [Fautenberry] grew up thinking that getting hit was normal." J.A. at 2190 (Aff. of Pamela Swanson at ¶ 14).

In addition to the abuse, there were two physically traumatic events that are strongly suggestive of the possibility of brain damage. The first incident was when Fautenberry "was hit in the back of the head by a wooden swing, and his recollection is that he lost consciousness, although for an uncertain amount of time." J.A. at 1916 (Neuropsychological Evaluation by Dr. Jeffery L. Smalldon at 8). Of the incident, one observer recalled that "when [Fautenberry] was around seven years old, he got hit on the head with a swing. [Fautenberry] bled profusely. He was taken to a local hospital in Norwichtown, Connecticut. It was around the time of the injury that [Fautenberry]'s behavior changed. [Fautenberry] became mean to the people around him." J.A. at 2185-86 (Aff. of Louise Corcoran at ¶ 20). Fautenberry may have been unconscious for up to seven hours and may have suffered a fractured skull, J.A. at 1917 (Dr. Smalldon at 9), but some records suggest that the damage may have been less severe, *see* J.A. at 1974 (Rep. of Med. Hist.) (noting that the swing injury resulted in neither a concussion nor a fracture). Regardless of the exact details, the incident still provided notice to Fautenberry's attorneys of the possibility of an organic brain defect.

"The second major head trauma occurred when [Fautenberry] was in his late-teens and serving in the U.S. Navy. He reports that he was laying flat atop a pontoon, reaching down over the side to retrieve a cigarette from a lower level, when his head became wedged in between the side of the pontoon and an approaching ship. He recalls that he was unable to breath [sic], and that he fully expected that his head was about to be crushed." J.A. at 1917 (Dr. Smalldon at 9). After the incident, military doctors took x-rays of Fautenberry's skull and found no sign of a fracture. J.A. at 1977 (Med. Rec.).

The last element that might have served as a red flag for Fautenberry's counsel is the presence of mental illness in his family. Fautenberry's mother took anti-depressants, J.A. at 2188

(Swanson at ¶ 5), and Fautenberry's grandmother "suffered from mood swings," J.A. at 2185 (Louise Corcoran at ¶ 18).

None of these elements—the abuse, the traumatic head injuries, or the family history—are conclusive of anything. When combined with Fautenberry's "history of intermittent, severe headaches," J.A. at 1916 (Dr. Smalldon at 8), however, it should have established for his attorneys that an investigation into Fautenberry's mental health was of paramount importance for the mitigation phase of his trial. Indeed, it appears that Fautenberry's attorneys were not unaware of the issue; Fautenberry's counsel requested neuropsychological testing because "it is suggested that the Defendant may be suffering from some organic impairment or underlying organic disorder." J.A. at 915 (Mot. for Neurological Exam.). In response to his counsel's request, the trial court ordered Dr. Schmidtgoessling to conduct a neurological examination, J.A. at 1065 (Entry Ordering Neurological Exam.), and authorized funds for a psychologist and a mitigation expert, J.A. at 1066 (Granting Mot. to Employ Dr. Tieger); J.A. at 1067 (Granting Mot. to Employ Dr. Shorr). Simply requesting neuropsychological testing, however, does not in itself guarantee that counsel's performance was effective.

## B. An Obligation to Investigate

Many of the cases that have found ineffective assistance of counsel at the mitigation phase are cases where the defendant's attorneys failed to invest even a minimal amount of time into discovering a brain defect when they were alerted to the real possibility that one might exist. Such a "complete failure to investigate mitigating evidence constitutes ineffective assistance of counsel." *Mason v. Mitchell*, 320 F.3d 604, 620, 626 (6th Cir. 2003); *see also Morales v. Mitchell*, 507 F.3d 916, 931-35 (6th Cir. 2007) (finding ineffective assistance when trial counsel failed to conduct interviews with various family members and friends, each possessing mitigating evidence). Thus, this court has found ineffective assistance of counsel when the defendant's attorneys were told that there was a potential mental-health issue but never consulted with any mental-health expert, *see Harries v. Bell*, 417 F.3d 631, 638 (6th Cir. 2005), and when "Petitioner's counsel . . . failed to diagnose Petitioner's brain injury, despite the fact that they knew or should have known that Petitioner shot himself in the head," because the defendant's attorneys never provided the defendant with an independent psychiatric analysis, *Haliym*, 492 F.3d at 715-16.

Just because the starkest examples of counsel's failures are the ones most likely to find disapprobation by this court does not mean that counsel is ineffective *only* when they fail to do the most minimal investigation. Instead, there is a sliding scale for evaluating counsel's obligation to investigate. On the one hand, the duty to investigate does not encompass a duty to overturn every stone in the pursuit of every remote possibility; "reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Rompilla v. Beard*, 545 U.S. 374, 383 (2005). On the other hand, "[c]ounsel's constitutional duty to investigate a defendant's background in preparation for the sentencing phase of a capital trial is 'well-established.'" *Harries*, 417 F.3d at 637 (quoting *Coleman v. Mitchell*, 268 F.3d 417, 449 (6th Cir. 2001)). Furthermore, that the defendant could be sentenced to death "magnifies counsel's responsibility to investigate." *Id.*; Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, Guideline 10.7 Commentary (Am. Bar Ass'n, Rev. Ed. 2003) ("2003 Guidelines") ("This duty [to investigate] is intensified (as are many duties) by the unique nature of the death penalty . . . .").[1]

---

[1] The Supreme Court "long ha[s] referred [to these ABA Standards] as guides to determining what is reasonable." *Rompilla*, 545 U.S. at 387 (second alteration in original) (internal quotation marks omitted) (quoting *Wiggins v. Smith*, 539 U.S. 510, 523 (2003)). "Considering counsel's performance in light of the current ABA Guidelines is proper despite the fact that the ABA Guidelines were issued well after Petitioner's trial, as the ABA

In applying this sliding scale for evaluating counsel's duty, the importance and relevance of the potential topic for investigation can make counsel's obligation "particularly pressing," *Rompilla*, 545 U.S. at 386, while the difficulty in obtaining or the speculative nature of the potential information may mean that counsel is less culpable for a failure to investigate. *See id.* at 386 n.4. Thus, in *Rompilla*, the Supreme Court found ineffective assistance of counsel when the Court concluded that the existence of numerous red flags made the potential existence of an extreme emotional disturbance more than remote speculation and of great significance for the defendant's case. *See Rompilla*, 545 U.S. at 392-93.

In the instant case, the possibility that Fautenberry suffered from an organic brain defect was certainly not rampant speculation given all of the red flags that Fautenberry's counsel should have noticed. Accordingly, Fautenberry's counsel were not under some cursory obligation to investigate the potential for brain damage but were instead under a significant and pressing obligation to do so.

## C. Fautenberry's Counsel's Investigation

Although Fautenberry's counsel were under a significant and pressing obligation to pursue the possibility that their client suffered from an organic brain defect, I conclude that they failed to live up to their obligation. The mitigation testimony that they presented on Fautenberry's mental condition was that of Dr. Schmidtgoessling. In order to evaluate Fautenberry, Dr. Schmidtgoessling conducted a series of tests: "I did a Raven, which is a kind of a screening test for certain lines of organic functioning. A Bender, MMPI, Trails A and B, all those things looking at his intellectual and cognitive functioning. I did an MMPI. That was the bulk of the information that we had in terms of preparing our evaluation of Mr. Fautenberry." J.A. at 669 (Mitig. Hr'g of Sept. 14, 1992, Unsworn Stmt. of Dr. Schmidtgoessling at 297:12-18).

On the basis of her evaluation, Dr. Schmidtgoessling stated her conclusion in no uncertain terms: "In short, the available psychological testing yielded no signs suggestive of organic impairment." J.A. at 1275 (Dr. Schmidtgoessling Rep. at 3). Fautenberry's counsel, for inexplicable reasons, did their best to impress this conclusion upon the sentencing panel; twice on direct examination, Fautenberry's counsel prompted Schmidtgoessling to reaffirm her conclusion. J.A. at 669 (Hr'g, Dr. Schmidtgoessling at 297:23-24) ("As far as I could tell there were no signs of organic impairment . . . "); J.A. at 672-73 (Hr'g, Dr. Schmidtgoessling at 300:24-301:3) ("As an adult now, you know, in terms of a psychological description, I would say that there is no sign of any major mental disorder. We are not talking of any schizophrenia or manic depression, nothing like that."). The government, in contrast, actually elicited a more favorable analysis from Dr. Schmidtgoessling, provoking her to admit that Fautenberry did suffer from "a severe personality disorder but not as I understand it a disease or defect." J.A. at 684 (Hr'g, Dr. Schmidtgoessling at 312:21-24). On redirect, again Fautenberry's attorneys provoked Dr. Schmidtgoessling to emphasize her adverse conclusion:

> Q.   Mr. Tolbert asked you about the mental disease or defect and your testimony
>      was that John Fautenberry is not bipolar, correct?
>
> A.   Correct.
>
> Q.   He is not Schizo?

---

Guidelines represent 'a codification of longstanding, common-sense principles of representation understood by diligent, competent counsel in death penalty cases.'" *Haliym*, 492 F.3d at 717 n.28 (quoting *Hamblin v. Mitchell*, 354 F.3d 482, 487 (6th Cir. 2003)).

A.  Correct.

Q.  He does not have this mental disease or defect, is that correct?

A.  The way I understand that term, that's right.

Q.  Now I'm sure there are other mental diseases and defects than the two I have mentioned, is that correct?

A.  That pretty well covers it, though.

Q.  Okay, so to qualify for this section under mental disease or defect I almost have to be cubbyholed into that, is that accurate, I have to have one of those two?

A.  Yeah.

J.A. at 694-95 (Hr'g, Dr. Schmidtgoessling at 322:15-323:8). Fautenberry's counsel, therefore, while under an obligation to investigate fully the possibility that Fautenberry may have an organic mental defect, concluded that there was no defect and presented a witness during the mitigation phase who impressed that conclusion upon the sentencing panel three separate times.

## D. Use of Dr. Schmidtgoessling was Defective Assistance of Counsel

Fautenberry's counsel's reliance upon the testimony of Dr. Schmidtgoessling was defective. My objection to their reliance on her testimony, however, is not that counsel repeatedly emphasized adverse testimony, nor is it about the accuracy of her analysis; instead, I believe that her testimony was problematic because Fautenberry's counsel failed to possess even a rudimentary grasp of Dr. Schmidtgoessling's work sufficient to assess whether her conclusion was fairly grounded in her testing.

On post-conviction review, Fautenberry has presented the opinion of Dr. Jeffrey Smalldon ("Dr. Smalldon") to establish that Dr. Schmidtgoessling's testing was insufficient to support her conclusion:

> In fact, however, no recognized neuropsychological test battery was ever performed, and thus there was not available a sufficient body of data to justify a conclusion—one way or the other—about the presence of brain impairment. *No professional with specialized training and experience in neuropsychological assessment would expect to learn from the limited battery of tests administered by Dr. Schmidtgoessling whether Mr. Fautenberry is brain impaired.* [The tests Dr. Schmidtgoessling administered] do not at present enjoy widely-accepted status even as effective means of 'screening for' organic brain impairment, and that data derived from this battery, while perhaps suggestive, is not sufficient to rule out the presence of such impairment.

J.A. at 1914 (Dr. Smalldon at 6) (emphasis added). Of course, the assertion that Dr. Schmidtgoessling's conclusion had no foundation in her testing is not true just because Fautenberry and his counsel have now found an expert willing to assert as much. We do not need to take Dr. Smalldon's word on the matter; Dr. Schmidtgoessling herself has previously admitted in another case that "neither she nor any other staff member at the court's psychiatric clinic were qualified to conduct the type of testing and evaluation that was required to diagnose Petitioner with organic brain damage for the purpose of showing the effect of that factor at mitigation." *Powell v. Collins*, 332 F.3d 376, 395 (6th Cir. 2003); *see also id.* at 384 ("Dr. Schmidtgoessling admitted that she was

'definitely not equipped' to conduct the necessary neuropsychological testing for this phase of Petitioner's case."). Thus, Fautenberry's counsel repeatedly emphasized to the sentencing panel Dr. Schmidtgoessling's conclusion of mental normalcy, which, as it turns out, she most likely had not conclusively established. Had Fautenberry's counsel been aware of the shaky foundations underlying Schmidtgoessling's conclusion, his counsel might have chosen not to provoke repeatedly her erroneous assertion and they might have continued to pursue a more conclusive determination. *See id.* at 400 ("Dr. Schmidtgoessling's inability to provide conclusive evidence regarding organic brain damage made other avenues of investigation all the more crucial.").

Counsel presenting mitigating evidence do not need doctorates in psychology to ply their craft; but just as counsel are required to have a basic understanding of forensic science when presenting forensic evidence, Fautenberry's counsel cannot call a psychologist to testify while counsel are ignorant of the foundations of her testimony and then hide behind technical psychological terms such as "MMPI" or "Trails A and B." Recently, in the context of an arson prosecution, we have held that a lawyer must possess a basic understanding of the science that underlies his witness's testimony:

> Even more importantly, it is inconceivable that a reasonably competent attorney would have failed to know what his expert was doing to test the State's arson conclusion, would have failed to work with the expert to understand the basics of the science involved, at least for purposes of cross-examining the State's experts, and would have failed to inquire about why his expert agreed with the State. *A lawyer cannot be deemed effective where he hires an expert consultant and then either willfully or negligently keeps himself in the dark about what that expert is doing, and what the basis for the expert's opinion is.*

*Richey v. Bradshaw*, 498 F.3d 344, 362-63 (6th Cir. 2007) (emphasis added) (citation omitted). Fautenberry's attorneys were thus under an obligation to understand the basic foundations of Dr. Schmidtgoessling's testimony, but they failed to fulfill this obligation.

While "'[a]n attorney is not required to be so expert in psychiatry'" so that he could diagnose a medical condition in the absence of any indicators, *Clark v. Mitchell*, 425 F.3d 270, 286 (6th Cir. 2005) (alteration in original), that does not excuse deficient attorney performance when red flags alert him to the possibility of a mental deficiency. We have repeatedly denied petitions for habeas where the petitioner attempted to blame his attorneys for failing to diagnose brain damage despite a total absence of red flags indicating the potential for any brain damage. *See, e.g., Clark*, 425 F.3d at 285 (concluding that "[i]t was not unreasonable for Clark's counsel, untrained in the field of mental health, to rely on the opinions of these professionals" who concluded that there was no brain damage); *Campbell v. Coyle*, 260 F.3d 531, 555 (6th Cir. 2001) ("Even though Dr. Chiappone as a trained psychologist failed to detect any evidence of PTSD, Campbell asks us to declare that his counsel's independent failure to make the same diagnosis is an objectively unreasonable mistake, depriving him of his Sixth Amendment right to the effective assistance of counsel. There is no evidence that Dr. Chiappone was incompetent, or that Campbell's lawyers had any reason to question Chiappone's professional qualifications.").[2]  An attorney, therefore, does not need to possess the skill to diagnose his client's hidden ailments and can generally rely on the expertise of a licensed practitioner. *See Lundgren v. Mitchell*, 440 F.3d 754, 772 (6th Cir. 2006).

---

[2] Even where there are red flags and counsel failed to investigate, we have declined to find ineffective assistance of counsel if the petitioner is unable, even during post-conviction proceedings, to produce any evidence of an organic brain defect. *See Morales*, 507 F.3d at 939; *Carter v. Mitchell*, 443 F.3d 517, 529 (6th Cir. 2006), *cert. denied*, 127 S. Ct. 955 (2007).  The case at hand, however, is not such a situation where the petitioner has failed to provide medical evidence.

For an attorney to fulfill his duty in the mitigation phase, one trained in law and advocacy need not also be expert in medicine, but a lack of training in medicine cannot excuse a failure of expertise in the law. Normally, "[c]ounsel's diligence in *obtaining* not just the constitutionally mandated single mental health expert, but two mental health experts, shows that counsel engaged in a reasonable investigation . . . ." *Lundgren*, 440 F.3d at 772. "But the mere hiring of an expert is meaningless" when counsel fails to use the expert's knowledge to understand the nature and limits of the expert's testimony. *Richey*, 498 F.3d at 362. Fautenberry's counsel could not be faulted for not diagnosing Fautenberry's mental impairments on their own, but once they decided to present a psychologist to the sentencing panel, they were under an obligation to understand the basics of their witness's testimony. *See Richey*, 498 F.3d at 362-63; *Skaggs v. Parker*, 235 F.3d 261, 269 (6th Cir. 2000) (stating that counsel had "a responsibility to present meaningful mitigating evidence" when the court concluded that it was ineffective assistance of counsel when defense attorneys called a neuropscyhologist who had falsified his credentials and whom counsel knew had previously done a laughable job at the first trial); *Driscoll v. Delo*, 71 F.3d 701, 709 (8th Cir. 1995) (holding that defense counsel was defective for failing "to understand the laboratory tests performed and the inferences that one could logically draw from the results" when challenging the state's expert). Because they failed to grasp the basics of Dr. Schmidtgoessling's testimony, I conclude that Fautenberry's counsel were defective.

This is not, in contrast to the majority's suggestion, a question of whether or not Dr. Schmidtgoessling was correct in her analysis. Instead, the question should be whether Fautenberry's attorneys were sufficiently able to evaluate the correctness of Dr. Schmidtgoessling's analysis. Had Fautenberry's counsel been better equipped to scrutinize Dr. Schmidtgoessling's testimony and recognized the need for further investigation, they might have discovered evidence of an organic brain impairment. Fautenberry has now presented the statement of one medical professional who has reached quite a different conclusion than Dr. Schmidtgoessling: "It is my opinion, offered with reasonable psychological certainty, that Mr. Fautenberry is brain impaired." J.A. at 1922 (Dr. Smalldon at 14). Dr. Smalldon concluded that the impairment was only "mild," but added that it was "by no means insignificant. 'Mild' when used as a descriptive adjective in this context only serves to differentiate one classification of brain injury from other classifications where the associated deficits might be even more dramatically apparent." J.A. at 1922-23 (Dr. Smalldon at 14-15). According to Dr. Smalldon, "[b]rain impairment of the sort that is clearly apparent in Mr. Fautenberry's case can also cause serious problems in such areas of day-to-day functioning as impulse control; modulation of affect; planning; problem-solving; and the capacity to tolerate frustration." J.A. at 1923 (Dr. Smalldon at 15). Thus, there was readily available to Fautenberry's attorneys significant mitigating evidence, and the failure to collect and present readily obtainable evidence of this sort is classified as nothing short of an "abdication of advocacy." *Powell*, 332 F.3d at 399-400.

## E. Fautenberry's Uncooperative Behavior

The majority would excuse any failure on the part Fautenberry's counsel on the basis that Fautenberry refused to cooperate with Dr. Tanley. As the majority declares: "Had Fautenberry not impeded Dr. Tanley's examination, the doctor presumably would have discovered, verified, and revealed any such brain damage." Maj. Op. at 6. The fault, however, for any failure to discover Fautenberry's brain damage, given all of the red flags in his medical history, cannot be placed at the feet of a man who is supposedly mentally impaired. Instead, aware of the various indicators of an organic brain impairment, it was solely the responsibility of Fautenberry's attorneys to pursue zealously evidence of an impairment.

The American Bar Association's ("ABA") Guidelines that establish the appropriate conduct for defense counsel in death-penalty cases specifically state that mitigating evidence must be pursued "regardless of any statement by the client that evidence bearing upon penalty is not to be collected

or presented." 2003 GUIDELINES, Guideline 10.7(A)(2); *id.* at Guideline 10.7 commentary ("The duty to investigate exists regardless of the expressed desires of a client."); GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES, Guideline 11.4.1(C) (Am. Bar Ass'n, 1983) ("1983 GUIDELINES"). While the majority would excuse otherwise deficient performance when counsel claims that their client made it difficult for them to find mitigating evidence, the ABA demands that defense counsel go beyond the barriers that their client may erect. The ABA even recognizes that when pursuing mitigating evidence, "[o]btaining such information typically requires overcoming considerable barriers, such as shame, denial, and repression, as well as other mental or emotional impairments from which the client may suffer." 2003 GUIDELINES, 10.7 commentary. While the ABA recognizes the challenges that defense counsel may face and exhorts counsel to continue pursuing mitigating evidence in the face of those challenges, the majority condones a half-hearted effort.

Our precedent, like the ABA guidelines, also directs counsel to persevere in the search for mitigating evidence despite difficulties that the defendant may himself create. For instance, the Supreme Court found ineffective assistance of counsel when the defendant was "even actively obstructive by sending counsel off on false leads." *Rompilla*, 545 U.S. at 381. Similarly, we have noted that "'defendant resistance to disclosure of information does not excuse counsel's duty to independently investigate.'" *Harries*, 417 F.3d at 638 (quoting *Coleman*, 268 F.3d at 449-50). In a case where we noted that "[t]rial counsel cannot be faulted for their client's lack of cooperation," *Lorraine v. Coyle*, 291 F.3d 416, 435 (6th Cir. 2002), *cert. denied*, 538 U.S. 947 (2003), neither could we fault trial counsel for a lack of effort; in that case, counsel arranged for an EEG, a CAT Scan, and an MRI, and counsel persisted in eventually obtaining the test results even when the defendant initially refused. Similarly, in *Byrd v. Collins*, 209 F.3d 486 (6th Cir. 2000), *cert. denied*, 531 U.S. 1082 (2001), counsel was not held responsible when the defendant refused to allow a psychologist or psychiatrist to interview him, *id.* at 526-27, because there were no red flags indicating the potential for brain damage and increasing counsel's obligations. As I have already stated, counsel does not have an obligation to pursue outlandish leads; however, when there are indicators of a significant, potential mitigating defense, counsel has an obligation to pursue it.

Regardless of whether or not there was a breakdown in communication between Fautenberry and his attorneys, his attorneys remained obligated to investigate fully the potential presence of an organic brain impairment. It is my conclusion, therefore, that Fautenberry has established that his counsel were defective: his counsel was on notice that there was a significant possibility of brain damage, they were under an obligation to investigate fully that possibility, they failed to comprehend the basic scientific limits of Dr. Schmidtgoessling's testimony, and their failure is not excused by Fautenberry's uncooperative actions.

The last court in Ohio to address Fautenberry's ineffective-assistance claims was the Court of Appeals for Ohio's First District considering Fautenberry's petition for state-postconviction relief. The state court addressed only whether Fautenberry's counsel was defective and concluded that Fautenberry's resistance to meeting with Dr. Tanley precluded any finding of defective performance. *See* J.A. at 2325-29 (Op. of Dec. 31, 1998 at 3-7). The court stated that counsel's failure to do more, "even if true, does not make the consequences of Fautenberry's own recalcitrance imputable to his attorneys, nor does it cast their performance outside the 'wide range of reasonable professional assistance.'" J.A. at 2328 (Op. at 6). While the Ohio Court of Appeals's holding is clearly contrary to *Rompilla*, *Rompilla* was not decided until 2005, well after the Ohio Court of Appeals's 1998 decision. *Rompilla*, however, was only the most recent case that the Supreme Court has decided on this matter; *Strickland* and *Burger v. Kemp*, 483 U.S. 776 (1987), both held that counsel is not deficient when they fail to investigate mitigating evidence only when they reasonably believe that such efforts would be wasted. *See Burger*, 483 U.S. at 794-95; *Strickland*, 466 U.S. at 699. Although these cases do not specifically address dealing with an obstinate client, such specificity is not necessary. "[C]learly established law under [AEDPA] encompasses more than just bright-line

rules laid down by the [Supreme] Court. It also clearly includes legal principles and standards enunciated in the Court's decisions." *Taylor v. Withrow*, 288 F.3d 846, 850-51 (6th Cir.), *cert. denied*, 537 U.S. 1007 (2002). "The lack of an explicit statement" of a rule "is not determinative" because "[t]he Court has made clear that its relevant precedents include not only bright-line rules but also the legal principles and standards flowing from precedent." *Id.* at 852. Because Fautenberry's counsel could not have reasonably believed that a medical examination would have been fruitless, their obligation to pursue that evidence did not wane simply because their client was being difficult; holding otherwise is contrary to clearly established federal law.

## II. The Prejudice Resulting From Counsel's Deficient Performance

If Fautenberry is to prevail on his ineffective assistance of counsel claim, not only must he prove that his counsel were defective, but also he must show that counsel's defectiveness was prejudicial. Because the Ohio Court of Appeals did not reach this issue, we apply no deference under AEDPA. *Maples*, 340 F.3d at 436. The majority states that even if Fautenberry had presented evidence of an organic brain impairment, "[i]t is highly unlikely that this sort of evidence would have altered the three-judge panel's decision to impose the death sentence for Fautenberry's murder of Daron, which they found was 'contemplated and calculating'—a conclusion that is not at all mitigated or reduced by the traits associated with or the side effects of organic brain disorder." Maj. Op. at 7. I must disagree; we have repeatedly held that evidence of a brain impairment is very significant during mitigation. Furthermore, the sentencing panel's conclusion that the murder was "contemplated and calculating" cannot be divorced from the fact that the panel was repeatedly told that Fautenberry was mentally healthy; evidence of a brain impairment would almost certainly cast doubt on Fautenberry's abilities to contemplate and calculate and would certainly raise questions of culpability.

The hurdle for establishing prejudice is not high: "Petitioner 'need not show that counsel's deficient conduct more likely than not altered the outcome in the case,' rather, only that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Lundgren*, 440 F.3d at 770 (quoting *Strickland*, 466 U.S. at 694). "Ohio is a 'weighing' state, which means that the aggravating circumstances must outweigh the mitigating factors in order to impose the death penalty. Under federal law, one juror may prevent the death penalty by finding that mitigating factors outweigh aggravating factors. As the Supreme Court recently said in *Wiggins*, the 'prejudice' prong is satisfied if 'there is a reasonable probability that at least one juror would have struck a different balance.'" *Id.* (quoting *Wiggins v. Smith*, 539 U.S. 510, 523-28 (2003)). Although Fautenberry was sentenced by a panel of three judges and not a jury, Ohio similarly requires a panel of judges to be unanimous in a death sentence. OHIO REV. CODE ANN. § 2929.03(D)(3).

Our precedent has repeatedly emphasized the significance of evidence of an organic brain impairment during the penalty phase. In *Harries*, we held that it was reasonably probable that evidence of frontal lobe damage would have changed the sentencing outcome. *See Harries*, 417 F.3d at 641. In *Frazier*, we noted that there was a significant "probability that the jury would find that a murderer who suffers from a functional brain impairment is less morally culpable than one who does not, even if the brain impairment did not 'cause' Frazier to murder Skiba." *Frazier*, 343 F.3d at 798. And in *Glenn v. Tate*, 71 F.3d 1204 (6th Cir. 1995), we suggested that a jury's sentence would change when presented with evidence of an organic brain defect. *See id.* at 1211 ("John Glenn's sentencing proceeding can hardly be relied upon as having produced a just result when the jurors were given to understand, in the unchallenged report of Dr. Siddall, that the crime was not the product of mental retardation or organic brain disease." (footnote omitted)). Given the importance of evidence of an organic brain impairment during sentencing, I believe the only conclusion is that Fautenberry could establish prejudice in his counsel's defective performance.

### III. CONCLUSION

Given Fautenberry's history of physical abuse, headaches, and significant head injuries, his counsel had an obligation to investigate fully a potential mitigation defense of an organic brain defect. This obligation did not diminish just because Fautenberry erected obstacles to his attorneys' efforts. Had Fautenberry's attorneys scrutinized the basis of their purported expert witness's conclusion, they would have realized that they had not fully investigated the presence of brain damage as they were obligated to do. Instead, counsel were unaware of the limits of their witness's testimony and repeatedly emphasized to the sentencing panel that their client had no mental deficiencies. This was both defective and prejudicial. Accordingly, I conclude that Fautenberry has established ineffective assistance of counsel at the mitigation phase of his trial and that the Ohio Court of Appeals's holding was contrary to clearly established federal law. Therefore, I respectfully dissent.